

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th floor*
*New York, New York 10278*

June 30, 2025

**BY CM/ECF**

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Dajahn McBean*, **24 Cr. 541 (PAE)**

Dear Judge Engelmayer:

    Pursuant to the Court's June 10, 2025 Order, the Government and counsel for defendant Dajahn McBean have conferred and respectfully submit this letter regarding proposed schedules and procedures for proceeding to trial:

**Joint Proposed Schedule**

    The parties have conferred regarding a potential schedule for additional discovery productions and the filing of pretrial motions in this case. For example, the Government is in the process of producing additional discovery materials, including materials from two prior federal prosecutions of the defendant in this District and anticipates completing this production by August 1, 2025 with any additional materials produced on a rolling basis. *See United States v. Dajahn McBean*, 17 Cr. 216 (RJS); *United States v. Dajahn McBean*, 20 Cr. 226 (KPF).[1]

    The defendant's requests to the Government for additional discovery materials shall be made on a rolling basis by November 3, 2025, and the Government will respond on a rolling basis by December 15, 2025. To the extent that discovery motions are necessary, the parties agree on the following schedule:

    Discovery Motions:    January 15, 2026
    Government's Response:  February 12, 2026
    Reply:                 March 2, 2026

    With respect to pretrial motions, the Government proposes that the Court adopt a scheduling approach similar to that used by Judge Garnett in *United States v. Luigi Mangione*, 25

---

[1] The Government is also planning to produce additional discovery materials to the defendant relating to the individual identified as "Victim-1" in the Indictment, the intended target of the murder for hire and cyberstalking plot.

Cr. 176 (MMG). In that case, Judge Garnett set a deadline at the initial pretrial conference for the filing of all motions specifically addressing the death penalty, followed by a schedule for pretrial motions. The Court set a status conference several months after those motions are fully briefed to set a trial date and schedule for trial related documents. (*See* 25 Cr. 176). Consistent with that approach, the parties respectfully request that the following schedule for death penalty related motions:

> Defense Motions: September 30, 2025
> Government's Response: November 14, 2025
> Reply: January 26, 2026

Once those motions have been fully briefed, the parties would request that the Court schedule a pretrial conference would follow to set a trial schedule and address related pretrial matters, including motions in limine, jury selection procedures, and any required notices.

**Government's Submission Regarding Capital Case Procedures and Practices**

Regarding procedures and best practices, the Federal Judicial Center—a research and education agency of the judicial branch—published in April 2004 a resource guide titled "Resource Guide for Managing Capital Cases, Volume I: Federal Death Penalty Trials."[2] (the "FJC Manual"). The April 2004 resource guide contains a comprehensive summary of issues that arise in federal death penalty trials relating to appointment of counsel, pretrial management of capital cases, discovery issues, common legal challenges, jury selection issues, guilt phase proceedings in capital cases, and penalty phase proceedings. Based on the FJC Manual and the Government's experience with death penalty trials in this district and others, the following issues could be raised in advance of trial:

- Defense motions to strike the death penalty (either *per se* or as applied), and any defense motion to strike any aggravating factors or other aspects of the notice of intent to seek the death penalty. *See* FJC Manual at 25-26.

- Notice under Federal Rule of Criminal Procedure 12.2(b)(2) regarding the use of expert evidence of a mental condition during the penalty phase. *See* FJC Manual at 23-24.

- Defense motions to compel the Government to produce discovery materials for purpose of penalty phase.

- Jury Selection - Because each side receives 20 peremptory challenges under Rule 24(b) and many jurors are excluded due to their views on the death penalty, courts must summon large jury pools. Capital cases frequently use detailed juror questionnaires, either mailed in advance or distributed on-site. Voir dire is also more extensive in capital cases. Judges use general and individual questioning, especially for "death qualification." *See* FJC Manual at 35-41.

---

[2] The resource guide is available for download here: https://www.fjc.gov/content/resource-guide-managing-capital-cases-volume-i-federal-death-penalty-trials (last visited on June 20, 2025)

- Pursuant to 18 U.S.C. § 3432, the defendant is entitled to a list of the veniremen (and women), and of the Government's witnesses, including the "place of abode" for each venireman and witness, three days before commencement of trial (excluding weekends/holidays) unless the Court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person. *See* FJC Manual at 24-25.

- Amount of time between guilty phase and penalty phase. *See* FJC Manual at 46.

- Admissibility of evidence during the penalty phase, including victim impact evidence. *See* 18 U.S.C. § 3593(c) ("Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."); FJC Manual at 29-31, 53-54.

- Scope of appropriate aggravating and mitigating factors to be considered by the jury. *See* FJC Manual at 51-55.

    Special findings - 18 U.S.C. § 3593 requires the jury to return findings for any aggravating factor the government noticed and proved, including both statutory and non-statutory types. However, a jury is not required to return a finding on mitigating factors. *See* FJC Manual at 59.

**Defendant Dajahn McBean's Submission Regarding Capital Case Procedures and Practices**

As set forth above, the parties propose a schedule that sets forth filing deadlines for the first two (foundational) waves of litigation. The first wave encompasses motions related to discovery including motions for a bill of particulars, an informational outline[1] regarding the government's noticed aggravating factors, and discovery motions relating to the statutory and non-statutory aggravating factors contained in the Notice of Intent to Seek the Death Penalty, as well as for discovery relating to potential mitigating factors, including lack of future danger, and case specific discovery. The second wave encompasses the extensive, preliminary legal challenges that do not turn on the resolution of the discovery litigation, including a motion to challenge the capital-eligible counts of the indictment which allege violations of Section 249(a)(1)(B)(i) and 924(c); challenges to the constitutionality of the Federal Death Penalty Act (FDPA); any motion to strike the death notice based on the defendant's age[2], and defects in the indictment and/or prosecution as outlined in Fed. R. Crim. P. Rule 12(a)(3).

Indeed, the defense is unable to mount meaningful challenges to the government's proposed aggravating factors until it knows the contours of the proof that the government intends to rely on to establish those factors. Furnishing the defense with the information necessary to file these motions is the purpose of the informational outline that we will be asking the Court to order in the first wave of discovery motions. Attempting to craft challenges to aggravating factors in the abstract, without the benefit of this information, will result in generic pleadings that assist neither the parties nor the Court in framing the issues for decision. Such a course of action will

almost inevitably lead to unnecessary re-litigation once more detailed disclosures are made, whether the Court agrees with the overwhelming number of district courts who have found that provision of an informational outline is the most efficient way to proceed, or whether information is provided piecemeal through discovery or the disclosure of *Jencks* material.

Once the initial two waves of litigation are complete, the parties will be in a position – if necessary – to propose a realistic schedule for further proceedings that includes motions to establish procedures for trial.

At this point, it must be emphasized that at the time that the government filed its June 6, 2025, Notice of Intent to Seek the Death Penalty, there were only 52 days remaining before the July 28, 2025 trial date – which, since October 29, 2024, had been a fixed trial date. ECF No. 53. Indeed, despite having a basis to file its Notice of Intent in this case where Mr. McBean was arraigned on federal death penalty-eligible charges on or about October 17, 2024, the government did not give formal notice that it was seeking capital punishment until June 2025. It does not seem as if the government developed any new evidence that justified its decision to seek less than two months before the start of trial and clearly, from defendant's perspective, 52 days was

---

[1] Informational outlines are used to provide defense counsel with meaningful advance notice of the facts and categories of evidence the government intends to rely on to prove the aggravating factors it has alleged under *18 U.S.C. § 3593(a)*. Providing this information prior to trial streamlines the investigation and litigation necessary for defense counsel to move to exclude and/or prepare to meet such evidence in accordance with their stringent obligations as counsel in a death penalty case. For these reasons, while such an outline is not statutorily required, an overwhelming number of district courts in federal capital prosecutions have recognized their utility and ordered the government to provide them.

[2] A claim that the government is categorically precluded from seeking the death penalty due to the defendant's mental illness, in contrast, is dependent upon the completion of the extensive psychosocial history investigation and expert evaluation process that must precede an adequate understanding of a capital client's mental condition.

insufficient to permit for an adequate defense at a capital murder trial.[3]

During the 8-month period between Mr. McBean's arrest and the government's June 6, 2025 notice, only a preliminary, incomplete mitigation investigation for a potential death penalty trial was done. With less than two months before the trial, Mr. McBean's defense team's focus turned to preparation for a non-capital trial. With respect to mitigation, although a mitigation specialist was retained, there had been no appointment of any specialized mental health experts (e.g., a psychiatrist, psychologist, and neurologist with experience in capital cases), who can assess Mr. McBean both for intellectual disability[4] and for mental health mitigation. All are essential for an effective defense in a death penalty case. See *18 U.S.C. § 3005* ("learned counsel" requirement); All are essential for an effective defense in a death penalty case. *See 18 U.S.C. § 3005* ("learned counsel" requirement); GUIDE TO JUDICIARY POLICY, Vol. 7A, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 620.60.10 ("Appointment of Counsel Before Judgment");[5] *id.* at 91 (Appx. 6A, "Commentary") ("[T]he first responsibility of the court in a federal death penalty case is to appoint experienced, well-trained, and dedicated defense counsel who will provide high quality legal representation."); American Bar Association (ABA), GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA's *Guidelines*") 4.1.1("Defense Team and Supporting Services"), *reprinted in* 31 HOFSTRA L. REV. 913, 952 (2003) ("The defense team should consist of no fewer than two attorneys [qualified to handle capital cases], an investigator, and a mitigation specialist."); *id.* (Commentary), *reprinted in* 31 HOFSTRA L. REV. at 1061 ("Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively [in a capital case].").

Both the Fourth Circuit and Supreme Court have looked to the ABA's Guidelines in determining whether a capital defense attorney provided ineffective assistance of counsel. *See, e.g., Williams v. Stirling*, 914 F.3d 302, 313 (4th Cir. 2019) (citing ABA's Guidelines and *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). In addition, the Judicial Conference of the United States Courts has recommended that: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.) and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death

---

[3] Because it takes so long for the defense (and the Court) to prepare for a death penalty trial, the DOJ typically files a notice that it is seeking the death penalty long before a trial is scheduled to occur. In *Ferebe*, 332 F.3d at 725, the Fourth Circuit noted that "Ferebe presents some evidence, and the prosecution does not challenge it, that, nation-wide, federal prosecutors file Death Notices, upon authorization by the Attorney General, with an average of 8.4 months remaining before trial." 332 F.3d at 725. The average time between death penalty notices and scheduled trial dates has grown significantly since *Ferebe* was decided. During the past two decades or so, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial has been *28 months*. **Exhibit A** (declaration of Matthew Rubenstein,

Director of the Capital Resource Counsel (CRC), which is funded and administered by the Administrative Office of the U.S. Courts).

[4] *See Atkins v. Virginia*, 536 U.S. 304 (2002) (Eighth Amendment prohibits a death sentence imposed on an intellectually disabled defendant).

[5] Available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-ch06.pdf

Penalty Cases."[6] GUIDE TO JUDICIARY POLICY, Vol. 7A, Appx. 2A: Model Plan for Implementation and Administration of the Criminal Justice Act, XIV.B.10, at 26-27.[7]

The need for two counsel (including at least one learned counsel), a mitigation specialist, and appropriate expert witnesses reflects the fundamental Eighth Amendment requirement in capital cases that all relevant mitigating evidence must be admitted and considered by a capital sentencing jury. *See, e.g., Skipper v. South Carolina*, 476 U.S. 1 (1986). Similarly, the Supreme Court repeatedly has concluded that capital defense counsel provided ineffective assistance of counsel when they failed to develop or offer relevant mitigating evidence during the capital sentencing phase. *See, e.g., Wiggins v. Smith*, 539 U.S. 510 (2003). Likewise, the Supreme Court has envisioned capital defense counsel having a meaningful opportunity to defend against aggravating evidence offered by the prosecution. *See, e.g., Barefoot v. Estelle,* 463 U.S. 880, 901 (1983) (assuming that "the adversary process can[] be trusted to sort out the reliable from the unreliable evidence" about an aggravating factor, with the capital defendant having "the opportunity to present his own side of the case" in aggravation). Just like developing mitigating evidence takes substantial time, so does preparing for a defense against the prosecution's aggravating evidence. *See Le*, 316 F. Supp.2d at 353.

In the present case, the defense's incomplete preparation for a death penalty trial has occurred mostly because the government waited just 52 days before the schedule jury trial to file a notice that the government is seeking the death penalty.

This significant period of time in which little preparation for a capital trial has occurred – including without the required experts – means that the defense now must start almost entirely from scratch in preparing for a capital trial. This case is also unique in that from the start, the parties believed that it was not likely to be a death penalty case where the defense would have commenced preparation for a death defense months before the notice was filed, including hiring mitigation and mental health experts and engaging in discussions about death-qualifying a jury.

Even assuming that Mr. McBean currently had the assistance of the previously discussed experts, a substantial amount of time is still required to prepare for a death penalty trial in view of the "highly specialized and demanding litigation"[8] involved in a death penalty case. As the ABA's Guidelines recognize:

> In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the extraordinary time and effort necessary to ensure effective and zealous representation in a capital case. Studies have consistently found that

---

[6] This Court should also consider the ABA's Guidelines in determining whether the government's June 6, 2025 notice of intent to seek the death penalty was filed in a reasonably timely manner based on the facts and circumstances of this case.

[7] Available at: https://www.uscourts.gov/sites/default/files/2025-01/guide-vol07a-2.pdf

[8] GUIDE TO JUDICIARY POLICY, Vol. 7, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations, §620.30(b)(1) ("Procedures for Appointment of Counsel in Federal Death Penalty Cases").

> defending capital cases requires vastly more time and effort by counsel than noncapital matters...In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889.

ABA GUIDELINES, Commentary to Guideline 6.1 ("Workload"), reprinted in 31 HOFSTRA L. REV. at 967-68 (footnotes omitted; emphasis added); see also ABA Guideline 1.1 (Commentary to "Introduction"), reprinted in 31 HOFSTRA L. REV. at 925-26.

With respect to the capital sentencing phase, the Guidelines provide that extensive mitigation development must be done:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." At least in the case of the client, this begins with the moment of conception.

ABA Guideline 10.7 ("Investigation") (Commentary), reprinted in 31 HOFSTRA L. REV. at 1022.

The ABA's 2008 Supplemental Guidelines in detail set forth the inordinate amount of work required to prepare for a capital sentencing phase.[9]

---

[9] The Supplemental Guidelines provide, in particular, that:

The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi- generational family history, genetic disorders and vulnerabilities, as well as

multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

. . . Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to

establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

> . . . Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.
>
> . . . It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:
>
> 1. Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:
>   a. Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.
>   b. Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.
>   c. Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.
>   d. Persons with specialized knowledge of institutional life, either generally or within a specific institution.
>
> 2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:
>   a. The client's family, extending at least three generations back, and those familiar with the client;
>   b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;
>   c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;
>   d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;
>   e. Former and current neighbors of the client and the client's family, community members, and others familiar with the

neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;

f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

Of course, only preliminary work on Mr. McBean's mitigation case has begun. In a typical death penalty case, it takes learned counsel and a mitigation specialist at least one year, and often more, to effectively investigate and develop mitigation. See ABA, MODEL RULE OF PROFESSIONAL RESPONSIBILITY 1.1 ("Competence") ("Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.") (emphasis added); id., Commentary ("Competent handling of a particular matter . . . includes adequate preparation. . . . [M]ajor litigation . . . ordinarily require more extensive treatment than matters of lesser complexity and consequence.").

Further, when a capital defendant spent a portion of his childhood in a foreign country – as Mr. McBean did, in Jamaica – there is even more time-consuming mitigation work required, including foreign travel. *See generally* Scharlette Holdman & Christoper Seeds, Cultural Competency in Capital Mitigation, 36 HOFSTRA L REV. 883, 920 (2008); *see also State v. Gutierrez*, 136 Nev. 881, 477 P.3d 342 (Nev. 2020) (ruling that a capital defense attorney provided ineffective assistance by failing to travel to Mexico in order to develop mitigating evidence for his capital client, who grew up in Mexico).

Moreover, by abruptly seeking to transform the long-scheduled trial from a non-capital trial to a death penalty trial, the government also has forced the defense to reassess its past approach to preparing for the guilt-innocence phase. As the ABA's Guidelines explain:

> Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged

---

> g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.
>
> . . . It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.
>
> . . . It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray

      him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

ABA, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, *reprinted in* 36 HOFSTRA L. REV. 677, 689-92 (2008)

and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.

ABA Guideline 10.10.1 ("Trial Preparation Overall") (Commentary), reprinted in 31 HOFSTRA L. REV. at 1047-48.

**The Court Should Set a Trial Date Only When the Litigation Has Progressed Sufficiently to Permit a Realistic and Firm Date to be Set.**

While the parties actively litigate the first two waves of ligation, with the ongoing schedule and pace of that litigation being managed by the Court, the defense, as stated above, would continue the time-consuming work of conducting a mitigation investigation; analyzing the voluminous digital discovery material; and preparing for a trial with the highest possible stakes. Putting off a decision on the scheduling of a trial allows for the foundational motion practice and investigation to be completed and a realistic schedule to be more fully contemplated once that litigation is complete.

The immediate lead-up to the lengthy trial of this case will require the commitment of extraordinary time and resources above and beyond those required to be expended by the parties. Extensive time and effort will likely be required by the Court and its staff to review and decide a constant flow of motions, right up until the start of voir dire and beyond. The sheer logistics of staging a capital trial also imposes an enormous amount of extra work upon courthouse staff tasked with coordinating the courtroom and administering the court calendar. The work of the jury administrator necessarily begins months before the trial actually commences, in order to identify and summon many hundreds of potential jurors; oversee the completion of extensive written questionnaires by each of them and distribute them to the parties; coordinate with the Court and parties to handle requests for excusal on hardship and other grounds; and to ultimately ensure that a sufficient number of venirepersons are present in court on the day that voir dire begins.[10] If dictated by a trial date set a year or more in advance that ultimately proves unworkable, all of this work would be for nought. It is a significantly more efficient allocation of critical resources to complete the initial phases of motions, followed by the remainder of the pretrial litigation, and then to set a firm trial date informed by the actual pace of the litigation.

This will result in a trial that is both optimally ready for presentation to a jury and within the time frame that is typical of complex, high-profile federal capital cases such as this one and of recent capital trials conducted in this circuit that were substantially less involved.

In *United States v. Bowers*, 2:18-cr-00292-RJC-1, a Notice of Intent to Seek the Death Penalty was filed on August 26, 2019. (ECF No. 86). A trial date was eventually set in the matter to begin approximately 44 months later in April 2023. ECF No. 788. There, the government moved one month after the notice of intent was filed for the Court to impose a scheduling order

---

[10] It is worth noting that the time consuming task required before a death penalty trial can occur – preparing questionnaires for prospective jurors, sending them to prospective jurors, and then analyzing them before individual voir dire – typically takes six to eight weeks.

that included all stages of litigation up to an including a trial date. ECF No. 91. The Court denied the motion to set a trial date and set for date for the filing of initial motions only, as the defense requests here. ECF No. 110. The lifespan of the case, of course, included the period for which the nation was affected by the global coronavirus pandemic. However, extensive litigation continued throughout that period – over 220 docket entries were made in the year following the World Health Organization's declaration of a pandemic on March 11, 2020 – and so the scheduling of the matter cannot be attributed to the COVID-19 crisis.

Similarly in *United States v. Saipov*, 1:17-cr-722-VSB-1 (S.D.N.Y.), the time between notice of intent to seek the death penalty and trial was 50.8 months.

Including *Saipov*, in the most recent capital trials in the Second Circuit going back to 2011, the time from the authorization decision to the trial was an average of 36.33 months. (*See id.; and United States v. Basicano,* 1:05-cr-60-NGG-1 (E.D.N.Y.); *United States v. Azibo Aquart*, 3:06-cr-160-SRU-3 (Conn.); where the time from the death-penalty authorization to trial was 26.3 months and 31.9 months, respectively.).

Other cases in which seeking a death sentence was initially authorized and later deauthorized, proceeded on comparable schedules. For example, *in United States v. Tartaglione*, 7:16-cr-832-KMK-1 (S.D.N.Y.), following a 2016 indictment, the case was initially authorized in 2019. Once ancillary counsel issues were resolved in March 2021, the Court set a trial date for May 2023, some 22 months hence. And in *United States v. Alexis Saenz & Jario Saenz*, No. 2:16-cr-403-GRB-SIL-11 & 12 (E.D.N.Y.), following a 2017 indictment, the case was first authorized in July 2020. A trial date was set on October 6, 2023, to commence six months later in March 2024.

For the reasons stated above, the tiered approach proposed schedule proposed by the parties is the most efficient and expeditious method of completing the massive amount of pretrial litigation that will be required in this case and should therefore be adopted by the Court.

        Respectfully submitted,

        JAY CLAYTON
        United States Attorney for the
        Southern District of New York

By:     /s/
        Andrew K. Chan
        Dominic A. Gentile
        Assistant United States Attorneys
        (212) 637-1072 / 2567

cc:    Counsel of Record (by ECF)