UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

KARL SMITH,
        a/k/a "Pacavell,"

       *Defendant.*

S3 24 Cr. 541 (PAE)

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Ryan W. Allison
Dominic A. Gentile
Timothy Ly
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND...................................................................................2

    A.    The Plot to Kill Victim-1 in December 2023 ........................................2

    B.    The Aftermath of the Xscape Shooting................................................8

    C.    Communications Between January and June 2024...............................9

    D.    Instagram Posts and Messages in April and May 2025 .......................15

ARGUMENT ...........................................................................................................22

    I.    The Court Should Admit Evidence from Smith's Instagram Account as Direct Evidence of the Crimes Charged or, Alternatively, Under Rules 404(b) and 403 ............................................22

    A.    Applicable Law....................................................................................22

    B.    Discussion............................................................................................25

    II.    The Court Should Admit Victim-1's Present Sense Impressions and Excited Utterances to NYPD Officers Immediately After the Xscape Shooting ...................................................................................33

    A.    Applicable Law....................................................................................33

    B.    Discussion............................................................................................37

    III.    The Court Should Admit Limited Videos and Photographs of Victim-1's and Burgos's Injuries Following the Xscape Shooting ...................................................................................39

CONCLUSION........................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Crawford v. Washington,*
    541 U.S. 36 (2004) ................................................................................................35, 39

*Davis v. Washington,*
    547 U.S. 813 (2006) ...............................................................................................36, 39

*Estate of Guidry v. Lowe's Home Centers,*
    2019 WL 137607 (S.D. Miss. Jan. 8, 2019) ..............................................................34

*Huddleston v. United States,*
    485 U.S. 681 (1988) ...............................................................................................23, 24

*Michigan v. Bryant,*
    562 U.S. 344 (2011) .................................................................................. 36, 37, 38, 39

*Miller v. Crown Amusements, Inc.,*
    821 F. Supp. 703 (S.D. Ga. 1993) ............................................................................34

*Ohio v. Clark,*
    576 U.S. 237 (2015) ...................................................................................... 36, 38, 39

*Old Chief v. United States,*
    519 U.S. 172 (1997) ...............................................................................................40, 41

*United States v. Barret,*
    2011 WL 6704862 (E.D.N.Y. Dec. 21, 2011) .........................................................28, 29

*United States v. Bein,*
    728 F.2d 107 (2d Cir. 1984) .........................................................................................31

*United States v. Blakey,*
    607 F.2d 779 (7th Cir. 1979) .......................................................................................34

*United States v. Bracy,*
    2022 WL 17801133 (E.D.N.Y. Dec. 19, 2022) .........................................................37

*United States v. Brady,*
    26 F.3d 282 (2d Cir. 1994) ..........................................................................................24

*United States v. Brown,*
    254 F.3d 454 (3d Cir. 2001) ........................................................................................38

*United States v. Brown*,
  77 M.J. 638 (C.A.A.F. 2018) ................................................................................34

*United States v. Bumagin*,
  136 F. Supp. 3d 361 (E.D.N.Y. 2015) ...................................................................29

*United States v. Cain*,
  587 F.2d 678 (5th Cir. 1979) ................................................................................34

*United States v. Carboni*,
  204 F.3d 39 (2d Cir. 2000) ...................................................................................23

*United States v. Carpenter*,
  372 F. Supp. 3d 74 (E.D.N.Y. 2019) .....................................................................33

*United States v. Colon*,
  880 F.2d 650 (2d Cir. 1989) .................................................................................24

*United States v. Cruz*,
  343 F. Supp. 2d 226 (S.D.N.Y. 2004) ...................................................................23

*United States v. Cummings*,
  858 F.3d 763 (2d Cir. 2017) .................................................................................31

*United States v. Donovan*,
  577 F. Supp. 3d 107 (E.D.N.Y. 2021) ...................................................................30

*United States v. Fell*,
  531 F.3d 197 (2d Cir. 2008) .................................................................................35

*United States v. Figueroa*,
  618 F.2d 934 (2d Cir. 1980) .................................................................................25

*United States v. Gelzer*,
  50 F.3d 1133 (2d Cir. 1995) ...........................................................................23, 24

*United States v. Hatfield*,
  685 F. Supp. 2d 320 (E.D.N.Y. 2010) ...................................................................30

*United States v. Hawkins*,
  59 F.3d 723 (8th Cir. 1995) ..................................................................................34

*United States v. Inserra*,
  34 F.3d 83 (2d Cir. 1994) .....................................................................................24

iii

*United States v. Jackson*,
   124 F.3d 607 (4th Cir. 1997) .................................................................34

*United States v. Jaswal*,
   47 F.3d 539 (2d Cir. 1995) ...................................................................24

*United States v. Jones*,
   299 F.3d 103 (2d Cir. 2002) ...........................................................33, 35

*United States v. LaSanta*,
   978 F.2d 1300 (2d Cir. 1992) ..............................................................23

*United States v. Lauria*,
   541 F. Supp. 3d 311 (S.D.N.Y. 2021)..................................................28

*United States v. Lyle*,
   856 F.3d 191 (2d Cir. 2017) .................................................................25

*United States v. Medico*,
   557 F.2d 309 (2d Cir. 1977) .................................................................34

*United States v. Mejia-Valez*,
   855 F. Supp. 607 (E.D.N.Y. 1994) ................................................33, 38

*United States v. Munoz*,
   765 F. App'x 547 (2d Cir. 2021) .....................................................31, 32

*United States v. Myers*,
   550 F.2d 1036 (5th Cir. 1977) .............................................................30

*United States v. Napout*,
   2017 WL 4685089 (E.D.N.Y. Oct. 17, 2017)................................25, 40

*United States v. Obayagbona*,
   627 F. Supp. 329 (E.D.N.Y. 1985) ......................................................34

*United States v. Ortiz*,
   857 F.2d 900 (2d Cir. 1988) .................................................................23

*United States v. Parker*,
   936 F.2d 950 (7th Cir. 1991) ...............................................................34

*United States v. Puguero*,
   2020 WL 5913309 (S.D.N.Y. Oct. 6, 2020).........................................38

iv

*United States v. Qamar,*
   671 F.2d 732 (2d Cir. 1982) ........................................................................31

*United States v. Ramirez,*
   894 F.2d 565 (2d Cir. 1990) .......................................................................23

*United States v. Romero,*
   304 F. App'x 14 (2d Cir. 2008) ..................................................................39

*United States v. Rosario,*
   2014 WL 5870708 (S.D.N.Y. Nov. 13, 2014) ...........................................29

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) .........................................................................41

*United States v. Scarpa,*
   913 F.2d 993 (2d Cir. 1990) ................................................................35, 38

*United States v. Siegal,*
   717 F.2d 9 (2d Cir. 1983) ...........................................................................23

*United States v. Smith,*
   727 F.2d 214 (2d Cir. 1984) .......................................................................23

*United States v. Steele,*
   216 F. Supp. 3d 317 (S.D.N.Y. 2016) ..................................................34, 37

*United States v. Steele,*
   390 F. App'x 6 (2d Cir. 2010) ....................................................................30

*United States v. Thomas,*
   54 F.3d 73 (2d Cir. 1995) ...........................................................................23

*United States v. Tocco,*
   135 F.3d 116 (2d Cir. 1998) ...............................................................35, 38

*United States v. Ulbricht,*
   79 F. Supp. 3d 466 (S.D.N.Y. 2015) ..........................................................31

*United States v. Velazquez,*
   246 F.3d 204 (2d Cir. 2001) .......................................................................41

*United States v. Zackson,*
   12 F.3d 1178 (2d Cir. 1993) .......................................................................23

v

*Washington v. Griffin*,
   876 F.3d 395 (2d Cir. 2017) ........................................................................35

*White v. Illinois*,
   502 U.S. 346 (1992) .....................................................................................39

**Statutes**

18 U.S.C. § 1958 ..................................................................................................1

18 U.S.C. § 2 .......................................................................................................1

18 U.S.C. § 2261 ..................................................................................................1

18 U.S.C. § 2261A ...............................................................................................1

18 U.S.C. § 371 ....................................................................................................1

**Other Authorities**

2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[13] ...................................24

Judgment, Dkt. 146, *United States v. McBean*, 20 Cr. 260 (E.D.N.Y. May 14, 2024) ...............10

Sand, *Modern Jury Instructions*, Instr. 60-14 .........................................................25

Sand, *Modern Jury Instructions*, Instr. 63-21 .........................................................25

**Rules**

Fed. R. Evid. 401 ....................................................................................39, 40

Fed. R. Evid. 403 ............................................................................................passim

Fed. R. Evid. 404(b) ......................................................................................passim

Fed. R. Evid. 803(1) ...................................................................................33, 34

Fed. R. Evid. 803(2) ...................................................................................35, 38

Rule 403 advisory committee's note........................................................................25

**Constitutional Provisions**

U.S. Const. amend. VI.........................................................................................35

## PRELIMINARY STATEMENT

The Government respectfully seeks *in limine* rulings prior to the trial of the defendant, Karl Smith, a/k/a "Pacavell," which is scheduled to begin on July 28, 2025.

This trial will be about a series of crimes that Smith committed between December 2023 and September 2024, together with Dajahn McBean, a/k/a "Jeezy Mula," a/k/a "Freeze," Chelsey Harris, a/k/a "Ms. Chinn," and others, including: (i) a conspiracy to set up a rival of McBean's ("Victim-1") to be murdered in exchange for money, which resulted in attempted murders of Victim-1 on December 24 and December 26, 2023, as well as the death of Victim-1's girlfriend, Clarisa Burgos, on December 26, 2023, in violation of 18 U.S.C. § 1958, as charged in Count One of the Indictment; (ii) a scheme to use cellphones and the internet to track and lure Victim-1 during the plot to kill him, in violation of 18 U.S.C. §§ 2261(b)(1)-(3), 2261A(2)(A) and (B), and 2, as charged in Count Two of the Indictment; and (iii) a conspiracy to destroy evidence and to obstruct the investigation into the plot to kill Victim-1, in violation of 18 U.S.C. § 371, as charged in Count Three of the Indictment.

The Government respectfully requests that the Court issue *in limine* rulings on three issues. *First*, the Court should admit the following as direct evidence of the charged conduct and, alternatively, as evidence admissible under Rules 404(b) and 403 of the Federal Rules of Evidence: (1) images of Smith possessing firearms that Smith posted to his Instagram account between December 2023 and May 2024, while he was participating in the charged plot to kill Victim-1; and (2) images and messages containing Smith's comments on the evidence in this case and containing a death threat made by Smith against a suspected witness, which Smith posted to Instagram in or about April 2025 using a contraband cellphone while detained at Metropolitan Detention Center – Brooklyn ("MDC").

*Second*, the Court should admit statements made by Victim-1 during a 911 call and to members of the New York City Police Department (the "NYPD") as they were rendering aid to him immediately after Victim-1 and Burgos were shot outside the Xscape nightclub on December 26, 2023, as excited utterances and present sense impressions; and

*Third*, the Court should admit under Rules 401 and 403 of the Federal Rules of Evidence certain videos and photographs of Victim-1 and Burgos in the aftermath of the Xscape shooting.

## FACTUAL BACKGROUND

### A. The Plot to Kill Victim-1 in December 2023

In late December 2023, Dajahn McBean, Karl Smith, Chelsey Harris, and others began executing a plot to kill Victim-1, who had been feuding with McBean on Instagram. At the time, McBean was detained at MDC and was using a contraband cellphone to communicate with Smith and Harris, who were at liberty. Smith and Harris's role in the plot was to track Victim-1 and to lure him to nightclubs in Queens, where gunmen arranged by McBean would shoot and kill Victim-1. McBean, through intermediaries, paid Smith and Harris for their role in this plot.

Smith and Harris tracked and lured Victim-1 on multiple nights during this conspiracy. Each time Smith and Harris went out on these efforts, they communicated with each other and McBean via Telegram, an encrypted messaging application that they apparently believed would protect their messages from being recovered by law enforcement. Harris also often communicated directly with Victim-1 by text message, at McBean and Smith's direction. These messages were recovered from a search of Harris's cellphone.[1]

---

[1] The evidence at trial will show that McBean, Smith, and Harris operated the Telegram and Instagram accounts described below. However, the Government expects that Smith will contest the authenticity and validity of these incriminating Telegram and Instagram messages and/or dispute that he was the person who sent the incriminating messages.

Smith and Harris first attempted to track Victim-1 at a nightclub late on December 20 and into the early morning of December 21, 2023. That evening, McBean sent money to Harris and Smith through intermediaries and arranged for their transportation to the nightclub.

During this first effort to track Victim-1, at about 1:36 a.m. EST on December 21, Smith used an Instagram account named "bodmonsheluv"—which is registered to the email account "karl.smith15@aol.com" and to Smith's cellphone number—to message another account, "Come outside I'm buying a bottle," and encouraged the user of the other account to come to "Mermaid." Ex. 1, at USAO_282965. When the other account asked who else was there, Smith replied, "I'm only wit chin," which is Harris's alias. *Id.* at USAO_282966. The other account then asked, "Ms chin ?," and Smith responded, "Yeah we on a lil mission for my cousin." *Id.* at USAO_282967. The other account asked, "Why u so last minute Jah Jah." Smith wrote back, "It was a mission lmao it's not late just come." *Id.* A few hours later, Smith posted several videos and photographs to the "bodmonsheluv" account depicting himself and Harris partying in nightclubs, drinking a large bottle of liquor, and flashing cash:

  

While Smith and Harris were out on December 20 and 21, they were using their cellphones to communicate via Telegram with McBean about looking for Victim-1. That evening, McBean repeatedly directed Smith and Harris when and where to go to meet Victim-1. For example, at 3:02 a.m. on December 21, McBean directed Smith and Harris to look for Victim-1 at "mermaids"— the same club that "bodmonsheluv" referenced in his Instagram message earlier that night. McBean also demanded that Smith and Harris send him regular updates about their progress locating Victim-1.

During the afternoon of December 21, McBean, Smith, and Harris exchanged Telegram messages in which they expressed frustration about their inability to locate Victim-1 the previous evening. McBean, Smith, and Harris continued to exchange Telegram messages on this topic until about 7:55 p.m. on December 21. About an hour later, Smith posted the following image on the "bodmonsheluv" Instagram account, showing himself looking disappointed and sitting in a car

with a firearm resting on the center console, having failed to complete his mission to locate Victim-1.



*See* Ex. 2.

Eventually Harris found a way to introduce herself to Victim-1. During the evening of December 22, 2023, following directions she received from Smith and McBean via Telegram, Harris sent Victim-1 a text message, "Hey its Chin." Harris continued to text with Victim-1 for several days, flirting with him and encouraging him to meet up with her in person.

On or about December 23, 2023, McBean, Smith, and Harris plotted to use Harris's relationship with Victim-1 to lure Victim-1 to Hush Cafe Lounge and Garden ("Hush"), a nightclub in Queens, where shooters would be waiting. During the early morning hours of December 24, 2023, Harris convinced Victim-1 to pick her up in the Bronx and take her to Hush. When Victim-1 and Harris arrived at the club, Harris messaged Smith via Telegram to provide updates about Victim-1's location. After arriving at the club, Harris wrote to Smith, "But i

remember jeezy [*i.e.*, McBean] said not to go back to his car," "so how we gonna do this." Harris then asked Smith, "Is jeezy [*i.e.*, McBean] ppl situated?" Harris told Smith to "ask him if they here yet." Shortly thereafter, Harris messaged Smith, "He outside," "Im in bathroom." Smith replied, "Bet," "Wats hush addy [*i.e.*, address]." Smith then sent multiple Telegram messages to McBean confirming, "He outside."

Gunmen fired on Victim-1's car that evening, missing Victim-1 but hitting his car. Victim-1 posted about this shooting on his Instagram account, which Smith was regularly monitoring. Hours after this shooting, McBean caused two intermediaries to wire Harris $1,500.

Having failed to kill Victim-1 outside Hush, McBean, Smith, and Harris tried again on December 26, 2023, this time luring him to Xscape NYC ("Xscape"), a different nightclub in Queens. That afternoon, McBean messaged Smith and Harris via Telegram, "Gotta be queens," "Ask him what shit y'all wanna get into." Less than ten minutes later, Harris texted Victim-1, "Wat we boutta get into" and engaged Victim-1 in a conversation about meeting up in person. Meanwhile, McBean messaged Smith and Harris, "But the pick up," "Gotta be queens." Smith wrote back to McBean and Harris, "So I'm tryna find a brunch spot." McBean instructed Smith, "Find one in queens." Smith then wrote to McBean and Harris, "Xscape."

Later that day, Harris invited Victim-1 to meet her at Xscape, as McBean and Smith directed. At about 10:21 p.m., surveillance cameras caught Smith driving Harris to Xscape. At about the same time, McBean messaged Smith and Harris via Telegram, "Ok bet ima tell you around the time they gonna be there." A few minutes later, surveillance cameras within Xscape captured Smith and Harris walking into the club, sitting down together at a table, and using their cellphones. McBean then wrote to Smith and Harris, "Kopy don't tell him come get you yet," "Like 40 mins away," "Ima tell you when tell 'em slide [*i.e.*, come]."

McBean, Smith, and Harris then discussed how Smith and Harris would signal to McBean which vehicle Victim-1 was driving, so that the shooters would know which car to target. At about 11:15 p.m., Harris sent Victim-1 the location of Xscape. A few minutes later, McBean messaged Smith and Harris, "No walk up to it then act like you forgot the food," "And text me the car color," "Once you tell me the car," "Don't walk near it again."

At about 11:28 p.m., McBean asked Smith and Harris, "Where dude." Smith replied, "He told her 15 mins." Around the same time, surveillance cameras captured a black SUV (the "Black SUV") parking a few blocks away from Xscape.

At about 11:37 p.m., Victim-1 texted Harris, "Come outside." Harris replied, "Coming I jsutv paid." McBean then messaged Smith and Harris, "The car I need," "Color."

At about 11:39 p.m., surveillance cameras captured Harris exiting Xscape and walking up to a vehicle containing Victim-1 and Clarisa Burgos, which was parked just outside. Harris looked inside Victim-1's vehicle without entering the car. Harris then doubled back to Xscape, walked to a vestibule area where she could still see Victim-1's car, and knelt while using her cellphone.

At about 11:41 p.m., three people dressed in all black with their hoods up exited the Black SUV, walked directly to Victim-1's car outside Xscape, and opened fire. Victim-1 was struck but survived the volley of bullets. Burgos, who was in the front passenger's seat of Victim-1's car, was killed in the gunfire.

**B. The Aftermath of the Xscape Shooting**

Immediately after the shooting outside Xscape, Victim-1 drove himself and Burgos to a police precinct. On his way there, at about 11:53 p.m., Victim-1 called 911 to report that he had been shot, that he needed medical assistance, and that he was near the 103rd Precinct. *See* Ex. 3.[2]

Victim-1 arrived at the police precinct about two minutes later. He was suffering from multiple gunshot wounds to his upper body, and he was bleeding profusely. Members of the NYPD began rendering emergency medical aid to Victim-1 in the vestibule of the precinct. In that process, the NYPD officers asked Victim-1 details about himself and about the shooting, such as Victim-1's name and date of birth, where the shooting had occurred, where Victim-1 had been shot, and whether Victim-1 knew who had shot him. Victim-1, still suffering from the gunshots, was visibly shaken and unable to remember many details about the shooting. But Victim-1 managed to tell the officers that he had been shot while he was sitting in his car outside a bar and that his girlfriend, Clarisa, was deceased in the passenger's seat of his vehicle. *See* Ex. 4. NYPD officers also searched Victim-1's car, which was parked outside the precinct, and found Burgos in the passenger's seat. Ex. 5. Victim-1 was taken to the hospital.

On December 27, 2023, while Victim-1 was at the hospital, McBean, Smith, and Harris used Telegram to discuss the Xscape shooting. That same day, Smith used the "bodmonsheluv" account to send a contact on Instagram a link to Burgos's Instagram page. Ex. 6. Later that evening, members of the NYPD approached Harris and asked her to accompany them to the precinct for

---

[2] Because Exhibits 3, 4, and 5 reveal the identity of potential witnesses, the Government respectfully requests that the Court accept them under seal for purposes of this motion. Exhibits 3, 4, 24, and 28 are audio and video files that cannot be filed electronically on the docket. The Government will share a copy of those files with defense counsel by file-sharing website and will deliver a disc containing copies of those files to chambers.

questioning. Harris then messaged McBean and Smith on Telegram, "Delete everything," "Boyz at my house," "Askin to talk," "Im stickin to my scripy." The police interviewed Harris, but she was not immediately placed under arrest.

### C. Communications Between January and June 2024

Between January and June 2024, McBean, Smith, and Harris remained in contact. During that period, Smith also posted and shared more images of himself with firearms, and McBean and other co-conspirators continued to harass and attack Victim-1 and to obstruct any investigation into the Xscape shooting.

### 1. Communications Between Smith and Harris

Smith and Harris regularly contacted each other after the Xscape shooting. For example, on March 4, 2024, Harris texted Smith, "see hedo got a heart for me! I luvvvv him," and sent the following screenshot of McBean at MDC on a video call with Harris underneath the text "Freezer Pack," *i.e.*, McBean's alias:



On March 6, 2024, Harris messaged Smith on Instagram to discuss "rumors" that Harris was involved in the Xscape shooting. Harris complained to Smith, "Bro im never gonna have a normal life." Ex. 7, at USAO_283060. Smith replied, "Nobody is on that page pls," "Nobody even talking bout that no more." *Id.* Harris asked Smith if she should try to discourage people from discussing her rumored involvement, asking him, "Should i say: 'idk why my name keeps getting attached, but i literally have no reason to set anyone up. Please stop spreading rumors'." *Id.* Smith and Harris then discussed the benefits and drawbacks of posting that comment. *Id.* at USAO_283060-61.

On May 7, 2024, Smith texted Harris, "Write freeze [*i.e.*, McBean] for me," "Ask him if he went to court yet." Harris wrote back to Smith, "Not yet." (McBean's sentencing in his criminal case in the U.S. District Court for the Eastern District of New York was scheduled for May 9, 2024. *See* Judgment, Dkt. 146, *United States v. McBean*, 20 Cr. 260 (E.D.N.Y. May 14, 2024).) Later, Smith wrote, "Tmm oh cus I thought he went to court already was bout to get tight tell him I'm checking in make sure he good." Harris replied, "Okay gonna tell him now," "We miss your

presence in the chat." Smith wrote back, "My dawgs." The next day, Smith sent Harris the following image of McBean's music:



### 2. Additional Images of Smith Possessing Firearms

Smith posted additional photos of himself displaying firearms on the "bodmonsheluv" Instagram account following the Xscape shooting. On January 9, 2024, Smith used

"bodmonsheluv" to send another Instagram account an image originally taken on September 11, 2021, depicting Smith pointing two firearms at the camera from the backseat of a car.



Ex. 26.

On January 18, 2024, Smith used "bodmonsheluv" to send a contact an image of a firearm and wrote, "Lil n**** don't get popped."



Ex. 8, at USAO_283023-24. The contact replied, "lmao give it back to the owner karl." *Id.* at USAO_283024. Smith replied, "It's mine Stewart." *Id.*

And on May 15, 2024, Smith used the "bodmondsheluv" account (which he temporarily renamed "plutodapimp") to post an image of himself, taken from the angle of a selfie during an

apparent FaceTime video call, possessing a firearm in a car with the caption, "People would really have you driving around like this."



Ex. 27.

### 3. Efforts to Obstruct Justice

Smith and Harris's co-conspirators also used an Instagram page named "Code 33" to obstruct the investigation into the Xscape shooting. On May 13, 2024, Code 33 issued a series of posts designed to intimidate a person identified as "Dolly" or "Officer Allen," who Code 33 speculated was cooperating with the investigation. Code 33's posts included an alleged recording of "Dolly" reporting "Ms. Chinn" (*i.e.*, Harris) to the police. At the end of this series, Code 33

posted the text, "i understand you cooking officer allen up rn but no more post and delete just finish the [rat emoji] I already called the funeral home [two laughing and crying emojis]." Ex. 28. Of course, rat emojis are commonly used to reference those cooperating with law enforcement.

In June 2024, McBean used Code 33 in the scheme to attack and harass Victim-1. Victim-1 was arrested on unrelated fraud charges in spring 2024 and detained at MDC pending trial. On June 2, 2024, Victim-1 was slashed at MDC. McBean, using a contraband cellphone that the Government later recovered and searched, obtained a video of the beginning of that slashing and paid for the video through an intermediary. McBean then sent that video to Code 33 and encouraged Code 33 to publicize the video, to embarrass and harass Victim-1 again. Code 33 did as McBean requested, posting the video on Instagram and invoking Victim-1's alias, "Chinaman," in the video's caption.

### D. Instagram Posts and Messages in April and May 2025

In October 2024, Smith was arrested and detained at MDC pending trial. The "bodmonsheluv" Instagram account went dormant for some time after Smith's arrest. But in April 2025, "bodmonsheluv" was suddenly revived: Its vanity name changed, and the account began to share messages about this case. "Bodmonsheluv" also began to share messages and images demonstrating that Smith was the person operating the account in April 2025, even though he was detained at MDC:

- On April 12, 2025, another account sent "bodmonsheluv" a message containing Smith's nickname, "Pacavellllll." "Bodmonsheluv" replied, "Sis I miss u." Ex. 9.

- That same day, "bodmonsheluv" posted the following image of Smith at MDC, confirming that Smith was still the user of the account:



Ex. 10.

- On April 13, 2025, Smith posted a picture of himself on the "bodmonsheluv" page and wrote, "Stop asking me if it's really me it is !!!! Lmao & why nobody told me everybody side tooth missing in jail smh":



Ex. 11.

- Later that day, a contact messaged "bodmonsheluv" to ask, "How are you even on this? [*i.e.*, Instagram]" Smith replied, "I got access to a phone duhhh …." Ex. 12.

- Later that same day, Smith used "bodmonsheluv" to tell a contact on Instagram that he regretted not cooperating with the Government in this case, writing, "I should've snitched," "Let me stop," "They want me to tell so bad." Ex. 13.

- On April 14, 2025, Smith used "bodmonsheluv" to post the following text, attempting to identify any cooperating witnesses in this case and confirming that the current user of the account was "in jail," as Smith was at the time:



Ex. 14.

- On April 15, 2025, another Instagram account asked "bodmonsheluv" about his chances of success at trial in this case. Smith replied, "They just got me in the chat," "In sis phone," a reference to the incriminating Telegram chats between McBean, Smith, and Harris that were found in Harris's phone. Ex. 15, at USAO_283049. A few minutes later, Smith used "bodmonsheluv" to confirm that his "trial" was on "July 28th." *Id.* at USAO_283051.

- On April 18, 2025, Smith used "bodmonsheluv" to post the following text, which referred to Smith's detention at MDC:



Ex. 16.

- On April 19, 2025, Smith used "bodmonsheluv" to post the following text denying that he was cooperating with the Government:



Ex. 17.

- One minute later, Smith used "bodmonsheluv" to post the following text denying that he was "biting cheese" (like a "rat" might, *i.e.*, cooperating) and was instead "going to court with [his] CO Ds":



> If I was bitting cheese nigga I wouldn't be going to court with my CO Ds derlick.. you be there you sis peoples not mine pls watch your tounge bro word you know the date for trial .. nuff said

Ex. 18.

- Four minutes later, Smith used "bodmonsheluv" to post the following text again denying that he was cooperating with the Government and referring to "code 33," the same Instagram account used to harass a suspected witness in May 2024 and to harass Victim-1 in June 2024:



> Like I never seen so much ppl omd it's like yall waiting for me to fold so yall can run with sum !! Niggas is fighting for they life literally if I was biting cheese code 33 would be the first to post my paper work he be omd daily

Ex. 19.

- Two minutes later, Smith used "bodmonsheluv" to post the following text discussing the discovery in this case and again referencing "code 33":



> & speaking of code 33 the Feds has his page .. the 33 lives one my lawyer showed me so yall keep sending shit to that page yall gone be sharing a cell with my black ass soon

Ex. 20.

- Four minutes after that post, Smith used "bodmonsheluv" to post the following text on Instagram, threatening the same suspected witness ("Dolly") who Code 33 had tried to intimidate in May 2024:



> Everybody PLS GOMD!!! Anybody in my shoes would've been folded first day.. they tryna give a nigga life just please gomd & Dolly when I come home you a dead bitch I put that on my mother
>
> You another one you really a wicked evil girl you playing with all our life's who's on this case shit is not a fucking game bitch this shit real life!!

Ex. 21.

- One minute after posting this threat, Smith used "bodmonsheluv" to send a message confirming that his trial was "in July." Ex. 22, at USAO_283028.

- About an hour after Smith posted the threat against "Dolly," another Instagram account messaged him, "Delete this !!" and followed up with an audio message recommending that Smith delete the threat because of his "case." Ex. 23 at USAO_283046-47; Ex. 24. Smith replied that he figured that someone had already reported the threat to law enforcement because he was "going to the box tonight," a form of punishment at MDC. Ex. 23, at USAO_283048.

- On April 24, 2025, Smith used "bodmonsheluv" to send a message on Instagram confirming his identity: "It's pac [*i.e.*, Smith's alias] bro this my finsta." Ex. 25. That same day, Smith used "bodmonsheluv" to send a message to another contact confirming again that his "trial is July 28th." Ex. 22, at USAO_283028.

- On April 28, 2025, Smith acknowledged the authenticity of the incriminating Telegram chats in this case and confirmed again that he is the person who sent those chats, writing in a message sent from "bodmonsheluv," "Yea I know they just got me in that dumbass chat." When the contact asked for clarification, Smith responded, "I said the chat that night that's what they got me on," "Pissed." Ex. 15, at USAO_283052-53.

- Later that same day, another contact messaged "bodmonsheluv," "u need to take some ppl out your page cause I just seen sumn shit someone posted" and then sent Smith a screenshot of the threat he posted on April 19. Ex. 22, at USAO_283030-31. Smith confirmed that he already had taken "mad ppl out" of his account. *Id.* at USAO_283032. The other account asked "bodmonsheluv," "lol

cause why would u say that u tryna be stuck in there cause now her ass about to try n get u in trouble." *Id.* Smith replied, "She already did but it ain't work." *Id.* at USAO_283033.

- On May 11, 2025, Smith used "bodmonsheluv" to send a message in which he confirmed that he was using a contraband cellphone: "I begged to use the phone to tell u I appreciate u frfr thank u smh I hate I'm in here." Ex. 22, at USAO_283037.

## ARGUMENT

**I.**  **The Court Should Admit Evidence from Smith's Instagram Account as Direct Evidence of the Crimes Charged or, Alternatively, Under Rules 404(b) and 403**

The Court should admit two categories of evidence from Smith's "bodmonsheluv" Instagram account: (1) images and discussion of Smith possessing firearms during the charged plot to shoot, stalk, and harass Victim-1 (Exs. 2, 8, 26, 27); and (2) Instagram messages and posts containing Smith's comments on the evidence in this case, containing a threat Smith made against a suspected witness in or about April 2025, and identifying Smith as the user of the "bodmonsheluv" account in April 2025 (Exs. 9-25).[3]

### A. Applicable Law

#### 1. Rule 404(b)

Rule 404(b) precludes the admission of "any other crime, wrong, or act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but permits the admission of such evidence "for another purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

---

[3] The Government provided defense counsel with Rule 404(b) notices on June 23 and 24, 2025.

Evidence of "uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation omitted); *see also United States v. Cruz*, 343 F. Supp. 2d 226, 231 (S.D.N.Y. 2004). Even when evidence is considered "other acts" evidence, it may be admitted if it (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value which is not substantially outweighed by any unfair prejudicial effect. If requested, such evidence must be admitted with limiting instructions to the jury. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)); *United States v. Smith*, 727 F.2d 214, 219-20 (2d Cir. 1984); *United States v. Siegal*, 717 F.2d 9, 16-17 (2d Cir. 1983); *United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").

The U.S. Court of Appeals for the Second Circuit "follows an 'inclusionary' approach to the admission of other act evidence, so that 'evidence of prior crimes, wrongs or acts is admissible for *any* purpose other than to show a defendant's criminal propensity.'" *United States v. LaSanta*, 978 F.2d 1300, 1307 (2d Cir. 1992) (emphasis in original, citations omitted); *accord United States v. Thomas*, 54 F.3d 73, 81 (2d Cir. 1995) (allowing evidence of defendant's prior conviction on charge of transporting stolen money orders in interstate commerce where it demonstrated knowledge and intent with respect to money orders at issue in present case); *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (allowing circumstantial evidence from prior unrelated and uncharged robbery where it established the defendant's connection to a weapon used in present

case); *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995). The Court has broad latitude in determining whether to admit evidence under Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994); *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994).

The admission of extrinsic evidence concerning a defendant's "other acts" is particularly appropriate where the defendant's state of mind is at issue. *See, e.g.*, *Huddleston*, 485 U.S. at 685; 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[13], at 404-98 to 404-102. Of course, a defendant can eliminate the issues of intent, knowledge, and identity, and thereby forestall the admission of other act evidence, either by electing a defense that does not dispute intent or knowledge or by agreeing to stipulations that remove these issues from consideration. As the Court of Appeals has emphasized, "to take such an issue out of a case, a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed. A defendant may not purposely use ambiguity tactically, seeking to gain the one advantage of barring admission of prior acts evidence by proffering a particular defense theory, only to later seek the additional advantages stemming from arguing lack of intent to the jury." *See United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989).

### 2. Rule 403

Rule 403 states, in relevant part, that "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Generally speaking, however, because "any proof highly probative of guilt is prejudicial to the interests of th[e] defendant," "[t]he prejudice that Rule 403 is concerned with involves 'some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence.'" *Gelzer*, 50 F.3d at 1139 (quoting *United States v. Figueroa*, 618 F.2d

934, 943 (2d Cir. 1980)); *see* Rule 403 advisory committee's note ("'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one."). "In determining whether to exclude evidence … under Rule 403, the Court must balance the probative value of the evidence with the potential for unfair prejudice to the defendant, *i.e.*, whether the evidence 'involve[s] conduct any more sensational or disturbing than the crime … with which [the defendant has been] charged.'" *United States v. Napout*, 2017 WL 4685089, at *7 (E.D.N.Y. Oct. 17, 2017) (alterations in original) (quoting *United States v. Lyle*, 856 F.3d 191, 207 (2d Cir. 2017)).

## B. Discussion

### 1. Images and Discussion of Firearms

The images and messages on Smith's "bodmonsheluv" Instagram account regarding Smith's possession of firearms during and immediately after the charged plot to kill Victim-1 are admissible as direct evidence of the charges and under Rule 404(b) as evidence of Smith's intent, knowledge, plan, absence of mistake, lack of accident, and identity.

The December 21 image of Smith in a car with a firearm on the center console (Ex. 2) is clearly admissible as evidence that is inextricably intertwined with the charged conduct and as evidence of Smith's intent and knowledge. Count One of the Indictment requires the Government to prove that Smith and Harris's located Victim-1 for McBean "with the intent that a murder be committed." Sand, *Modern Jury Instructions*, Instr. 60-14. Count Two of the Indictment similarly requires the Government to prove that Smith and Harris tracked and lured Victim-1 "with the intent to kill, injure, harass, intimidate, or cause substantial emotional distress to" Victim-1. Sand, *Modern Jury Instructions*, Instr. 63-21. Smith posted the December 21 image to Instagram just hours after his and Harris's first effort (or "mission") to find Victim-1 on McBean's behalf on December 20 and 21. *See* Ex. 1, at USAO_282967. That timing indicates that Smith possessed this

25

firearm during his first stalking "mission" with Harris and, thus, is evidence that Smith was tracking Victim-1 while carrying a firearm and with the intent that Victim-1 would be shot, murdered, killed, injured, harassed, intimidated, and placed in substantial emotional distress. The December 21 image of Smith with a firearm is also evidence that Smith knew his effort to track and lure Victim-1 on December 20 and 21 was sufficiently dangerous that it required Smith to arm himself with a firearm. In other words, Smith was armed because he anticipated on each occasion that gunfire might be directed at Victim-1, and that he might require a firearm, whether to participate in shooting Victim-1 or to protect himself in the wake of any such shooting.

The December 21 image is also probative of Smith's intent and knowledge during his and Harris's subsequent attempts to lure and set up Victim-1 at Hush on December 24 and at Xscape on December 26. As described briefly above, the trial evidence will show that Smith and Harris's stalking efforts on December 20 and 21, on December 24, and on December 26 all were part of a continuous plot to have Victim-1 killed—each effort targeted the same victim, involved the same or similar co-conspirators communicating in the same chat group, was executed using the same or similar modus operandi, and resulted in similar outcomes. Given the continuity and similarity of those actions, the jury can fairly infer that McBean, Smith, and Harris shared the same intent and purpose for the entire life of the scheme to track and lure Victim-1 from December 20 through December 26. Knowing that Smith possessed a firearm and intended to have Victim-1 shot during the December 20 and 21 tracking effort could therefore inform the jury's assessment of Smith's intent, or knowledge about others' intent, to have Victim-1 killed when Smith participated in the December 24 and December 26 luring schemes.

Relatedly, the December 21 image is evidence that Smith's involvement in tracking and luring Victim-1 was not a mistake or accident, and that Smith was more than merely present when

attempts were made on Victim-1's life. Smith will likely argue to the jury that the shootings targeting Victim-1 after Smith and Harris lured him on December 24 and December 26 were coincidences, and that Smith had no idea when he was helping to track and lure Victim-1 that the goal was to have Victim-1 killed. The fact that Smith possessed a firearm during the December 20 and 21 tracking effort shows otherwise, as it demonstrates that Smith intended or knew that Victim-1 would be shot in part because of Smith's actions. The jury should be allowed to rely on Smith's firearms possession on December 21 to infer that it was more than just an accident or mistake that other gunmen happened to shoot at Victim-1 during the other nights that Smith lured and located Victim-1. Again, Smith was himself prepared to participate in the shooting on December 21 and prepared to protect himself at all other relevant times.

The December 21, January 9, January 18, and May 15 images of firearms and related conversations (Exs. 2, 8, 26, 27) are also admissible as evidence that identifies Smith as the user of the "bodmonsheluv" account. Identifying Smith as the user of that account will be a critical element of the proof at trial, as it is clear that "bodmonsheluv" was one of McBean and Harris's co-conspirators in the plot to kill Victim-1. The user of "bodmonsheluv"—*i.e.*, Smith— (1) admitted that he was "on a mission" with Harris on December 20 and 21, which Telegram messages demonstrate was an effort to track Victim-1; (2) acknowledged that the December 20 and 21 "mission" involved traveling to "Mermaid," which is a bar where McBean directed Smith and Harris to look for Victim-1 on the Telegram chat; (3) admitted in messages sent in April 2025 that the user of "bodmonsheluv" was the same person who participated in the incriminating Telegram chat with McBean and Harris on the night of the Xscape shooting; and (4) acted with consciousness of guilt, including by expressing regret that he did not "snitch" in this case, plotting

with Harris to spread false information about Harris's supposed lack of involvement in the Xscape shooting, and threatening a suspected witness in the case.

The December 21, January 9, January 18, and May 15 images and conversations all show that Smith was the user of "bodmonsheluv." The December 21, January 9, and May 15 images clearly depict Smith alone with firearms in his hands. Only Smith would likely have access to, and be able to post, so many legally compromising images of himself. Although the January 18 firearm image does not contain Smith's face, the photograph is taken at an angle that suggests the person who captured the image is holding the gun. And after "bodmonsheluv" sent the January 18 image to a contact on Instagram, the contact responded using Smith's first name, "lmao give it back to the owner *karl*," and "bodmonsheluv" replied, "It's mine Stewart." Ex. 8, at USAO_283024 (emphasis added).

Further, the December 21, January 9, January 18, and May 15 images and related conversations are admissible under Rule 404(b), as evidence of Smith's "opportunity" to obtain firearms that could be used to shoot Victim-1, "absence of mistake" with respect to the shootings of Victim-1, and "ability to access" firearms to shoot at Victim-1. *United States v. Barret*, 2011 WL 6704862, at *19 (E.D.N.Y. Dec. 21, 2011). In cases involving the use and possession of firearms, courts routinely admit evidence of prior firearms possession under Rule 404(b) to prove opportunity, absence of mistake. *See, e.g.*, *United States v. Arroyo*, 600 F. App'x 11, 13 (2d Cir. 2015) ("[E]vidence that [the defendant] possessed a firearm less than seven months after the … drug sales is certainly relevant to show that he had an opportunity to possess a gun at the time of those sales."); *United States v. Lauria*, 541 F. Supp. 3d 311, 317 (S.D.N.Y. 2021) ("To the extent that the Government seeks to introduce these photos and videos [of prior firearms possession] as evidence that the Defendants had the opportunity to access firearms, and to access them in and

28

around the time of the February 15, 2019, robbery, the Second Circuit has repeatedly held that this is an appropriate purpose."); *United States v. Rosario*, 2014 WL 5870708, at *4 (S.D.N.Y. Nov. 13, 2014) (evidence of prior firearms possession "would be admissible [in an armed robbery case] to prove [the defendant's] ability to obtain firearms, the absence of a mistake in [the defendant's] possession of firearms, or to rebut a 'mere presence' defense"); *United States v. Bumagin*, 136 F. Supp. 3d 361, 370 (E.D.N.Y. 2015) (admitting evidence of "Defendant's ability to obtain firearms, his knowledge of firearms, especially how to obtain and then dispose of them, and further show opportunity and absence of mistake"); *Barret*, 2011 WL at *18-20 (2003 and 2004 firearms convictions admissible in case involving narcotics distribution and related firearms use). As in those cases, in this case, the December 21, January 9, January 18, and May 15 firearms images and conversations are evidence of Smith's possession of, and access to, firearms during and within months of his participation in a plot to shoot Victim-1. It is appropriate to admit those images under Rule 404(b) as proof of Smith's opportunity to use, and access to, such weapons during the plot to kill Victim-1.

Finally, the firearms images and conversations on Smith's "bodmonsheluv" account are not substantially more *unfairly* prejudicial than probative. The Indictment charges Smith with knowingly and intentionally participating in an extended plot to set up Victim-1 to be shot and killed. The jury will hear evidence of two separate shootings. They will watch surveillance video of three assassins open fire on Victim-1's car outside Xscape. And they will hear and see evidence of Victim-1's and Burgos's severe gunshot wounds, which resulted in Burgos's death. The four images of Smith possessing a firearm found on his "bodmonsheluv" Instagram account are not so much more sensational or disturbing than the evidence of those December 24 and December 26 shootings that they must be excluded under Rule 403. Quite to the contrary, as described above,

the photographic evidence of Smith's possession of a firearm demonstrates that Smith was not just a mere witness or bystander in the plot to murder Victim-1. He was a full-fledged member of the conspiracy who was actively seeking to kill Victim-1 by any means necessary, and his possession of a firearm shows that his participation in the conspiracy was willful, knowing, and serious.

### 2. Posts from MDC

The messages and posts on Smith's "bodmonsheluv" Instagram account in April and May 2025 are statements of the defendant that are admissible as direct evidence of the charged conduct and to prove identity under Rule 404(b).

Two sets of messages sent by "bodmonsheluv" during this period are admissible as admissions that are directly relevant to the charged conduct. These are the messages that Smith sent on April 15 and April 28, in which Smith acknowledged the authenticity of the incriminating Telegram chats recovered from Harris's cellphone and admitted that he was one of the participants in those chats. Ex. 15, at USAO_283049, USAO_283052-53. Those statements are admissible, just as they would be if Smith had made them during a recorded jail call. *See, e.g.*, *United States v. Donovan*, 577 F. Supp. 3d 107, 117 (E.D.N.Y. 2021) ("Courts frequently allow the government to introduce statements by defendants made during recorded jail phone calls." (collecting cases)).

Another set of "bodmonsheluv" messages and posts are admissible to prove Smith's consciousness of guilt. *See, e.g.*, *United States v. Hatfield*, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010) ("direct evidence" of the charge includes evidence that "shows consciousness of guilt"); *see also United States v. Steele*, 390 F. App'x 6, 12 n. 2 (2d Cir. 2010) ("[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.") (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)) (internal quotation marks omitted); *United States v. Ulbricht*, 79 F. Supp. 3d

466, 489 (S.D.N.Y. 2015) (same). This includes Smith's April 13 message expressing regret about not "snitching" (Ex. 13), as that message implies that Smith could provide law enforcement with useful information about this case because he participated in the criminal conduct.

The threat against the suspected witness "Dolly" that Smith posted on April 19 (Ex. 21) is also admissible to prove consciousness of guilt and to prove Smith's intent to conspire to obstruct the investigation into the Xscape shooting, as charged in Count Three of the Indictment. "'Evidence of threats by a defendant against a potential witness against him can ... be used to show guilty knowledge' under Federal Rule of Evidence 404(b), so long as Rule 403's balancing test is satisfied." *United States v. Munoz*, 765 F. App'x 547, 550 (2d Cir. 2021) (quoting *United States v. Bein*, 728 F.2d 107, 114-15 (2d Cir. 1984)). To be sure, however, "[b]ecause 'the potential prejudice from death threats may be great,'" the Court of Appeals "require[s] the government to 'have an important purpose for the evidence in order to satisfy the Rule 403 balancing test.'" *Id.* (quoting *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982)). For example, a death threat may be admissible when it is related to the offenses for which the defendant is being tried or when it is "inextricably intertwined with the evidence regarding the charged offense." *Id.* at 551 (quoting *United States v. Cummings*, 858 F.3d 763, 778 (2d Cir. 2017)).

The threat Smith made on April 19 is admissible both because it shows the user of the account's consciousness of guilt with respect to the Xscape shooting and because the threat related to, and is inextricably intertwined with, the obstruction conspiracy charged in Count Three. The witness who Smith threatened was "Dolly." The trial evidence will show that Code 33, which is an account with ties to McBean, also threatened "Dolly" in multiple posts in May 2024, during the charged schemes to stalk Victim-1 and to obstruct this investigation. The threat that Smith made against "Dolly" using the "bodmonsheluv" account, which he made after repeated posts naming

31

Code 33, is thus evidence that Smith shared McBean and Code 33's intent to obstruct this investigation by intimidating the same witness. This helps demonstrate that Smith conspired with McBean and others to obstruct this prosecution and increases the probative value of this threat beyond the mine-run case. But to ensure that the admission of this threat complies with Rule 403, the Government requests that the Court issue a limiting instruction that the jury is only permitted to consider Smith's April 19 threat to the extent that it sheds light on Smith's consciousness of guilt with respect to the Xscape shooting and on Smith's intent to obstruct investigations into that shooting, and that the jury may not "misconstrue the death threat[] as evidence of [Smith's] murderous propensity." *Munoz*, 765 F. App'x at 551.

Finally, unless Smith is willing to agree to a stipulation that would moot this issue, several of the "bodmonsheluv" messages and posts in April and May 2025 are admissible to prove that Smith was the person operating that account when it shared the relevant messages and posts described above. These include the "selfie"-style photographs of Smith in MDC that "bodmonsheluv" posted on April 12 and April 13 (Exs. 10, 11); the references to Smith's court events, like his trial date, that "bodmonsheluv" included in multiple messages and posts (Ex. 15, at USAO_283051, Ex. 17, Ex. 18, Ex. 22, at USAO_283028); the acknowledgements by the user of "bodmonsheluv" when others would refer to him using Smith's nickname of "Pac" or "Pacavell" (Exs. 9, 25); the references to the user of "bodmonsheluv" being in detention at MDC, as Smith was (Exs. 14, 16, 17, 20, 23); and the references to the user of "bodmonsheluv" needing to use a contraband cellphone to access Instagram, like Smith would have while incarcerated at MDC (Exs. 12, 22). The Government would consent to a reasonable limiting instruction that the jury is not to draw any inference about Smith's propensity to engage in criminal conduct from the fact that he was detained at MDC in April and May 2025, akin to a limiting instruction the Court

might issue in connection with admitting recorded jail calls. *See, e.g.*, *United States v. Carpenter*, 372 F. Supp. 3d 74, 80 (E.D.N.Y. 2019) (admitting recorded jail calls in which the defendant instructed co-conspirators to delete evidence but offering to "entertain a proposed limiting instruction" to mitigate any unfair prejudice).

## II.    The Court Should Admit Victim-1's Present Sense Impressions and Excited Utterances to NYPD Officers Immediately After the Xscape Shooting

The Court should admit statements made by Victim-1 during his 911 call (Ex. 3) and while members of the NYPD were rendering emergency aid to him (Ex. 4) immediately after the Xscape shooting as present sense impressions and excited utterances.

### A.  Applicable Law

#### 1.  Present Sense Impressions and Excited Utterances

The present sense impression exception to the rule against hearsay permits the admission of an out-of-court "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002).

Because "in many, if not most, instances, precise contemporaneity is not possible," "a slight lapse is allowable" between when the declarant perceived the event and when the declarant made the statement. Fed. R. Evid. 803(1) advisory committee's note (1972). Although there is no bright-line rule delineating when a statement is no longer made "immediately after" an event for purposes of Rule 803(1), courts have generally found that present sense impressions provided within fifteen minutes of witnessing a particular event will satisfy this requirement. *See United States v. Mejia-Valez*, 855 F. Supp. 607, 614 (E.D.N.Y. 1994) (admitting description

approximately sixteen minutes after events); *United States v. Blakey*, 607 F.2d 779, 786 (7th Cir. 1979) (admitting description made between several minutes and twenty-three minutes after events); *United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) (statement by witness to police upon their arrival at the scene was admissible as "description of ongoing events"); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) (admitting 911 phone call placed approximately seven minutes after incident); *United States v. Obayagbona*, 627 F. Supp. 329, 340 (E.D.N.Y. 1985) (admitting descriptions of events that took place between two minutes and fifteen minutes of events); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 706 (S.D. Ga. 1993) (finding that 911 call placed less than ten minutes after incident satisfied Rule 803(1)); *Estate of Guidry v. Lowe's Home Centers*, 2019 WL 137607, at *4 (S.D. Miss. Jan. 8, 2019) ("The Fifth Circuit has found statements made within 15 minutes of an incident to be sufficiently contemporaneous to qualify for the present sense impression to the hearsay rule." (citing *United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979)); *see also United States v. Medico*, 557 F.2d 309, 313 (2d Cir. 1977) (finding that description made approximately five minutes after events met the requirements of Rule 803(1), but affirming district court's admission of statement under residual exception); *United States v. Brown*, 77 M.J. 638, 651-52 (C.A.A.F. 2018) (holding generally that five minutes will usually be within the present sense impression exception and twenty minutes is at the "outer edge" of the exception). "Even where a longer time has passed between the events and the statement describing them, admission under Rule 803(1) can be 'buttressed by the intrinsic reliability of the statements.'" *United States v. Steele*, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (quoting *United States v. Parker*, 936 F.2d 950, 954 (7th Cir. 1991)).

The excited utterance exception to the rule against hearsay permits the admission of an out-of-court "statement relating to a startling event or condition, made while the declarant was

under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). The "length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" *Jones*, 299 F.3d at 112. "Thus while the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement 'describe or explain' the contemporaneous event or condition, the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements—*i.e.* those that 'relate to' the event." *Id.* at 112 n.3. In determining whether to admit a statement as an excited utterance, courts examine the time lapse between the event and the statement, whether the event was "startling," *id.*, 299 F.3d at 113, or "stressful," *United States v. Fell*, 531 F.3d 197, 231 (2d Cir. 2008), as well as the declarant's demeanor, including whether the declarant was "distraught," *id.*, "agitated," "scared," *Jones*, 299 F.3d at 113, or "nervous," *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990).

### 2.  The Confrontation Clause

The Confrontation Clause gives the accused "[i]n all criminal prosecutions, ... the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause "prohibits admission at trial of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him." *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017). The Court subsequently clarified that "the Confrontation Clause applies *only* to *testimonial* hearsay." *Davis v. Washington*, 547 U.S.

813, 823 (2006) (emphasis added). Thus, if statements are "not testimonial hearsay," then "[t]he Confrontation Clause d[oes] not bar their admission at ... trial." *Michigan v. Bryant*, 562 U.S. 344, 378 (2011).

To determine whether a statement is "testimonial," the Supreme Court has set forth a "primary purpose" test. The Court first articulated this test with respect to "ongoing emergencies":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

The Court has since made clear that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358. Courts "must consider all of the relevant circumstances," and "the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 244-45 (2015).

In conducting that analysis, "whether an ongoing emergency exists is simply" is "an important factor," among other considerations, "that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 366. Other factors to be considered include "the informality of the situation and the interrogation," as a "formal station-house interrogation ... is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Clark*, 576 U.S. at 245. Ultimately, "[w]here no such primary [testimonial] purpose

exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359.

### B. Discussion

Victim-1's short descriptions of the Xscape shooting during his 911 call and while the NYPD treated his gunshot wounds in the vestibule of the police precinct are neither hearsay nor testimonial statements barred by the Confrontation Clause.

Victim-1's statements were present sense impressions. Both statements described an event or condition. During the short 911 call, Victim-1 repeatedly said, "I'm shot," provided his location, and stated his plan to go to the police precinct. *See generally* Ex. 3. At the precinct, Victim-1 similarly described what he could muster about the Xscape shooting, telling the officers that he had been shot while he was sitting in his car outside a bar and that his girlfriend was deceased in the passenger's seat of his vehicle. *See generally* Ex. 4. Both statements also occurred within the accepted timing limits of the present sense impression exception—the 911 call occurred just twelve minutes after the Xscape shooting, and Victim-1 began speaking to the police in the vestibule of the precinct just fourteen minutes after the Xscape shooting. *See Steele*, 216 F. Supp. 3d at 321-22; *United States v. Bracy*, 2022 WL 17801133, at *5 (E.D.N.Y. Dec. 19, 2022) (admitting as present sense impression 911 call made minutes after shooting).

Victim-1's statements were also excited utterances. He made these statements shortly after three masked shooters surrounded Victim-1's car and fired dozens of rounds, striking Victim-1 repeatedly and killing his girlfriend right before his eyes—undoubtedly a "startling" event. Both the 911 and the bodycam video of Victim-1 at the precinct show that Victim-1 was still experiencing the physical pain of, and under the stress caused by, the shooting when he made the statements at issue. *See, e.g., Steele*, 216 F. Supp. 3d at 322-23 (affirming admission of excited utterances after several minute delay); *United States v. Delvi*, 275 F. Supp. 2d 412, 415-16

(S.D.N.Y. 2003) (affirming admission of excited utterances after forty minute delay); *Mejia-Valez*, 855 F. Supp. at 614 ("A shooting, even in this day and age, is a startling event."); *United States v. Puguero*, 2020 WL 5913309, at *4 (S.D.N.Y. Oct. 6, 2020) (affirming admission of excited utterances after twenty minute delay); *see also Tocco*, 135 F.3d at 127 (affirming the admission of an excited utterance made three hours after startling information); *Scarpa*, 913 F.2d at 1017 (affirming admission of excited utterance made five or six hours after startling event); *United States v. Brown*, 254 F.3d 454, 459 (3d Cir. 2001) (observation of someone wielding a firearm qualifies as a startling event for purposes of Rule 803(2)).

Admitting the nontestimonial statements Victim-1 made in his 911 call and to police officers who were rendering him emergency medical aid also would be consistent with the Confrontation Clause. The clear purpose of Victim-1's statements was not to help prove past events in a criminal prosecution but rather to help responding officers with two related "ongoing emergenc[ies]": treating Victim-1 for the multiple gunshot wounds he had just sustained and attempting to locate the shooters. *See Bryant*, 562 U.S. at 359 (holding that "emergency" was still "ongoing" for purposes of "testimonial" inquiry where location of suspect in a shooting was unknown and suspect was still "a potential threat to the responding police and the public at large"); *cf. id.* at 365 (explaining that emergency might no longer be ongoing "if a perpetrator is disarmed, surrenders, is apprehended, or ... flees with little prospect of posing a threat to the public").

"[T]he informality of the situation" further established that the "primary purpose" of the statement was not "aimed at obtaining testimonial evidence against the accused." *Clark*, 576 U.S. at 245. The 911 operator's and the responding NYPD officers' questions to Victim-1 were not "formal station-house interrogation[s]." *Id.* They were spontaneous questions by law enforcement personnel responding to a man who had walked into the precinct with over a dozen gunshot wounds

and who had parked a car outside the precinct with his dead girlfriend in the passenger's seat. Victim-1's responses to the officers' questions in that context have none of the hallmarks of a testimonial statement that requires cross-examination under the Confrontation Clause.

Furthermore, the very fact that Victim-1's statements constituted excited utterances supports the conclusion that there was no Confrontation Clause issue. *See United States v. Romero*, 304 F. App'x 14, 17 (2d Cir. 2008) (holding that victim's excited utterance was not testimonial under *Crawford*). As the Supreme Court has explained, "in determining whether a statement is testimonial, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Clark*, 576 U.S. at 245. Thus, the "logic" that "justif[ies] the excited utterance exception in hearsay law"—that the statement is "considered reliable because the declarant, in the excitement, presumably cannot form a falsehood"—also supports the conclusion that a statement made during an ongoing emergency is non-testimonial: "Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Bryant*, 562 U.S. at 361-62. Moreover, the hearsay exception for excited utterances and spontaneous declarations "is at least two centuries old and may date to the late 17th century," *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992), and the Supreme Court has recognized that "the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding," *Clark*, 576 U.S. at 246.

## III. The Court Should Admit Limited Videos and Photographs of Victim-1's and Burgos's Injuries Following the Xscape Shooting

The Court should overrule any Rule 401 or 403 objection to (1) a limited number of surveillance videos that depict Victim-1 walking from his car to the police precinct after the

Xscape shooting, which show his gunshot wounds; (2) the body-worn camera footage of NYPD members rendering aid to Victim-1 at the precinct, which also shows Victim-1's injuries (Ex. 4); and one photograph of Burgos's injuries after the shooting (Ex. 5).

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Old Chief v. United States,* 519 U.S. 172, 178 (1997). And as explained above, Rule 403 requires the Court to "balance the probative value of the evidence with the potential for unfair prejudice to the defendant, *i.e.*, whether the evidence 'involve[s] conduct any more sensational or disturbing than the crime … with which [the defendant has been] charged.'" *Napout*, 2017 WL 4685089, at *7.

There is significant probative value to the limited evidence of the victims' injuries that the Government seeks to introduce. Count One of the Indictment charges Smith with murder-for-hire conspiracy resulting in personal injury and death, and Count Two charges Smith with stalking resulting in life-threatening bodily injury and death. The jury therefore will need to decide whether Victim-1 sustained personal injuries and/or life-threatening bodily injuries and whether Burgos died as a result of Smith and his co-conspirators' conduct, and images of Victim-1's and Burgos's injuries will help the jury make those findings. The video and photographs that trace Victim-1's vehicle from the scene of the shooting outside Xscape directly to the vestibule of the police precinct will establish a clear causal link between the shooting and the victims' injuries. And because the images of the victims' injuries show that Victim-1 was shot numerous times and Burgos was shot in the head, those images will help the jurors decide whether the shooters intended to kill Victim-1

and Burgos.[4] To the extent there is any prejudice, it is not unfair, and it certainly does not substantially outweigh the significant probative value of the images.

Moreover, "the Government generally has a right to present evidence of a fact … to establish the 'human significance' of the fact and 'to implicate the law's moral underpinnings.'" *United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001) (quoting *Old Chief*, 519 U.S. at 187-88). Because of this rule permitting the Government to "underscore[] the moral blame attaching to" the defendant's conduct, the Court of Appeals has approved of district courts receiving into evidence extensive and graphic photographs of autopsies and murder scenes. *Id.* (citing *United States v. Salameh*, 152 F.3d 88, 122-23 (2d Cir. 1998)). Here, the Government is proposing to offer much more limited evidence of the impact of Smith's crime—just a few videos and photographs designed to make the relevant moral and legal points without unfairly inflaming the jury.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

DATED:      June 30, 2025
            New York, New York

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney

                                By:   _/s/_____
                                        Ryan W. Allison
                                        Dominic A. Gentile
                                        Timothy Ly
                                        Assistant United States Attorneys
                                        (212) 637-2474/ -2567 / -1062

---

[4] The footage of Victim-1 in the vestibule of the precinct also has independent probative value, as it contains admissible statements from Victim-1 about the circumstances of the Xscape shooting, as described above.