

THE LAW OFFICES OF

# Richman Hill & Associates PLLC

2027 Williamsbridge Road, Bronx, NY 10461
718.892.8588 | fax: 718.518.0674

Stacey Richman, Esq.
srichmanlaw@msn.com

Renée C. Hill, Esq.
rhillesq@msn.com

October 20, 2025

Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square, Courtroom 1305
New York, New York 10007
EngelmayerNYSDChambers@nysd.uscourt.gov
*Via ECF, Via Email and Courtesy Hard Copy By Hand*

> RE: United States v. Chelsey Harris
> Superseding Information No.: S_24Cr. 541 (PAE)
> Sentencing Submission on behalf of Chelsey Harris

Your Honor:

This is one of the most confounding sentencing submissions I have ever written. Chelsey Harris is an unlikely person to meet at this precipice. I hope to ensure you understand her as an individual to facilitate your heavy burden. Rarely have I encountered in this realm someone as positive and otherwise properly directed with a more hardworking devoted family attentive to their children. Rarely have I experienced so much outreach from people with uplifting statements about a young person. Rarely when visiting a client at a detention facility do both educators and guards note what a positive human being this individual, Chelsey is. Rarely do I meet a young woman so contrite and committed to rehabilitation with dawning recognition of the depth of her acts. Rarely do I have a young woman, who is so promising and industrious who in so short a period of time arrived at a place where another young woman was killed, another injured and she stands before this Court with her future in the balance.

Lack of Cooperation:

Another aspect that needs to be addressed, was the refusal of Ms. Harris to cooperate in this matter. This was not hubris nor a failure to seek to take responsibility for her actions but a response to what she experienced in the evolution of this matter. Her belief is that there is no safety. All attempts to convince her otherwise were belied by the cancer of social media and the

1

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

realities of what occurred in this matter. It would appear from the discovery that Chelsey was placed in a position of limited knowledge, and all information was captured in the search warrant returns on text and social media warrants in this overall investigation.

Highlighted in the PSR at paragraphs 29, 30 and 39[1] refer to posts on an Instagram account named Code 33, which per the Government is operated by yet another co-conspirator which refer to threats to a "Dolly" or "Officer Allen" stating the posting individual is "call[ing] the funeral home;" a slashing of Mr. Williams and another "threat to kill." Notably as set forth by the Government's investigation, "*[t]here is no evidence that Harris was a participant in Code 33's Instagram account.*" See also PSR at paragraph 29, (Italics added for emphasis). However, the fear instilled by public postings was real and remains so.[2] Counsel specifically from early in this matter noted to the Government Chelsey's fears regarding the Code 33 account.

I have discussed the invitations of the Government with Ms. Harris repeatedly. She has stated she respects the families she has affected, she seeks to take responsibility and to give them closure, but she hopes to one day come home and not live in fear or fear for those she loves.

Finally, the irony that Chelsey is coping with her participation in this matter and that the Government now is seeking death as to her co-defendant seems contrary to the moral of this moment. She does not want to participate in causing any further hurt to anyone in any manner and participation in a matter which may lead to another death is stomach turning. Chelsey has gone back to her roots and spends a great deal of time studying the Bible. Her journals and biblical references are to the lessons therein, penance and surrender to the will of God.

Timing of the Plea:

The delay in seeking to simply take responsibility for her actions in this matter originated in miscommunication as between the defense and the Government. It was perceived that the Government would not discuss resolution without cooperation and here there would be none. In

---

[1] The posts referred to PSR paragraph 39, were by a co-defendant on his personal Instagram. Ms. Harris had no part in their creation or knowledge of them but for information learned during this matter while she was detained. She learned the information from someone outside of detention during a phone call with a friend who reported it to her. See also, Government's Fed. R. Evid. 404(b)(2) letter re Smith of June 24, 2025.

[2] The lack of Chelsey's participation in the further harassing of Mr. Williams subsequent to the critical days when the shootings occurred must be noted. Her participation to that point was ruinous. Her obstructive actions of December 27, 2023 and her maintenance of communication with her codefendant's thereafter can be understood in the context of the distortion of her moral isolation in relation to the events in which she played a part. Her contact with two of her co-defendants is painful once understood. They knew she was young and impressionable. "**Chin is a kid.**" See, Timestamp: 12/25/23, 6:12:19 PM (UTC+0), text by codefendant Smith, Group Christmas; emphasis supplied.

2

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

the last two months leading up to the July 28, 2025 trial date, the Government approached me to ask why I had not sought a resolution. I frankly related my perception of their stated position. I could not tolerate the portent of what a loss at a trial of this matter would bring, life without the possibility of release for this young woman. She to me remains at that evolutionary journey from youth to adult. The waste of another life is not the solution for one who seeks to sincerely take responsibility.

In all matters we as defense counsel explore resolutions short of trial to attempt to negotiate exposures with more reasonable potential boundaries for our clients where the concerns are of the magnitude of this matter in light of the evidence. I had noted throughout that despite Chelsey's behavior in her abbreviated yet devastating involvement in the events which bring her before the Court, this was an extreme anomaly for this young woman. There is actual recognized contrition and potential here for penance that would not waste yet another life but could serve better by her educating others. The waste of this particular life with her promise of meaningful rehabilitation and meaningful contribution to society is respectfully, to this counsel, painfully illogical.

The plea presented was terrifying and acrid, but it was a plea which removed the obvious trial result, and, with that plea, we have the opportunity for this Court to understand Chelsey and issue a just sentence.

## Our Examination:

All matters require an examination of the purposes of sentencing provided to us by 18 U.S.C. 3553a. This matter's particular recipe requires an assessment of the poor choices of young people, even those who are otherwise promising; the analysis of the evolution of youth as set forth through Miller v. Alabama (567 U.S.460 (2012) and its progeny; the recognition that youth and the mistakes of younger individuals are not necessarily a definition of incorrigibility; and the cancer of social media with its distortions, its impact on choice and perceptions of reality.

This matter is also troubling for its parallels and portent losses generationally. A young mother is lost, a young son is without his mother. A young woman was involved in the conspiracy that led to this loss. It was not of her design, but she recognizes and takes full responsibility for her participation as a necessary tool to that design's end. She regrets she did not extricate herself and regrets her conduct thereafter in the haze of that participation; yet, she wants desperately to be a mother as well. In a time where we are to see the sexes as equals, is there truly equality as between sentencing young women and young men? Men can procreate throughout their lives. Women have a finite window. That is a window I will also address, because I do believe it is a consideration.

3

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

In contemplating sentencing, the potential for rehabilitation is an important factor, but it is not supported by our system of incarceration. Notably, 18 U.S.C. §3582(a) entitled, "Factors To Be Considered in Imposing A Term Of Imprisonment," notes "[t]he Court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, … **recogniz[es] that imprisonment is not an appropriate means of promoting correction and rehabilitation."** (Bold added for emphasis).

I have read many of Your Honor's decisions in the realm of cases of youth and gang participation. In United States v. C.F., Male Juvenile (15 CR 445 (PAE)) this Court gave a thorough assessment of the balancing test set out under The Juvenile Justice and Delinquency Prevention Act (JJDPA), 18 U.S.C. 5031-504. Whilst Chelsey comes from an excellent family and is an intelligent young woman thus her background is in contrast to that of C.F., a focal point of the consideration in C.F. is applicable in sentencing here. Chelsey made terrible choices in this matter, she was in a tornado of belief in associations that brought her to the events of Christmas week 2023. "As a broad guidepost, however, the Court is to balance "the goal of rehabilitation" against "the threat to society posed by juvenile crime." Nelson II, 90 F.3d at 640 (quotation omitted); United States v. Ramirez, 297 F.3d 185, 193 (2d Cir. 2002). As a result, in weighing the factors, the nature of the offense and the *defendant's potential for rehabilitation* "are often properly given special emphasis." Ramirez, 297 F.3d at 193 (Italics added here). A court may give added weight to the nature of the offense when the crime at issue, such as intentional murder, is particularly serious, see Nelson I, 68 F.3d at 590." United States v. C.F., Male Juvenile (15 CR 445 (PAE)), Decision 11/22/16 at page 6. Here, in Chelsey the potential for rehabilitation is kinetic and has been in motion during her detention.

I recognize that Chelsey's chronological age is not that of a juvenile,[3] however as will be discussed below, her age of 22 at the time of these events and studies on both brain development and more recent research into the impact of social media on younger people I submit are correlative considerations here.

---

[3] "Raising the age to 25 enables the juvenile system to catch emerging adults during the 'age of opportunity and reorient them on a promising life trajectory." Dylan Raymond, 25 Is The New 18: Extending Juvenile Jurisdiction and Closing Its Exceptions, 2023 ULR 727 (2023) at page 751.; https://doi.org/10.26054/0d-576;-dwy7 (internal footnote in the original). "Like Blackstone's Ratio, which states that "it is better that ten guilty persons escape than that one innocent suffer," it is better that ten fully formed minds receive juvenile treatment-maybe even experience rehabilitation-than one underdeveloped mind receive unmitigated adult punishment. Id. at p. 749. See also, American Journal of Criminal Justice (2023) 48; 1157-1182; https://doi.org/10.1007/s12103-022-09694-5, which provides a criticism of the studies relied upon in Miller v. Alabama but concludes in alignment with the need for individuality in sentencing. "Sentencing decisions for juvenile homicide offenders should be made based on a thorough and holistic assessment of the offender, not based on a blanket assumption of immaturity due entirely to the offender's age." Id at 1175.

4

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

I am cognizant of the plea exposure. I believe, based on my work with the Government, they will be seeking something closer to 420 months (35 years) as they had proposed this as a resolve. I was surprised that Probation recommended 240 months, followed by 60 months as per the mandatory consecutive piece of the plea. I appreciate that Probation recommended that the mitigating factors of Ms. Harris "expressions of remorse and aberrant behavior in the instant offense may be mitigating variance factors to consider for sentencing." PSR at Paragraph 130. However, I feel Probation's recommendation is still too extreme.

There is also in the ideal of individuality in sentencing an aspect that I perceive is overlooked and that is the meaning of time to the individual at their stage in life. Thus, a year to a younger person is longer than the perception of a year to an older person. Time is fleeting for all but the impact of time at various stages of one's life may have more impact based on perception, life experience and the individual's potential for redemption and positive contribution. This year and two months by the point of sentencing has seemed an eternity. Chelsey has "been praying on the date of November 6," her sentencing date to understand her fate and to set her approach to what her future may or may not hold. She longs to touch her parents and has awoken to who are the people who are true in her life, who are friends and who were false friends, chimeras.

I will propose a sentence that is innovative with a purpose that serves the obvious aspects of the impact of the crimes committed, grace and respect to the victim and her family, the work of law enforcement; the sentencing considerations of 18 U.S.C. 3553a, one which positively serves the community and is sufficient but not greater than necessary for *this* individual recognizing her age, her potential service, actual rehabilitation, contrition and hope of motherhood.

In terms of potential service, an aspect of so many of the cases I handle involving younger people is the perception of consequence. Those of us who grew up before the advent of social media experienced our relationships as based on our localities, for example the neighborhoods we were from, the schools we went to, the relationships of our parents, relatives, local jobs. We were grounded in a sense of reality and as our behavior was in essence in one dimension, there was a level of balance in what others saw of our physical behavior. Social media I perceive led to a fracture of the common and provincial structure of socialization before social media ("BSM"). Social media can provide great benefits, but the B side (yes an actual reference to an album) is potentially, as here, destructive.

With the advent of social media people who would never otherwise interface can interface. The gossip and divisiveness that occurs on-line is more real to this generation than reality. The effect of bullying or enchantment due to on-line exchanges is as real as were the events of this matter. The distortion of the effects of social media exchanges, perceived

5

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

relationships, influence and power provide an inflated authority to the still malleable young person. This matter is replete in the ills, dystopic perceived realities, infatuations and authoritarianism that social media portends. This matter is a case study of influence and distortion of grounding.

The tragic ridiculous root of this case was on-line name calling by adult men who were already in the throws of their own matters in the criminal justice system. The perceptions of fame with its tentacles in the universe of social media and the flush of young fandom and perceived special attention led to Chelsey's involvement in this matter. Chelsey's interface with people she perceived as famous or of substance was via the virtual megaphone of social media. You perceive people as friends who are not even acquaintances yet now you may achieve contact. Your on-line "friends" see who talks to you, you are elevated in the false world which is reality to so many. To the young it may be dangerously intoxicating.

Here there was also the intervention of the pandemic. Chelsey had been enrolled in college yet, due to the pandemic all went virtual. Her father perceives this was a derailment which permitted greater diversion to Chelsey's online life, a flourishing social existence with people outside of her general experience and ultimately this matter.

In my review of the Government's statements about Chelsey they state that her codefendants "**convinced a younger woman**, Smith's co-defendant Chelsey Harris to act as bait. She would flirt with Victim 1 at Smith and CC1's directions, and she'd invite Victim 1 to meet her at clubs where he could be killed. Because CC1 was incarcerated at the time, Karl Smith was CC1's eyes and ears on the outside, surreptitiously accompanying Harris everywhere she went with Victim 1 and communicating that information back to CC1, who would, from prison direct to shooters where and when to attack." United States v. Karl Smith, 24 CR 541, Bail Hearing Minutes, October 15, 2024, page 6, lines 6-16 (emphasis not in the original).

"On about December 20th and 21st of 2023, Smith and Harris traveled to a nightclub where they attempted to run into Victim 1. On or about the next day, **Harris, taking direction from Karl Smith and CC1**, introduced herself to Victim 1 via text message. Id. at page 7, lines 3-8. "...early morning of December 24, 2023, **Harris again, taking direction from Karl Smith and CC1**, invited Victim 1 to take her to a nightclub known as Hush. Id. at page 7, lines 10-13. **Smith told Harris to** invite Victim 1 to a nightclub in Queens known as Escape. Id. At page 8, lines 4-6. "...Harris did exactly what Smith directed. Smith then drove Harris in Smith's vehicle, a car registered to [Smith], to Escape and awaited with her inside the club while Victim 1 was on his way This interaction, Smith driving Harris to the scene at the club, walking into the club, speaking with Harris in the vestibule, sitting inside the club with Harris as they were waiting for victim 1, it's all captured on surveillance video. Mr. Smith's face is clearly visible.

6

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

While they were at Escape, Harris and Smith were communicating with CC1 via Telegram. They were talking about how Harris should act around Victim 1 and how to identify Victim 1's car for the shooters. Meanwhile, Harris is also texting Victim 1 **at Smiths and CC1's direction,** luring Victim 1 to Escape that evening by promising to have sex with Victim 1 and his girlfriend, the deceased, Clarisa Burgos." Id. at pages 8, line 11 through page 9, line 3.[4]

"Eventually, Victim 1 drove his vehicle to Escape and parked in front of the club with Burgos in the front passenger seat. ...Smith offered to walk by Victim 1's car in a mask and then message the shooters the color of the victim's car, but even CC1 Thought that would be too obvious and might scare off Victim 1, so he told him not to do that. Harris, instead, eventually stepped outside Escape ostensibly to greet Victim 1. She then ran back inside the club and provided CC1 and the shooters with a description of Victim 1's car." Id. at page 9, lines 4-18.

See also PSR paragraphs 17, 18, 21, 22 and 23 noting that Chelsey acted at the direction of her co-defendants.

A review of the warrant application also notes "Chelsey Harris, a/k/a 'Ms. Chinn' working in conjunction with and *at the direction* of Karl Smith, a/k/a 'Pac,' and Dajahn McBean, a/k/a 'Jezzey Mula'...." See, Agent Affidavit in Support for A Search Warrant for Stored Electronic Communications, In the Matter of a Warrant for All Content and Other Information Associated with the Instagram Account princessmokha [ ] Maintained at Premises Controlled by Meta Platforms, Inc. USAO Reference No 2024R00242, at paragraph 8, USAO_277499 (italics added). "McBean **used a female**, whose Instagram is [Harris'], to execute his plan. Id. at paragraph 11g, USAO _277504. Id. at 11n(i)-(iv) with screenshots usao_277507-277510.

"...on or about December 20/21, 2023, and that McBean/Smith directed Harris to introduce herself to Williams at that party...." Id. USAO_277513 paragraph 12 (p). It seemed that McBean was flattering/flirting with Ms. Harris prior. See Id. USAO_277512 at paragraph 12 (2).

Ms. Harris does not know the shooters nor did she have any contact with the shooters. It appears she was purposefully isolated and it appears that she was used. See, Government position *supra.* Chelsey however, fully accepts responsibility for her role. "I wish I had the proper depth of words to truly express what I feel. Without a doubt my actions are beyond shameful to my upbringing and who my parents raised me to be." See PSR at paragraph 48 and Exhibit D. Through our work together, the dawning continuum of her penitence each day brings

---

[4] Chelsey maintains that she did not understand Ms. Burgos would be in the vehicle with Mr. Williams. She believed he would be picking Chelsey up and that he had never indicated someone would be with him at that point. This does not detract from her taking responsibility but is to serve as another vector of poor judgment context. She indeed was panicked upon her return to the vestibule.

7

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

her out of the trance of affinity to and awe of her codefendants. Her devotion to acceptance, apology, respect and rehabilitation is real. Id.

Stunning were the negative references revealed of the text messages behind Chelsey's back. USAO_277514 from Smith: "I just got here her bumbass not even here." December 21, 2023, at 12:56 a.m.[5] Sad were the text that reflect a young woman flush with the excitement the attention of a person older and to her famous, "see he do got a heart for me! I luvvvv him" Harris to Smith re McBean on 3/4/24 3:01:01p.m (UTC-5). See also PSR at paragraph 28. Unknown to Harris were other chats with which she had no involvement.

Chelsey did not initially fully understand the leap she was taking as she stated at her plea. In the next days she felt she could not back out. In my time working with Chelsey she is still coming to terms with the reality of what her participation has led to. She is haunted by Ms. Burgos' visage and when she was brought to court for her plea, she recognized the family for their similar features. I feel she will need grief counseling in her continued reflection on the events of this matter. She attempts to speak poignantly and sincerely to the family in her statement.

Ms. Harris has no gang affiliations. She met co-defendant Smith a man 4-5 years her senior because he noticed her travel postings on Instagram. From here the two began exchanging texts. The man absent in the story is known as "Stali." Ms. Harris met him because she did a graphic design for Stali's girlfriend's business. From this point Ms. Harris who had industriously started her own businesses in high school and discovered her talent for graphic design was invited to events and met others with some renown in the online world. She was socializing with older people, she was experiencing the ether of that which she perceived as grown up and climbing in the world of business and social circles. As a young woman, this was intoxicating but not malicious.

My cadre of young women interns are also troubled by this case as they see themselves as Chelseys.[6] A good student, treasurer of her high school class, the salutatorian who spoke at graduation. A neighborhood friend on their way to college. The isolation of pandemic shutting down your college, a life turned to maximum online. An industrious young woman who started her own natural skin care business from home in high school and was a success.

---

[5] See, supra, Agent Affidavit in Support for A Search Warrant for Stored Electronic Communications, In the Matter of a Warrant for All Content and Other Information Associated with the Instagram Account princessmokha [ ] Maintained at Premises Controlled by Meta Platforms, Inc. USAO Reference No 2024R00242

[6] Ci'Arra Nonis, St. John's University School of Law, JD Candidate May, 2027 deserves recognition for her excellent work in this matter in working with me through the discovery and contributing her reflections from her view as an emerging adult in the context of social media and reflection on Chelsey as a young woman of similar age and background.

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

An overall good girl from a good family dabbling in the new nightlife one can access as you reach 21. The thrill of going to clubs and parties and seeing people you perceive as famous from the internet, the bastion of existentialism for this generation. Then you feel valued, cared for, someone who would stand up for you if a guy was rude to you or improperly made a pass at you. You think you have older brothers. You feel you would do things for them. You fail to comprehend the reality of the web and the spiders. This is also revealed in the returns from the social media warrants.

To we in the courtroom, bench, Government, counsel, reporter and marshals, Mr. McBean is another man in another case. But to social media Mr. McBean is Jeezy Mula and is quite well known. He has a significant fan base as a rapper. He has a true presence in a part of the world of social media.

His attention to Ms. Harris permitted the eventual suspension of her judgement for its false sense of import. This is not a young woman who set out to join a criminal enterprise or participate in crime. It was the tragic folly of impressionable youth. In effect Ms. Harris was groomed by people she perceived as older and who presented as initially interested in her and flattering. To her they were worldly and influential. Amazingly the first time she ever saw co-defendant McBean in person was when she was brought into court for the arraignment on the superseding indictment which joined him to Mr. Smith and Ms. Harris. Her youthful impressionism is revealed in some of the texts where she reflected in essence "he cares about me! I luvvv him!"; this was not romantic but the excitement of a young fan in being known by the fan object who was to her in her view of social media, larger than life.

The events of December 23-27, 2023 were dystopic troubling nights on our streets. Ms. Harris' family came together in the shock and awe of the arrest and its attendant details. They are a deeply religious, hardworking and loving family, they recognize that there is a penance for one's actions but are utterly shocked at the anomaly of Chelsey's actions. In my exchanges with the Government and the unfolding of their perceptions of this matter we did not seek bail, nor would it logically have been granted. I learned a great deal reading the minutes of the Smith bail application for at that time the complaint and that application were the center of my knowledge of the facts of this matter.

///

## The Harris Family In Contrast

The Harris family is a kind, supportive, hard-working, educated family who were living the true American dream to raise their children in a place with opportunity and security. Her parents came from a central and rural section of Jamaica. The Harris parents' respective families

9

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

worked in agriculture, they met through friends. Chelsey's paternal grandfather was a liaison to the Minister of Agriculture in Jamaica. Chelsey's mother attended Northern Caribbean University in Jamaica and graduated with a degree in nursing. Her father and mother moved to New York, the girls were born. Raising a young family with two working parents without close family was challenging with extreme working hours. Thus, the family relocated back to Jamaica for a time.

When Chelsey was small she benefited from better schooling and family support in Jamaica. Their brother was born in Jamaica. The children attended Glenmuir Preparatory School in May Pen, Parish of Clarendon, Jamaica until Chelsey was 9 years old. Mr. Harris, Senior worked in NY and would visit his family. Upon the granting of status to Mrs. Harris, she had to immediately join her husband in New York. The children remained in Jamaica for two years in the care of family until they joined their parents in New York. They lived in a basement until the couple earned enough money to purchase their home in which they continue to reside.

All are balanced, loving and industrious people who worked to earn their piece of the American dream. Mr. Harris worked for the MTA and retired after a 26 year career as a bus operator, his son, Chelsey's younger brother follows in his footsteps. Before working for the MTA, Mr. Harris, Senior "held various jobs including security guard, handyman, exterminator, TLC cab driver, and Janitor. I worked every job with integrity and determination so that my wife and our three children could have stability and opportunity. Alongside my wife, I raised my children with value of discipline, responsibility, and hard work, lessons I also practiced in my own life." See, Exhibit B1.

Dr. Harris, Chelsey's mom, this year earned her PhD in nursing education (DNP, Doctor of Nursing Practice). She has been a full-time nurse at Bronx Psychiatic Center for the last 15 years. She as well taught at Mercy College where she teaches clinicals in psychiatric nursing. She had paused her work at Mercy College to complete her PhD and due to this matter. Chelsey's older sister is a labor and delivery nurse at Mt. Sinai Hospital. Each are serious people who value community, and they are a bound loving family.

Their greatest lament is that of their three children these wonderful people could not understand how their middle child, Chelsey, arrived before the Court in this scenario. She is an extremely positive and industrious girl who started her own holistic skin and hair care business in high school, Chin[7] Tsunami Care. She created the formulas, created the packaging, learned marketing all in her childhood home, and was able to earn significant funds. She learned marketing and design via online courses. She created an online store and was a true success. When she found that hiring a website designer too expensive, she taught herself how to do that.

---

[7] Chin has been Chelsey's nickname since she was a child. As demonstrated her skin care line was developed in high school and carries this nickname. "Chin" is not some nefarious a/k/a.

THE LAW OFFICES OF

# Richman Hill & Associates PLLC

She received compliments on her graphic work and developed another business, Chin Grafix. She designed logos and did freelance graphic design for individuals and companies.

She was an excellent student as reflected in Exhibit C (not filed on ECF, but provided to the Government and the Court in hard copy). She earned regent diplomas. As noted above, Chelsey was her class treasurer and a helpful member of her community. She graduated second in her class and spoke at graduation. She worked in typical jobs motivated teenagers can attain such as Chuck E Cheese from ages 16-18 and at the Olive Garden when she was 15. She turned her attention to her skin care line with its launch while she was still in high school at age 17. She is not the person one could imagine in this moment in the fact scenario of this matter.

Her parents are practical people, they wanted Chelsey to pursue a nursing career but she was a creative and with the success of the business she created she wanted to explore the world. She wanted to see and experience beyond the idyllic of her rural young childhood in Jamaica and then the Bronx. She traveled, she posted, she made friends, and as she reached 21 she explored the world of nightlife in Miami and New York. She moved in with her maternal uncle, an airline pilot, in Florida as she was always bound to her family.

Her single prior criminal conviction for forgery also evolved out of meeting negative people online. In her graphic business, Chelsey worked hard to create innovative designs for logos and letterheads and earned via her talents. It was through the viral connections of social media that she came into the orbit of her codefendants. Mr. Smith noticed her because of her travel postings, all via travel she herself had properly earned the money to support. She met another character in this fact pattern via designing a logo for his girlfriend. She met Mr. McBean solely through the introduction via social media and then via texting through her co-defendants present and absent.[8] She was smitten with the attention of these older people who seemingly had access to the glamour that she perceived was part of adults who parlayed their talents into fame. If it were not so actually tragic, it could be the plot of a film or cautionary Netflix series.

Chelsey's parents rage in debate about how their sunny daughter resides in the Essex County Jail. The sisters love each other but are so very different. They are separated by seven years. Chelsey wanted to see the world and create her life in a magical fashion and her sister chose a path with her nose to the grindstone and the devotion to her work that is unsung but so critical to all.

The parents debate one another, mom is very practical and did not favor her middle daughter's sense of wonder and adventure. Chelsey's sister is the embodiment of her mother's world view. Dad, adores his children and encouraged Chelsey's innovation and sense of

---

[8] Ms. Harris had never met the most recent addition to the indictiment, Ms. Bartholomew. She did not know of her at all.

11

adventure. That she is before the Court for these charges is beyond their possible perception for this child. This is simply not who she is. In his interview with probation for the PSR, Mr. Harris referred to his daughter as "strong, ambitious, creative [and] determined to do what she really wants to do." He states she is a 'social butterfly, and she is dedicated to her business ventures. When he learned of her instant offense, Mr. Harris recalled 'it was devastating. It's still devastating. I was shocked." See, PSR paragraph 82. "He pleads with the Court to 'be lenient with her. Give her a second chance at life. She's only 24 years old, she was only 22 when this all happened. Please be lenient with her." Id.

In the interview with Dr. Small, Chelsey's mother PSR 81. She described Chelsey as "always bubbly, very friendly, never scared to do things." .She was an excellent student and she never had issues with her classmates. Id. Dr. Small indicated that [Chelsey is the most expressive and extroverted of her three children, stating that no one ever has to guess how she is feeling. When Dr. Small learned of the defendant's offense, she reported feeling shocked and stated, 'I'm still in shock. It's like a bad dream. I want someone to pinch me and wake me.'...Dr. Small would like the Court to consider the following statement: "As a mother, and being selfish, I would say please have mercy. I feel for the other family who lost their daughter I can just imagine how they feel. But I would say, look at my daughter and her family. We are not those type of people. Give her a chance, she's very young. Give her a chance to come out and make something of herself. She's smart and can contribute to society if given a chance. I think if she was given another chance in life, she would make better choices. Be merciful so she can turn her life around." Id.

In the year I have known Chelsey, I have spent a great deal of time with her, her parents and her sister. I often work the weekends, and they frequently came and sat with me. I perceive in representing the young, it is important to understand the family from which they came to properly relate them to the Court. We are a composite of so many things. In knowing this family the anomaly of Chelsey's participation here only more starkly highlights this aberration in this sunny young woman's history. Of the fits and stumbles that we all go through on our march to adulthood, this was a tragic fall; a summation of the dangers of poor choices and events that were expanding around her; she was in a rip tide of malice and could not get back to shore. She is metaphorically drowning.

I think it so important to understand how any individual comes to the criminal justice system. As I came to know Chelsey, her presence in this matter is still shocking to me. It was particularly vexing, as her parents are so moral and properly directed. In my first meeting with Chelsey it was clear that she did not comprehend her situation; it was still early so I did not fully comprehend her, I had to gain her trust and to focus her in understanding the process and her options. I asked and explained the aspects that cooperation could provide. I brought her parents in to explain that to them as well. The Government offered protections. No one could be

12

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

convinced. From my review of the discovery, the technology that is available to us is the map that is left of people's actions and statements in the moment. They can be misinterpreted and if you do not understand the individual, you may not understand how they arrived at the moment but that is the purpose of this memorandum. It is also to demonstrate how little value Chelsey appears to be and thus I do not want her decision to become an anvil upon her.

I have also done a great deal of education in helping to wake Chelsey from the perception of who are real friends and the false prophets of social media. It is an awakening. As is the unfolding of her grief for her actions and the impact to the Burgos family and Williams. On one level you see Chelsey continuing communications with Smith and McBean – even when Smith separates himself from McBean- directing Chelsey to ask him questions and fill him in. See, Texts as between Smith and Harris 5/7/2024 7:12:38 pm (UTC –4) through 5/8/2024 7:04:38 pm (UTC –4).[9] You see her flush with perceived meaning[10] to a man she had never met in person but for whom she acted, contributing to bringing us all together before this Court. You see her cleave to the bravado of this perceived false family after the fact when the police came to her home, and she texted to delete messages. This is however, not the core of this young woman.

What is not seen was that in the months that passed after the events of Christmas week 2023 and the reports of Ms. Burgos' death were the Poe-esque haunting of Chelsey's moral self. She read the articles. She rued the loss of a mother to a son, of a daughter to a family and a sister to siblings. When you ask Chelsey what she perceives her stalking to be, it was in the viewing of the online life of Ms. Burgos. This brings her to tears as she is also a daughter, a sister and wants to be a mother. Through this she cannot go to her own parents for she is now on an island that they would never tolerate.

Her parents are honest, reliable and as caring and wonderful a mother and father as anyone could hope for. Their fear for their daughter and worry for her future is movingly expressed at every meeting. Their compassion for the victims in this matter is clear. In the letters from Chelsey's mother, sister, godmother and others they too reflect on the family of Ms. Burgos and pray for them. Their understanding of the situation and jeopardy at hand is practical whilst tempered with great sadness. How could their daughter be in this position? This is not who they are, or what they could conceive of for their child. They do not want to let their daughter know their pain in worry for her. They are all aware there is no repair for the rip in society but how can this question be answered in a more meaningful fashion than the termination of their daughter via jail time. They are not this. Nor are they "people of the street," they are working people, they do not know the gossip or dangers which lurk; they go to work and come home to their family.

---

[9] It appears that Smith directs Harris to contact McBean to ask him if he had gone to court in an unrelated matter. It appears that Smith is choosing not to get on the phone with McBean, yet directing Harris to do so. This is in the months subsequent to the events of Christmas week 2023.

[10] See supra, text 3/4/24 3:01:01 pm (UTC-5), "see he do got a heart for me! I luvvvv him"

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

In my discussions with Chelsey I have seen her struggle with understanding her predicament and how he came to this place. I think she is still in denial as to the abject silence that is death. The depth of experiencing loss is not fully understood until you experience it. She regrets she is amongst the responsible. I think she will need psychological support in this as part of rehabilitation.

When I represent young people, I first ensure they attain a forward thinking mindset. I do not want them to be further lost. Here there is a young woman with such promise. She embraces and tries to find the best in all things. She has studied while at the Hudson County Jail enrolling in college and earning 100 certificates by the time she was moved to Essex County Jail where there is no support for study. She had obtained two responsible jobs and was liked and respected by the Hudson County staff. She became a Tier Representative/Head Trustee where she was responsible for worker payroll, cleaned shower floors, regulated commissary, did laundry, mopping, sweeping and assisted with the reception of new detainees. She helped them to navigate their new environ.  At each of my visits staff noted that she is a good kid with a good attitude. She journals and has re-devoted herself to bible study. She begins every call with her main supportive friend with bible verse and prayer. I have introduced her to the writings of Marcus Aurelius. She reflects with me of her remorse, her shame, her guilt and regret that she could not in the midst of where she was, find a way to say no. She is confounded as to the realization of how she was swept up in morass of impressions, perceived obligations and need and that she did not see how to back out. She continued in a sense of bravado and obligation to the group that seemed necessary, but she cannot in retrospect explain why but from which she felt she was bound.

There are thirty two letters of recommendation they are grouped for your convenience. Typically, I excerpt all of the letters however, there are too many. I focus the Court on the letters from her family  whose statements were reiterated to Probation and set out above. The family reflects on the loss caused by Chelsey but remain stunned this sunny, bubbly girl is here.

Chelsey's sister, a Registered Nurse working at Mount Sinai Hospital in the Obseterics Unit also studying for her Master's degree as a family Nurse Practitioner writes:

"....As her oldest sibling, I naturally took on the role of a second mother, someone she would often turn to for support and guidance. Growing up, our family began with humble beginnings in Jamaica before moving to the United States. Like many siblings, we experienced milestones, challenges, disagreements, responsibilities, joyful moments, and hardships together. Through it all, I have come to know her deeply beyond the circumstances of her current legal situation. This moment does not reflect the sister I have helped guide alongside my parents as she matured into a young adult.

14

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

Despite the mistakes that have led to her current circumstances, I do not believe my sister's character is defined by this moment. Chelsey has always been bright, fearless, and driven determined to better herself and to encourage those around her....She has consistently been a supportive friend and a dependable source of help to others in need. I firmly believe she has the capacity to redirect her life, to learn from this experience, and to return to the path of contributing positively to her community and leaving a meaningful mark on the world. It is my hope that the Court recognizes not only the seriousness of the charges before her, but also her potential for rehabilitation and her worth as a person, as my only sister, deserving of the opportunity to change." Kathleen Harris, sister. See Exhibit B1.

Pastor Cecilio Edwards, also a proud veteran of the U.S. Army discusses his history and his knowledge of the Harris family. "The Chelsey Harris I know is the complete opposite of the person you've come to know due to these unfortunate circumstances. The Chelsey I know from birth is a God-fearing, gifted, highly motivated, talented, attractive, articulate, brilliant, industrious, generous, entrepreneurial, loving, caring, and hard-working young woman. She was raised by her parents in a loving home and environment. These parents share core values that include faith in God, love, education, honesty, hard work, humility, lawful striving, truth, respect for others, adherence to the law, integrity, dignity, charity, promoting peace, and love. These principles serve as the boundaries and foundation upon which their children are encouraged to build their lives.

Dr. Donna Harris is an excellent mother who leads by example and principles. Mr. Warvin Harris is a loving father who is compassionate, caring, unselfish, and truly a friend. Chelsey is a product of this loving environment, and I bear witness to that. We humbly ask the court for your mercy and compassion in your decision. Our sincere condolences go to the family of the deceased and all families affected by this tragedy. We are praying for and with you." See, Exhibit B2.

Close friend Tashanti Braham writes of the Chelsey he knows, the young woman to whom he speaks every day. Mr. Braham is pursuing a career in Computer Engineering and participates in community through cancer awareness walks, toy drives and food distribution to the homeless. "I have often been the person people turn to when they need guidance, motivation, or simply a voice of encouragement. I share this to give you a sense of my values as perspective as I speak on Chelsey's character." Tashanti came to know Chelsey through her online vegan-based hair, skin and body care products.

"During the time I have known Chelsey, I have seen her to be ambitious, intelligent, and faith-driven...Even while running [her] businesses, she was envisioning bigger and better, often sharing new ideas and future plans with me. At the same time, she shared her faith openly by

15

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

posting daily work journals and prayers onto social media, and she was someone I often saw attending church. Chelsey also took the time to encourage me personally, urging me to continue my education after I had taken a break and motiviating me to explore business ideas of my own. Her drive to keep improving herself and those around her was always evident.

...Chelsey calls me every morning and night to pray, not only for herself but for me as well. In less than a year, she has completed over 100 certificates and is now entering her third semester of school with a GPA of 4.0. She also serves as the tier representative in her housing area, an optional position the facility entrusted with her due to her reliability and leadership qualities. In this role, she helps new inmates settle in, manages payroll for workers, and takes on responsibilities like laundry and maintaining the cleanliness of the tier. In her personal time, she continues to read the Bible and other books to keep her mind and spirit strong.

In all, Chelsey is a kindhearted, peaceful, and ambitious person who uplifts those around her. ....To know her is to love her, and I sincerely hope the court is able to see her for who she truly is—a woman of faith, strength, and good character—and not only the circumstances that brought her here." See, Exhibit B3.

Each of the letters speak of a sunny young woman, filled with love, helpful to others, uplifting, a supportive friend in good times and bad, a girl that excelled academically, a favorite of her school teachers, responsible, the first to lend a helping hand, a positive influence, a positive attitude and above all her kindness and willingness to go above and beyond with integrity. See, the many letters in Exhibit B3. The people she has known and grown with are all positive people, engaged in their careers and communities. Interestingly, another aspect of the composite is that Chelsey was devoted to community, she is not a selfish young woman but one who sought to take her positive achievements and help others achieve their positives too.

"From the moment we met, Chelsey has been someone I could depend on for compassion, encouragement and genuine care. She has always been the better half of me, guiding me with her wisdom and supporting me through my own challenges. Her caring nature extends beyond friends and family, she has an extraordinary ability to empathize with others, often putting their needs before her own." Aaliya Forrest, see Exhibit B3.

"Chelsey is truly a one-of-a-kind person. She is the type of a friend who is always there when you need a shoulder to lean on, someone who celebrates your successes and helps you through your struggles. In my own life, Chelsey has been a constant source of support and encouragement. She is also special to my son, who is autistic and typically shy around people, yet he adores her. The bond she has with him speaks volumes about her kindness, patience, and natural ability to connect with others." Shaylah Wiggins, see Exhibit B3.

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

Chelsey's acceptance letter to Hudson County Community college can be found at Exhibit B4 along with recommendations from her English Composition professor and Academic Coach. Both speak glowingly of how Chelsey has distinguished herself, "not only through her academic achievement but also through her positive attitude, diligence and eagerness to learn.

Chelsey is a proactive and punctual student who consistently submits her work early or on time, and she engages fully with every assignment....When I suggested revisions to her grammar and sentence structure, she carefully applied those notes in subsequent drafts, showing both humility and dedication to growth....Beyond grades, Chelsey is pleasant and collaborative in class discussions, always contributing thoughtful comments while encouraging her peers...Her willingness to revise and improve, even when she had already earned strong grade, reflect both maturity and a genuine desire for self-improvement." See, David Nash, at Exhibit B4.

Thus, the struggle to understand Chelsey's involvement in this matter. I perceive her mother, Dr. Donna Smalls, with her psychiatric nursing training and experience will seek to work with her daughter to understand how Chelsey came to this abyss, to fully understand the chasm created by her actions and to seek grief counseling for her actions impacting another. I perceive some aspect of home confinement after incarceration will be a healthy component of sentencing to ensure that Chelsey is rebound within the values of her family, and to remain with her family for guidance, repair and repentance. In a number of my matters in our Districts, the Court has insightfully fashioned sentences tailored to that which our carceral system is lacking but serves to repair the community.

## *What is Just In this Matter For This Individual?*

In observing the commitment in sentencing pronounced by the Supreme Court in the wake of the Booker and Fanfan decisions right through to Pepper and Gall and their progeny, decided at the U.S. Supreme Court, we are to be guided by individuality in sentencing under the guidance of 18 U.S.C. 3553a.  This was a revolution in the wake of the devastation wrought by the United States sentencing guidelines where the prosecutor in applying the charge restricted the sentence to a particular narrow range, which was often elevated in comparison to that which was needed for the individual at the bar.  Indeed, the exposure of the plea agreement was terrifying but I encouraged Chelsey to put her faith in both the Court and in herself for it is the individuality of sentencing that is critical.

In the federal system the Court has the power to evaluate the individuals who stand before it and fashion an appropriate sentence in light of the factors set forth in Title 18 U.S.C. § 3553(a). The relevant factors are:

17



THE LAW OFFICES OF

# Richman Hill & Associates PLLC

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for. . .the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.

When imposing sentence, under these factors, courts are instructed to impose a sentence that is *"sufficient, but not greater than necessary."*

While Chelsey is chronologically an adult, she is still a clearly impressionable young person. It is said that the brain matures well into our twenties. Thus, I felt also instructive is the discussion in Miller v. Alabama, 567 U.S. ___ (2012). In Miller v. Alabama, the Court held that mandatory sentences of life without the possibility of parole are unconstitutional for juvenile offenders. The ruling extended beyond the Graham v. Florida 560 U.S. ___ (2010) case, which had ruled juvenile life without parole sentences unconstitutional for crimes excluding murder. This case is about life without the possibility of parole, and the exposure here is indeed life. The discussion of how the individual, especially an emerging adult should be contemplated is critical.

The Eighth Amendment's prohibition of cruel and unusual punishment "guarantee[ing] individuals the right not to be subjected to excessive sanctions;" "flows form the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. Miller v. Alabama, 567 U.S.___ (slip op. at 6), citing Roper v. Simmons, 543 U.S. 551, 560.

"Roper and Graham establish that children are constitutionally different from adults for sentencing purposes. Their 'lack of maturity' and 'underdeveloped sense of responsibility' lead to recklessness, impulsivity, and heedless risk-taking. Roper, 543 U.S., at 569. They 'are more vulnerable...to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And because a child's character is not

18

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

as 'well formed' as an adult's, his traits are 'less fixed' and his actions are less likely to be 'evidence of irretrievabl[e] deprav[ity].' Id., at 570. Roper and Graham emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." Miller v. Alabama, at Syllabus, page two and Slip op. p. 8, 9. Graham v. Florida, 560 U.S. __ (slip op., at 17, 23) guides us to reflect that those meting out punishment consider a juvenile's 'lessened culpability' and greater 'capacity for change;' and runs afoul of the high Court's requirement of individualized sentencing for defendants facing the most serious penalties. See, Miller v. Alabama, 567 U.S.__ (slip op. at 1-2) and 18 U.S.C. §3553(a). Please note as well that the cases considered in Miller v. Alabama included the consideration that one of the defendants had as well as the grave crime of which he was accused, a juvenile arrest history. Graham as well admonished that '[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed. See Graham, 560 U.S., at __ (slip op., at 25) and Miller v. Alabama, 567 U.S.__ (slip op. at 4).


This concept is honed less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society. Miller v. Alabama, 567 U.S.__ (slip op. at 6). The Supreme Court's decisions in this area which guide us "rest[ ] not only on common sense-on what 'any parent knows'- but on science and social science as well. Roper, 543 U.S. at 569. In Roper, [the Supreme Court] cited studies showing that '[o]nly a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior.' Id., at 570 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003). And in Graham, [the Supreme Court], noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' –for example, in 'parts of the brain involved in behavior control.' 560 U.S., at __ (slip op. at 17)." Miller v. Alabama, 567 U.S.__ (slip op. at 8-9).

Further, "[t]he evidence presented [to the Supreme Court previously] indicates that the science and social science supporting Roper's and Graham's conclusions have become even stronger. See, e.g. Brief for American Psychological Association et. al. as Amici Curiae 3 ("[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court's conclusions"); Id. at 4 ("it is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead and risk avoidance.")....("Numerous studies post-Graham indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of adolescent delinquency."). Miller v. Alabama, 567 U.S.__ (slip op. at 9, footnote 5). Continued assessment reveals that the male adolescent mind is not fully mature until the mid-late twenties.

The Court reasoned that the findings of transient rashness, proclivity for risk, and

19

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

inability to assess consequences-both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.' Miller v. Alabama, 567 U.S.__ (slip op. at 9) (internal citations omitted).  Nor can deterrence do the work in this context, because 'the same characteristics that render juveniles less culpable than adults'-the immaturity, recklessness, and impetuosity-make them less likely to consider potential punishment. Miller v. Alabama, 567 U.S.__ (slip op. at 9-10). "Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'-but 'incorrigibility in inconsistent with youth." Miller v. Alabama, 567 U.S.__ (slip op. at 10)(internal citations omitted). Too lengthy a sentence, to parallel the argument advanced in Miller v.Alabama 'forswears altogether the rehabilitative ideal." We must focus not only on the present but the future in that release will occur in this case. The outcome of the incarceration experience must serve as an answer for the act committed, the community's future; the future of the individual returned to society and must serve the individual with a view to healthy matriculation back into community.

By removing youth from the balance of consideration in punishment one removes the assessment of whether the law's harsher terms of imprisonment proportionately punishes a younger offender. Paraphrasing the logic of Miller v. Alabama (at slip op. 11).  Similarly by analogy length of sentence has different meaning to the younger.  In Miller v Alabama the majority posited that "this lengthiest possible incarceration is an 'especially harsh punishment for a juvenile' because he will almost inevitably serve 'more years and a greater percentage of his life in prison than an adult offender. (See Id. slip op. 12).  Here too Chelsey, given her relative youth, time has a different meaning, years to her are a greater percentage of her experience of life to date, thus each year has far greater perceptive impact.  The proposed period of ten years is just more than half of her life experience to date, and makes up for more than a youth can remember.  She has served now just over one year, the impact in my discussions with her has been that of an eternity, a lonely eternity. Chelsey reflected that the only hug she has had since her arrest is when I hugged her when she broke down and cried at her plea. She was enrolled in a parenting class because she was assured she would be able to hug her parents at the end. Before the class ended she was moved to the Essex County jail.  These as well are critical years for potential development, therapy and rehabilitation.  Chelsey will need support in her coping with what she has participated in. In the video when she re-entered the ironically named "Escape" lounge, when she was panicked as it would seem the reality was before her and she had seen another person in that car. She went to her knee.

"Youth is more than a chronological fact. It is a time of immaturity, irresponsibility, impetuousness and recklessness. It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage. And its signature qualities are all transient." Miller v. Alabama, 567 U.S.__ (slip op. at 13) (Internal citations omitted).

An individual's emotional disturbance is equally relevant. Id. The Supreme Court found that evidence (emotional disturbance) 'particularly relevant'-more so than it would have been in

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

the case of an adult offender. Id. (Slip op. at 14). "[J]ust as the chronological age of a minor is itself a relevant mitigation factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in assessing his culpability. Id. (internal citation omitted.) In Chelsey's life she was raised provincially and thus the world beyond cast a shining impression on her by which she was blinded, belying her actual good nature.

Her detention is having an existential impact, although she does not understand it as such. She reflects she often calls her family to cancel visits, she feels herself a wrong, a burden.

The resolution for this individual in this moment is critical. She is a thinking being, who through horrid choices which evolved over merely a week's time via the influence of men older than she, at a time when that age gap is rife with poor choices due to the influence and impressionism of youth has arrived at a place of contrition, shock and fear. She desperately wants to make amends with the knowledge that the loss of a life cannot be mended. The existence of her extremely present mother, father, siblings, and true friends, not the perceived friends of this matter, are an anchor, it is pure and she is focused upon them.

Hindsight and remorse are always 20/20. We must here mete out a just sentence with a view to what is not only sufficient, but not greater than necessary (18 U.S.C. 3553(a)); but what will return a functional human being to the community who may participate constructively to the community and serve others in a meaningful not as another housed forgotten that is not productive in the repair of her wrongs.

An additional component, one that I have addressed with the District Attorneys of Kings and Bronx Counties in my work in other cases with young people, some of those involving gang violence, is the lack of discussion of consequences in our educational system. I recall when I was in high school when health class was introduced, parents were up in arms, you are going to discuss sex with my kid? You are going to talk about sexually transmitted disease? There was however value, there is no class to discuss the dangers of online exposure, the danger of making poor choices if you are star struck by an infatuation and the consequences of jail. It is just assumed in society that people understand what the seasoned adult takes as obvious. But the parents of these generations cannot reflect on the infectious sucking tentacles of social media or their impact, we are not of that world, we assume. Yet here we are, a perfectly fine young woman, into a web and into a conspiracy she would never have fathomed for herself and yet she is here and seeks to take responsibility. Chelsey as a component of sentence has the capacity to be an educator and to warn other young people of the true dangers of social media and what therefrom may flow.

On October 5, 2025, Chelsey called me and I reviewed with her the final recommendation of the PSR, 300 months, I could hear her deflate, the shock, she has not even lived this long and her prayer of having a baby would be snuffed out.

Victim 1 and interface:

21

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

When Chelsey was transferred to New York she was sent to the Hudson County Jail. Laquan Williams, victim 1, was there as well. Chelsey related her shock when she saw him during movement. He would blow her kisses. She felt both fear and shame at her participation and thus at this confrontation. Via communications including to my office, we learned that Mr. Williams does not want to participate in any prosecution against Chelsey. This of course does not salve the event on a community level, but it is a reflection point.

Chelsey reflects in her writings on the impact to the Burgos family. She understands the love of family and the recognition of the loss she participated in and does not expect their forgiveness but seeks each day to honor Ms. Burgos in prayer and good deeds forward. See, Exhibit D.

### Chelsey's Work at Hudson County Jail and the Contrast of Her Experience At Her Transfer To Essex County Jail

As noted above, Chelsey who had never experienced detention had to adjust to her new existence. When I met her she was anxious and confounded. Once transferred to the Hudson County Jail she engaged and sought to contribute to the community that she was now a part of. She completed 100 CypherWorx Courses and earned three Hudson County Community College Certificates during her detention. See, Exhibit A, which includes at the beginning an alphabetical transcript list. She served the facility as a Tier Representative and was entrusted with many responsibilities including payroll, the welcoming and orientation of new detainees.[11] She valued the 30 minute visits she was permitted with her family. She so longs to touch and hug her parents. She related that I was her only hug since her detention when she became overwhelmed with emotion at her plea. She signed up for a parenting class with the hope of at the end being granted the ability to have a hug from her parents. This dichotomy is not lost in the aftermath of her actions, but reflect the still emerging adult in need of her parents.

On September 10, 2025, Chelsey was relocated to the Essex County Jail. Her experience there has been daunting. She is now on 23 hour lockdown. There are no exceptions. There is no outdoor time. Visits with her parents are reduced to 15 minutes weekly. Her discovery and writings which she wanted to contribute to this memorandum have not been transferred to her. She is shocked by the further depth of what incarceration can be. It is another level of penitence in a far harsher environ. She did not do anything wrong to cause this transfer. Whilst detention was shattering, she had found a way to be useful to the Hudson County Jail Community, and she was engaged in learning via the courses available. At Essex she feels a level of despondency and depression, she cries often as she is without purpose and air. I ask that the harsh conditions of

---

[11] Her only infraction at the Hudson County Jail was on December 2, 2024 when she confronted a woman who was bullying others and had instigated a conflict with Chelsey.

22

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

Essex also be taken into consideration.

Chelsey has devoted so much of her time to study, to journaling and self assessment through the Bible. Each day she begins a conversation with one of her friends with Bible verse. This is not a new look for Chelsey to impress the Court. She is a devoted Christian and thus her presence in his matter all the more out of her character.

The tattoo on her neck is Proverbs 19:21, "Many plans are in a man's heart but it is the Lord's purpose that prevails." Amongst verse we have discussed in anticipation of sentencing is Lamentations, 3:27-28, "It is good for a man to bear the yoke while he is young. Let him sit alone in silence, for the Lord has laid it on him." In her PSI interview as noted at paragraph 49, Chelsey provided copies from her personal journal, See also Exhibit E. Of her writings, she noted, "Perceive jail as a corral and as if a horse is running wild, he has no use and when a horse is in a corral they had locked in a box able to train. Maybe with me being here this is my corral and allows me time to reflect and be trained with the word of GOD." Journal entry 12/25/24 after morning sermon at Hudson County Jail by Pastor Phil, See Exhibit E.

Of particular moment to her today as I complete this writing from abroad and I speak to her she feels Lamentations 2 and 3 capture her, for her sins before the community and her faith and her need to yet find hope in faith despite devastation and anger caused by her actions. She notes that 2 Timothy 3:14-4:2[12] recently remind her of how powerful "sacred scripture is for correction."

<u>Chelsey's contrition, acceptance of responsibility and apology</u>:

Chelsey provided a written statement which is both included in the PSR at paragraph 48 and attached here at Exhibit D. Rarely have I seen in my work a young person so out of her personal context. A good person who has participated in an ultimate loss. Her remorse for the pain caused by her actions and her shame in reflection to the values instilled by her parents is pure.

"I wish I had the proper depth of words to truly express what I feel. Without a doubt, my actions are beyond shameful to my upbringing & who my parents raised me to be. Regardless, I'm aware that there is nothing I can say to ever restore the presence of a deceased loved one. I understand the value of love and despite obvious circumstances, I am blessed to be able to feel bits of it. Considering this feeling, I pray for the family of the deceased, the child left behind and their ability to still feel love. I pray that they find comfort, and peace with my decision to accept

---

[12] (3:14) But you must remain faithful to the things you have been taught. You know they are true, for you know you can trust those who taught you. (3:15) You have been taught the holy Scripture form childhood, and they have given you the wisdom to receive the salvation that comes by trusting in Christ Jesus. (3:16) All Scripture is inspired by God and is useful to each us what is true and to make us realize was is wrong in our lives. I t corrects us when we are wrong and teaches us to do what is right. (3:17) God uses it to prepare and equip his people to do every good work. (4:1) I solemnly urge you in the presence of God and Christ Jesus, who will someday judge the living and the dead when he comes to set up his Kingdome: (4:2) Preach the word of God. Be prepared, whether the time is favorable or not, Patiently correct, rebuke and encourage your people with good teaching." 2 Timothy 3:14-4:42.

THE LAW OFFICES OF
# Richman Hill & Associates PLLC

reasonability for my very own actions & it supplies them with the very same faith, that I have in God. The outgrowth of my participation and interests reflect my true desires to ultimately never want to hurt a soul.

....This is truly a lot for me and I wouldn't dare to beg for any sympathy as I accept the possibilities of any penalty. Ultimately, I can only hope to be granted an ounce of forgiveness for the pain that I have caused, as I am fearfully preparing for what is to come. Understandably, if I am never granted any forgiveness, I will forever be extremely remorseful for it all and I sincerely hope everyone can one day recognize this, from my heart-felt words." Id.

Chelsey is also preparing a statement she would like to present at sentencing.

Proposed Sentencing

The events of Christmas week 2023 and the continued association with her co-defendants were an extreme anomaly for an otherwise ideal emerging young adult. She was unaware of the connections of many other text streams and whirlpools around her. She did not participate in the ongoing harassment of Mr. Williams subsequent to the physical tragedies of late 2023. Her obstruction was I perceive within the swirl of the bind created in a false affinity to people to whom she was ultimately a tool. To wake her to the realities of these false friends and permit the unfolding of her moral failings in her own eyes has been a difficult road upon which she continues to walk. She is inspired only by her readings, and the knowledge that she will forever be in some way seeking to repair this tear in the world.

I humbly propose an innovative sentence. I propose as to Count 1 a sort of split sentence, 2 years of incarceration to be followed by 5 years incarceration (the mandatory minimum as to Count 2), to then be followed by 3 years home confinement with a mandate to work and or go to school (out of the home, akin to work release), to then be followed by five years of meaningful supervised release to include mental health therapy for grief and community service including as a lecturing cautionary tale for young people like herself. This aspect of service could be coordinated via the District Attorney's Offices of our city and Department of Education presentations.

My thought is that for a young adult from a moral home the society of her family will be supportive and constructive which are amongst the goals of sentencing but those cannot be achieved in detention. The structure offered by these parents can serve the goals of 18 U.S.C. 3553a in a meaningful manner and frankly will provide for proper guidance without the negatives of persons one may be influenced by in a jail setting.

I do not seek to be presumptive. I sought in this memorandum to have a frank discussion of Chelsey to ensure that she is understood in context despite her presence in this matter. With each of my clients, I stay in touch with those who will have me. I do so especially with the youngest, I will write to them during their terms of incarceration. I do try to advise them to use the time positively and to give them hope for tomorrow so that they may advance in their minds

24

THE LAW OFFICES OF

# Richman Hill & Associates PLLC

and not waste. I struggle to give hope where the appointed sentence is long. But for the youngest murder defendants (generally ages 18-25) I have worked on the average sentence- yes on the state side- has been 10-12 years, for that is a life time to youth and again, more than half of the lives they can remember.

The possibility of rehabilitation here is exponential as is the good this particular woman can serve as a cautionary tale.

One of the young women interns who came to your Court this summer was working on a thesis on the philosophical inquiry of justice and punishment. Her current focus "entails the act of forgiveness, which plays a role in harm done, and invites an alternative narrative of what justice ought look like in the aftermath of harm. [Her criminal law internship] further confirmed [her] passion in understanding how societies rebuild after institutional harm. I was able to observe and interact with numerous clients from different backgrounds and see the different curated approaches taken in order to achieve societal reparation and personals growth. If I want to contribute to transformative justice, I need to immerse myself in how communities confront past trauma an reimagine a model for ethical repair." Gabriella Rojas, Fulbright Application. Ms. Rojas in her work for the Ronald E. McNair Post Baccalaureate Achievement Program titled "An Ethical Analysis of the Death Penalty in the United States," "examined the polarized views of Immanuel Kant and John Stuart Mill who in essence believed in the act of retribution and the principle of equality in that application. She however ultimately argued that retributive justice encourages immortality through institutional harm and that these ideas foster and unethical framework of justice that discourages our capacity of reparation." I found in this moment Ms. Rojas' thoughts as contributing to my contemplation of where Chelsey stands in this moment.

It saddens and bewilders me that Chelsey is here. But I have come to know her, to understand her. I have grown close to her parents and sister. I look forward to serving as a guide for her through and after the service of her sentence. I know she still has much to learn and to contribute. She hopes to correct her wrong through service to others.

I seek your understanding of this woman in context and grace on Chelsey's behalf,

Most respectfully,

Stacey Richman