

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 11, 2025

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Street
New York, New York 10007

> Re:    ***United States v. Chelsey Harris*, 24 Cr. 541 (PAE)**

Dear Judge Engelmayer:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Chelsey Harris, scheduled for December 19, 2025. The defendant pled guilty pursuant to a plea agreement to (1) stalking resulting in death, in violation of 18 U.S.C. §§ 2261A(a)(2)(A), 2261(b)(1), (2), and 2 (Count One), and (2) aiding and abetting the possession a firearm in furtherance of a crime of violence, specifically the stalking resulting in death offense charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), and 2 (Count Two).

As described below, the defendant knowingly played a critical role in an effort by her co-conspirator, Dajahn McBean, to orchestrate a murder from his prison cell. The defendant set up the intended victim repeatedly and told McBean's shooters where to aim their bullets to kill the victim, despite knowing that an innocent woman, Clarisa Burgos, would be caught in the crossfire. As a result of the defendant's actions and those of her co-conspirators, Burgos is now dead, and Burgos's son, who is now just six years old, is without a mother. Because that conduct was so severe, the Government respectfully submits that a Guidelines sentence of at least 420 months' imprisonment would comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**A.    Background**

Overview

In December 2023, the defendant conspired with Dajahn McBean, a/k/a "Jeezy Mula," Karl Smith, a/k/a "Pacavell," and others to kill a rival of McBean's ("Victim-1"). The plot involved multiple attempts by the defendant, acting at the direction of McBean, Smith, and others, to entice Victim-1 with the promise of sex and to lure him to bars and clubs throughout New York City, where gunmen would be waiting to kill him. The entire time the defendant participated in this scheme, she knew that its principal architect, McBean, was detained at Metropolitan Detention Center – Brooklyn ("MDC") and using a contraband cellphone to direct the conspiracy.

Throughout the plot, the co-conspirators kept in close communication by sending each other text messages through Telegram, an encrypted messaging application, which the defendant later tried to delete.

As described in detail below, in furtherance of this plot, the defendant successfully lured Victim-1 to bars in Queens on December 24 and December 26, 2023. Both times, gunmen arranged by McBean tried to kill Victim-1. During the December 26 shooting, three gunmen surrounded Victim-1's car and unloaded about a dozen rounds of ammunition into the vehicle. Victim-1 was struck multiple times but miraculously survived. His girlfriend, Clarisa Burgos, who was seated in the passenger's seat, was struck in the head and died instantly. Burgos was twenty-eight years old. She was the mother of a four-year-old boy.

<u>The Initial Efforts to Track and Lure Victim-1</u>

In early December 2023, Victim-1 and McBean were engaged in a dispute over social media. Victim-1 was at liberty, and McBean was detained at MDC pending sentencing after pleading guilty to a violent crime in aid of racketeering in the U.S. District Court for the Eastern District of New York. The dispute consisted principally of dueling public social media posts in which Victim-1 and McBean mocked each other and threatened each other with violence. For example, on December 8 and December 9, 2023, Victim-1 publicly posted the following images and texts mocking McBean (whose alias is "Jeezy Mula") and his mother:




As another example, on December 10, 2023, Victim-1 publicly posted the following image of McBean (left, with his hands clasped) and an associate with the caption, "He does anything for

social media ima kill you every chance i get I told social media I got more money th[a]n both of them":



Shortly thereafter, McBean began using a contraband cellphone from his cell at MDC to conspire with the defendant, Karl Smith, and others to kill Victim-1.[1] The co-conspirators planned to use offers of sex from the defendant to lure Victim-1 to various bars and restaurants in New York City where Victim-1 could be ambushed and killed. The defendant and Smith, who were at liberty, provided McBean with regular updates about Victim-1's location throughout the plot, which enabled McBean to direct the shooters where to find and attack him.

The co-conspirators' first known effort to track Victim-1 occurred during the evening of December 20 and into the early morning hours of December 21, 2023. That evening, the defendant and Smith traveled to a club in Queens looking for Victim-1. The defendant and Smith provided regular updates to McBean via Telegram about their location and their attempts to find and engage with Victim-1. This effort to locate Victim-1 was ultimately unsuccessful, and the next day, the co-conspirators sent each other messages expressing their disappointment about being unable to find him. PSR ¶ 16.

---

[1] It is unclear when the defendant first began communicating with McBean, but the Government has recovered communications between them dating back at least to June 2023. It appears from these communications that the defendant and McBean were in an ongoing, flirtatious relationship, even though McBean was in custody and the defendant was at liberty.

Despite the failure of December 20 and 21, the defendant was able to obtain Victim-1's phone number. With McBean and Smith's assistance, she began corresponding with Victim-1 on December 22, 2023. That evening, the defendant and Victim-1 exchanged flirtatious messages, and the defendant encouraged Victim-1 to meet her in person. Throughout the next few days, whenever the defendant was communicating with Victim-1, she was simultaneously plotting with McBean and Smith via Telegram about what to say to Victim-1, how to flirt with Victim-1, and where to lure Victim-1 so that they could have him killed. PSR ¶ 17.

<u>The Hush Lounge Shooting</u>

At 12:41 a.m. on December 23, 2023, McBean messaged the defendant and Smith, "Hush is a go," referring to a nightclub named Hush Café Lounge and Garden in Maspeth, Queens. Less than an hour later, the defendant sent Victim-1 text messages arranging to meet in person during the evening of December 23.

At 2:05 p.m. on December 23, the defendant texted Victim-1, "Evening! Lmk [*i.e.*, let me know] when you free, have a good day." Victim-1 responded, "Okay." A few hours later, at 4:55 p.m., the defendant tried again to arrange a meeting with Victim-1, texting him, "Im boutta go to some shit in queens, called hush. Did you eat yet?" The defendant asked Victim-1, "[W]anna meet there or u feel for something else to eat?" Victim-1 asked to call the defendant later.

At 1:16 a.m. on December 24, 2023, Victim-1 asked the defendant where she was. The defendant responded, "Home… where u want me to be?" The defendant and Victim-1 exchanged flirtatious texts, and the defendant repeatedly offered to meet with Victim-1 in person. She made clear to Victim-1, "I['m] tryna see you fr [*i.e.*, for real]." Shortly thereafter, the defendant invited Victim-1 to pick her up from her home in the Bronx. Victim-1 then drove to the defendant's location and brought her to Hush around 3:00 a.m.

When they arrived at Hush, the defendant messaged Smith, who was communicating with McBean directly, "We at the bar," "We soon leave," "Wya [*i.e.*, where you at]." The defendant then told Smith that Victim-1 "went to the bathroom" and asked, "But i remember jeezy [*i.e.*, McBean] said not to go back to his car," "So how we gonna do this." Smith offered to call the defendant a taxi, but she insisted that she could find her own way home.

Still at Hush, the defendant asked Smith whether McBean had arranged the ambush yet so that she could leave the bar before the shooting began: "Is jeezy ppl situated?", "Ask him if they here yet," "Cause I ca[n] dead tell him im goin out n bang it on him [*i.e.*, leave without saying goodbye]." Smith wrote back, "Lmk [*i.e.*, let me know] when u ready I'll send ya Uber now." The defendant asked Smith to send the taxi at about 3:15 a.m. At 3:13 a.m., the defendant wrote to Smith, "Get it," referring to the taxi. The defendant told Smith that Victim-1 was "outside" and that she was "in the bathroom." Smith then messaged the defendant and McBean on Telegram, "He outside," and encouraged the defendant to go to her taxi. PSR ¶ 18.

Shortly thereafter, gunmen fired on Victim-1 outside Hush. The bullets missed Victim-1, but they struck his vehicle. Victim-1 later posted on social media, "Shots fire im not dead I'm up," and "Threw 10 shots and missed all 10 is crazy go get a refund twin [laughing and crying emoji] [middle finger emoji]." Victim-1 also posted a video of his car riddled with bullet holes,

accompanied by the caption, "Get your refund they [got] me out like Rick Ross when they shot … [h]is rolls Royce up smh [six laughing and crying emojis]," referring to a famous rapper who was shot at while riding in a Rolls Royce vehicle in Florida in 2013. Hours later, McBean, through two intermediaries, wired the defendant $1,500. PSR ¶ 19.

The Xscape Lounge Shooting

Having failed to kill Victim-1 outside Hush, the defendant, McBean, and Smith tried again to lure Victim-1 to another club on December 25, 2023. This plan did not work because Victim-1 fell asleep too early to meet up with the defendant that night. PSR ¶ 20. So the co-conspirators began plotting to attack Victim-1 again the following night.

During the afternoon of December 26, 2023, the defendant, McBean, and Smith began selecting the location for their next attempt to murder Victim-1. McBean told his co-conspirators that the "the pick up," meaning the location where the defendant would tell Victim-1 to meet her, had to "be [in] queens." Smith began trying to identify the ideal bar in Queens for the hit. At 5:43 p.m. on December 26, Smith wrote to the defendant and McBean, "Xscape," referring to a nightclub named Xscape NYC in South Richmond Hill, Queens.

As they were plotting the location of their next attack, the defendant, McBean, and Smith corresponded about the messages that the defendant should send to Victim-1 to entice him to meet her that evening. At 4:43 p.m. on December 26, McBean wrote to the defendant, "Ask him what shit y'all wanna get into." At 4:52 p.m., the defendant texted Victim-1, "Wat we boutta get into." Later that evening, McBean asked the defendant, "Yo," "I'm saying you told him," "Your plans corr[e]ct," "Food then Xscape." Smith then directed the defendant, "You need to send him a freaky pic or sum." Immediately thereafter, the defendant sent Victim-1 a picture of herself nude and, as directed, wrote, "Heard me? Im grabbin food really quick now then hookah and then coming to you."

At 8:06 p.m., Victim-1 wrote to the defendant, "Let's have a three some." The defendant appears to have informed McBean about this request, and McBean directed her to "say with who." The defendant then asked Victim-1, "With who bae." Victim-1 replied, "A girl," referring to Burgos. Victim-1 assured the defendant, "She pretty." The defendant agreed, writing "Okay i believe you." Victim-1 later provided Burgos's social media account to the defendant and wrote, "She nice." The defendant replied, "Okay okay!", "Cute."

At 9:52 p.m., McBean began growing impatient and messaged the defendant and Smith, "Talk to me," "Wassup," "It's 10." Smith, who had met the defendant at a restaurant in Manhattan that afternoon, told McBean that he and the defendant were "[l]eaving now." McBean replied, "Stay in contact with him tel[l] him you getting ready [to] head [to] xscape," "You need more shots [of alcohol]." Minutes later, the defendant wrote to Victim-1, "Got your food now bae headed to xscape now, imma lyk [*i.e.*, let you know] when i get there n shit. Im just gettin drinks real quick so i can be in the mood." A few minutes later, after receiving an update about the defendant and Smith's location, McBean wrote, "Ok bet ima tell you around the time they gonna be there." The defendant then texted Victim-1, "imma lyk [*i.e.*, let you know] when im ready for you."

The defendant and Smith arrived at Xscape at about 10:30 p.m. They informed McBean about their location, and he instructed them, "Kopy don't tell him come get you yet," "Like 40 mins away." McBean told the defendant and Smith that he would let them know when to tell Victim-1 to arrive at the club.

McBean then provided the defendant and Smith with clear instructions about how to arrange the ambush: "Only thing I need you [to] tell me is what V [*i.e.*, vehicle] boy in[.] act like you coming out for food then double back go [to the] bath room and type what V [*i.e.*, vehicle] boy in some shit like that," "I need to know the V [*i.e.*, vehicle]." Smith offered to "walk out" of Xscape "with [his] mask on." McBean rejected that idea because he believed that "[o]nce [Victim-1] see[s] a mask," "He gonna panick."

At 11:16 p.m., the defendant sent Victim-1 a location pin for Xscape and wrote, "Im ready forrr youu." Victim-1 started driving in the location of the club, with Burgos in the front passenger's seat of his car. Meanwhile, the defendant plotted with McBean and Smith about how best to tell McBean which car Victim-1 was driving, so that McBean could relay that information to the shooters. McBean recommended that the defendant "walk up to [Victim-1's car] then act like you forgot the food," "And text me the car color." McBean warned the defendant, "Once you tell me the car," "Don't walk near it again."

At about 10:26 p.m., a black SUV containing three gunmen drove past Xscape and parked about a block away. McBean then messaged the defendant and Smith, "On board," "Where dude." Smith told McBean that Victim-1 "told her 15 mins."

At 10:37 p.m., Victim-1 texted the defendant, who was inside Xscape, "Come outside." McBean then privately reminded the defendant, "The car I need." One minute later, the defendant exited Xscape and waited for Victim-1's car, which arrived and double parked just outside the club at about 10:39 p.m. As depicted in surveillance video, the defendant immediately walked up to the front passenger's seat of Victim-1's car and saw Burgos seated there. The defendant then walked

to the backseat door of the car, paused, and then ran back inside Xscape, consistent with McBean's instructions.



*The Defendant Looking at Burgos Inside Victim-1's Car Before the Shooting*

The defendant ran inside Xscape and then back to the club's vestibule, where she knelt down to hide herself from Victim-1 and Burgos, who were waiting in the car outside. At 10:40 p.m., from that kneeling position, the defendant messaged McBean, just as he had instructed her to do.



*The Defendant Kneeling in the Vesitbule of Xscape*

McBean responded to the defendant, "Color." After spending a few more moments using her cellphone from the ground in the vestibule, the defendant stood up and walked back inside the club. Victim-1 and Burgos were still outside waiting.

One minute later, three hooded gunmen dressed in all black exited the black SUV, which was still a block away. They walked calmly down the street, in the direction of Xscape. At the corner nearest to the club, with a clear view of Victim-1's car, the gunmen paused and split up— one gunman crossed the street to approach Victim-1's car from the passenger's side, while the two other gunmen approached Victim-1's car from the driver's side. PSR ¶ 25.

The gunmen then executed a coordinated attack. They surrounded Victim-1's vehicle and fired multiple shots into both sides of the car. Victim-1 tried to drive away, but the gunmen kept shooting. Eventually, the gunmen stopped, ran back to the black SUV, and drove off. PSR ¶ 25.



*The Shooters Firing on Burgos and Victim-1 Outside Xscape*

Victim-1 drove to a nearby police precinct to seek medical attention. As Victim-1 was driving away, the defendant texted him, "Where did you go," "The girl [*i.e.*, Burgos] don't like [me]?" When Victim-1 arrived at the precinct, the officers saw that several of the gunmen's bullets had struck Victim-1 in the torso, and that he was in dire need of medical attention. Officers also found Burgos slouched over in the front passenger's seat of Victim-1's car. She had been shot in the head and was already dead. PSR ¶ 25.

Efforts to Obstruct Justice

On December 27, 2023, while Victim-1 was at the hospital, McBean, Smith, and the defendant used Telegram to discuss the Xscape shooting. Later that evening, members of the NYPD identified the defendant from surveillance video recovered from Xscape and asked her to accompany them to the precinct for questioning. The defendant then messaged McBean and Smith on Telegram, "Delete everything," "Boyz [*i.e.*, the NYPD] at my house," "Askin to talk," "Im stickin to my scripy." PSR ¶ 26.

The police interviewed the defendant that evening, and she lied to the officers about nearly every material fact about her involvement in the scheme. The defendant claimed to have no advanced knowledge of the shooting outside Xscape and no involvement whatsoever in arranging the shooting. The defendant even claimed that when she knelt down in the vestibule of Xscape just minutes before the gunmen opened fire on Victim-1's car, she was tying her shoes rather than telling McBean the color of the target vehicle so that he could pass that information along to the shooters.

At the end of the interview, the police seized the defendant's phones and searched them pursuant to a warrant. A forensic extraction of the defendant's phone later revealed that she had deleted substantial portions of her Telegram communications with Smith and McBean about the plot to kill Victim-1 and had attempted to delete the "Delete everything," "Boyz at my house" series of messages she had just sent. PSR ¶ 26.

Members of the NYPD informed MDC officials about their suspicions that McBean had used a contraband cellphone to orchestrate the December 26 shooting. On December 29, 2023, MDC officials approached McBean's cell in preparation to search for this contraband cellphone. McBean's cellmate jammed the cell door shut and prevented MDC officials from entering to conduct the search. Behind the door, McBean smashed a contraband cellphone. Eventually, MDC officials pried open the cell door and recovered the destroyed phone. Law enforcement has not been able to retrieve electronic data from that broken cellphone because McBean destroyed it thoroughly. PSR ¶ 27.

In September 2024, law enforcement officers arrested the defendant at Miami International Airport for her role in this conspiracy. The officers interviewed the defendant again following this arrest, and again she lied extensively. For example, the defendant claimed that the $1,500 payment that McBean wired to her through two intermediaries in the days between the shootings at Hush and Xscape was a Christmas present. Meanwhile, McBean learned of the defendant's arrest and conspired with Smith to pay for the defendant's lawyer. McBean reasoned that law enforcement officers were "gonna use HER [*i.e.*, the defendant]," "To come for other people," but he assured Smith that "If she [*i.e.*, the defendant] shut[s] her mouth," "It's healthy." PSR ¶¶ 31-33.

### The Defendant's Guilty Plea

On June 26, 2025, the defendant pled guilty to the two charges in Superseding Indictment S4 24 Cr. 541 for her role in the plot to kill Victim-1, which resulted in Burgos's death. At her change-of-plea hearing, the defendant said that she lured Victim-1 to Hush believing only that "he would be harassed in some way." Ex. A, at 28. The defendant also said that she lured Victim-1 to Xscape days later believing only that "he would be injured in some way," even though she knew that gunmen had shot at Victim-1 outside Hush. *Id.* The defendant acknowledged that, "[u]ltimately, [her] actions contributed to and resulted in life-threatening bodily injury to Victim-1 and the death of Ms. Burgos." *Id.*

The Court asked the defendant several clarifying questions during her plea allocution. The Court asked, "When you did these things, did you know what you were doing was wrong?" *Id.* at 30. After an extended pause, the defendant answered, "Ultimately yes, your Honor." *Id.* That prompted the Court to ask, "Well, you knew that somebody was going to be shot?" *Id.* The

defendant replied, "Yeah." The Court inquired further, "Did you know that what you were doing in helping arrange that was wrong?" The defendant eventually said, "Yes, your Honor."

## B.     The Plea Agreement and the Stipulated Guidelines Range

The plea agreement between the Government and the defendant sets forth the parties' agreements as to the sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). The U.S. Probation Office agrees with the parties' Guidelines calculations. *See* PSR ¶ 112. The adjusted offense level for Count One, after applying a two-level enhancement for obstruction of justice and a three-level reduction for acceptance of responsibility, is forty-two, and the defendant is in Criminal History Category I. PSR ¶¶ 50-65. That results in a Gudelines range of 360 months' to life imprisonment for Count One. PSR ¶ 111. For Count Two, the stipulated Guidelines sentence is a consecutive term of sixty months' imprisonment. PSR ¶¶ 109-10. Accordingly, the combined Guidelines range for Counts One and Two is 420 months' to life plus sixty months' imprisonment.

## C.     Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### D.    A Guidelines Sentence of at Least 420 Months' Imprisonment Is Appropriate and Necessary

The Government respectfully submits that a sentence of at least 420 months' imprisonment is sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. Such a sentence is necessary to reflect the seriousness of the defendant's conduct, to provide for just punishment, to reflect the nature and seriousness of the defendant's crime, to promote respect for the law, to ensure adequate deterrence, and to avoid unwarranted sentencing disparities.

The need for the sentence to reflect the seriousness of the defendant's conduct and the need to provide for just punishment are paramount considerations here. The defendant participated in the most serious of offenses—a coordinated scheme executed over several days to kill another human being, which resulted in the near-death of Victim-1 and the death of Burgos, a twenty-eight-year-old innocent bystander. And when the defendant believed she had been caught, she tried to escape punishment for her crime by deleting her cellphone data, alerting her co-conspirators so that they could do the same, and lying repeatedly to the police.

The impact of that conduct is devastating and permanent. Burgos is dead and will never be able to live out the promise of her life. Burgos's son, who was four years old when his mother died, is left with only fleeting memories of her; to this day, Burgos's son still does not fully understand why his mother is not coming back. The rest of Burgos's close family, including her eight siblings, is also forever changed.[2] As one of Burgos's family members wrote in their statement, "The pain [of Burgos's death] runs deep—deeper than any sentence can measure." They miss Burgos's hugs, her laugh, and her infectious smile at Christmas celebrations and birthdays. The defendant and her co-conspirators took all that away. While a sentence of imprisonment will never bring Burgos back, justice requires a sentence of at least 420 months' imprisonment to reflect the gravity of Burgos's and her family's loss.

The nature and circumstances of the defendant's crime likewise justify a 420-month sentence. The defendant played a critical role in Burgos's death, and she participated in this criminal conspiracy with her eyes wide open. Whatever the defendant may say now about her initial knowledge about the precise purpose of the plot to hunt for Victim-1, *see* Def. Mem. at 8, the defendant certainly knew from the beginning that she would be helping the plot's leader—Dajahn McBean—attack Victim-1 even though McBean was detained on federal racketeering and violence charges. Despite that knowledge, the defendant still chose to lure Victim-1 to bars where

---

[2] The Government understands that several of Burgos's relatives may request to address the Court at the defendant's sentencing. The Government has also attached several written victim impact statements. The Government further respectfully requests that the Court enter the attached restitution order to compensate the Burgos family for their out-of-pocket funeral and burial costs.

McBean's men could shoot him on *two* separate occasions. The text messages recovered from the defendant's cellphone show that each time the defendant lured Victim-1, she knew not to go near his car after notifying McBean about the car's location, putting the lie to any suggestion that the defendant was naïve or unaware of why McBean wanted her to interact with Victim-1 or the broader gravity of her actions. *See* Def. Mem. at 6-8.

Although the principal purpose of the defendant and her co-conspirators' plot was to target Victim-1 for death, the defendant also knew that her actions put Burgos directly in the line of fire, and the defendant did not care. *Cf.* Def. Mem. at 7 n.4. By the time Burgos was killed on December 26, the defendant surely knew that she was assisting McBean in a plot not merely to harass Victim-1 but to have Victim-1 killed, as she had helped McBean orchestrate the Hush shooting two days earlier. Before Victim-1's car ever reached Xscape on December 26, the defendant also knew, or at least should have known, that Burgos would be in the car with Victim-1, because Victim-1 told the defendant about Burgos during their text exchange earlier that day. In any event, the defendant knew conclusively that Burgos was in the front seat of Victim-1's car when Victim-1 arrived at Xscape during the evening of December 26, and the defendant left the club to greet Victim-1 and Burgos. That moment when the defendant saw Burgos in the front passenger's seat was the critical inflection point when the defendant could have stopped this. It was the defendant's responsibility at that point to tell the shooters, though her communications with McBean, which car to target. The defendant could have called off the attack as soon as she saw Burgos and spared the life of a woman who had nothing to do with McBean and Victim-1's dispute. But the defendant decided instead to send McBean the identifying information for the car containing Victim-1 and Burgos, knowing full well that this would result in a barrage of gunfire directed at them both. That grievously callous decision warrants a 420-month sentence.

The defendant attempts to minimize her role in this offense by highlighting the fact that she was not one of the shooters and did not communicate with them directly. Def. Mem. at 6-9, 24-25. That may be factually true, but it lacks critical context. It is accurate that the defendant was not one of the shooters who killed Burgos and did not know the shooters' phone numbers or identities. But the defendant was not as far removed from the shooters as she suggests. The defendant lured Victim-1 on December 26 specifically to help the shooters kill him. The defendant also transmitted to the shooters, through McBean, critical identification information about the vehicle that the shooters intended to target. Thus, in essence, Victim-1 helped set up Victim-1 repeatedly and pointed the shooters in Victim-1 and Burgos's direction, knowing what the shooters intended to do with that information. Given how integral the defendant was to the shooting, it makes little, if any, moral difference that the defendant was not the one to pull the trigger herself. And it makes no difference at all that, because McBean inserted himself in the middle of the communication pipeline between the defendant and the shooters, the defendant did not know the shooters' identities or phone numbers. The defendant surely knew that the information she provided to McBean about Victim-1's car would make its way directly to the shooters so that they would know which car to attack. The defendant's consciously originating that chain of communication from herself to McBean to the shooters is serious enough to warrant a 420-month sentence.

The defendant also suggests that she is less culpable for Burgos's death because, in the defendant's telling, she was a mere puppet of McBean and Smith. Def. Mem. at 6-9, 24-25. Again,

this argument relies on some technically accurate information, but it is lacking critical context. It is true, for example, that the defendant sometimes sent messages to Victim-1 that were originally conceived by McBean or Smith. But many of the flirtatious messages the defendant sent to Victim-1 were written by her, without McBean's or Smith's assistance. Those messages were pure, self-motivated efforts by the defendant to draw Victim-1 closer to her in order to help the murder plot succeed. Moreover, even when Victim-1 sent messages and traveled to locations at McBean and Smith's direction, she did so knowingly and voluntarily. No one threatened or coerced the defendant into participating in this scheme, and the defendant cannot credibly claim that she was blind to the significance of the messages she was sending to Victim-1. The defendant bears responsibility for every message she sent to Victim-1 to help kill him, regardless of whether McBean or Smith occasionally acted as her ghost writer or editor.

The defendant's legal arguments about the diminished responsibility of juveniles are thoroughly unpersuasive. *See* Def. Mem. at 3-6, 9, 17-21. The defendant was twenty-two years old when she helped hunt down Victim-1, rendering irrelevant her citations to *United States v. C.F., Male Juvenile*, 15 Cr. 445 (PAE), *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005). Unlike a juvenile, by the time she directed the shooters to Victim-1's car on December 26, the defendant was an adult who could legally vote, serve on a jury, serve in the military, marry without parental consent, drink alcohol, and smoke cigarettes. *Cf. Roper*, 543 U.S. at 569 (distinguishing juveniles from adults because "almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent"). "[C]hildren are constitutionally different from adults [like the defendant] for purposes of sentencing," because adults are more culpable, have lesser prospects for reform, are less reckless and impulsive, are less vulnerable to negative influences, and have more fixed characters. *Miller*, 567 U.S. at 471. Largely for these reasons, courts across the country routinely reject extending the Supreme Court's rationales for juvenile sentencings to cases involving defendants in their early twenties. *See, e.g.*, *United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019); *Hicks v. State*, 578 P.3d 366, 386-92 (Wyo. 2025); *Michigan v. Abraham*, 2025 WL 76829, at *4-6 (Mich. Ct. App. Jan. 10, 2025); *Illinois v. Everett*, 208 N.E.3d 1130, 1138 (Ill. Ct. App. 2022) (collecting cases); *New York v. Sanchez*, 63 Misc. 3d 938, 941-47 (N.Y. Sup. Ct. 2019).

In any event, on the facts of this case, the defendant's attempt to cast herself as a youth misguided by social media and a raucous nightlife scene does not diminish her culpability for Burgos's homicide. *See* Def. Mem. at 3-6, 9, 17-21. Many people the defendant's age interact with toxic social media personalities, idolize rappers, and party at nightclubs. But few people who participate in those activities agree also to participate actively in an elaborate murder plot devised by an MDC detainee. And still fewer consciously choose to place an innocent mother in harms way just to please an incarcerated rapper. Yet the defendant made those calculated choices, and she did so over the course of several days, not impulsively, recklessly, or in the spur of the moment. Those were conscious decisions by a knowledgeable adult. They carry adult consequences.

The need to promote respect for the law also cuts in favor of a 420-month sentence. This crime is rife with overt disrespect for the law. This was not just another homicide, if there even is such a thing. At its core, this case is about how the defendant and her co-conspirators enabled McBean, a presentence detainee being held on serious federal charges, to commit a heinous act of violence in the community. In other words, it is about how the defendant consciously helped

McBean circumvent strict legal restrictions on his liberty that were designed to keep Burgos and the rest of the community safe from him. To make matters worse, the crime that the defendant helped McBean commit from his prison cell was the most serious of offenses—a planned assassination that went wrong and resulted in the death of an innocent woman. Moreover, when she was questioned by law enforcement about Burgos's death, the defendant lied, deleted evidence, and encouraged her co-conspirators to delete the evidence in their possession. Those actions betray a fundamental disrespect for some of our community's most serious laws, warranting an equally serious punishment.

The need to ensure adequate general deterrence also supports the Government's requested sentence. The defendant and her co-conspirators' crime was public, brazen, and severe, and it caught fire on social media because it involved McBean, a relatively infamous rapper. To this day, multiple social media users regularly post content commenting on the proceedings in this case. This crime has also garnered widespread attention in local media. Indeed, just hours after Burgos's death, surveillance video depicting the fatal shooting outside Xscape was circulating on local news channels. Because of the public nature of the defendant and her co-conspirators' crime—a publicity that they invited by associating with McBean and participating in assassination attempts in the open street—the community knows what the defendant and her co-conspirators did, and it knows how much the Burgos family has suffered as a result. That widespread publicity triggers a need for the Court to impose a sentence that is a sufficient public condemnation of this conduct and that sends a clear message to those watching about the punishment that will befall anyone who helps a federal detainee attempt to kill a rival and, in the process, helps to murder an innocent woman.

Finally, the need to avoid unwarranted sentencing disparities supports a sentence of at least 420 months' imprisonment. The Government acknowledges that the JSIN data reflects an average sentence of 297 months' imprisonment and a median sentence of 324 months' imprisonment for similar offenses by defendants in Criminal History Category I. PSR at 26-27. But this case has unique aggravating factors that support a sentence well above the average. Specifically, the aggregators include the co-conspirators' repeated attempts to kill Victim-1 on December 24 and December 26; the co-conspirators' extensive efforts to plan the attempts to murder Victim-1; the fact that Victim-1 was also nearly killed on December 26; the impact of Burgos's death on her young son and close family; the coordination between the defendant and McBean, who was detained at MDC, to circumvent the denial of McBean's bail in his criminal case in the Eastern District of New York; and the defendant's and her co-conspirators' extensive efforts to obstruct law enforcement's investigation into the homicide. Those aggravators combine to make this case particularly well-suited to a Guidelines sentence of at least 420 months' imprisonment.

**E.    Conclusion**

The Government respectfully requests that the Court impose a sentence of at least 420 months' imprisonment and enter the attached proposed restitution order.


Respectfully Submitted,

JAY CLAYTON
United States Attorney


by:    */s/*
Ryan W. Allison
Andrew K. Chan
Dominic Gentile
Assistant United States Attorneys
(212) 637-2474