

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 19, 2026

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     **Re:**    ***United States v. Karl Smith*, 24 Cr. 541 (PAE)**

Dear Judge Engelmayer:

     The Government respectfully submits this letter in advance of the sentencing of Defendant Karl Smith, which is scheduled for March 27, 2026.  The defendant pled guilty pursuant to a plea agreement to stalking resulting in death, in violation of 18 U.S.C. §§ 2261A(a)(2)(A), 2261(b)(1), (2), and 2 (Count One); and using and carrying a firearm in furtherance of a crime of violence, which was discharged, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2 (Count Two).

     As described below, the defendant played a critical role in co-defendant Dajahn McBean's efforts to orchestrate the murder of a rival ("Victim-1") while McBean was incarcerated at MDC Brooklyn in December 2023.  Repeatedly, the defendant and co-defendant Chelsey Harris set up Victim-1 to be killed, and they told McBean's shooters where to aim their bullets to kill Victim-1. As a result of this plot, Clarisa Burgos—an innocent bystander—was tragically shot in the head and killed.  Burgos's son, who is now just six years old, will spend the rest of his life without his mother.  Additionally, Victim-1 was shot over a dozen times and nearly died after being targeted in two different shootings.  Following the murder, the defendant participated in efforts to obstruct justice and intimidate witnesses, including a death threat that the defendant transmitted from a contraband cellphone while detained and awaiting trial at MDC Brooklyn.  Because of the seriousness of these crimes, the pain and loss caused to Burgos, Burgos's family, and Victim-1, the danger posed to the community by the defendant, and the need for both specific and general deterrence, the Government respectfully submits that a sentence of at least 45 years' imprisonment is necessary here to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).[1]

---

[1] On December 22, 2025, the Court sentenced co-defendant Chelsey Harris to 22 years' imprisonment.  (Docket No. 193).  The Government stands by its recommendation that Harris should have received a sentence of at least 35 years' imprisonment under the factors set forth in 18 U.S.C. § 3553(a).  In any event, for the reasons described in this submission, the Government respectfully submits that any sentence that is less than 10 years longer than the sentence imposed

## A.    Background

### Overview

In December 2023, the defendant conspired with Dajahn McBean, a/k/a "Jeezy Mula," Chelsey Harris, and others to kill a rival of McBean's ("Victim-1"). The plot involved multiple attempts by Harris, acting at the direction of McBean, the defendant, and others, to entice Victim-1 with the promise of sex and to lure Victim-1 to bars and clubs throughout New York City, where gunmen would be waiting to kill Victim-1. The entire time the defendant participated in this scheme, he knew that its principal architect, McBean, was detained at Metropolitan Detention Center – Brooklyn ("MDC") and using a contraband cellphone to direct the conspiracy. Throughout the plot, the co-conspirators kept in close communication by sending each other text messages through Telegram, an encrypted messaging application.

As described in detail below, in furtherance of this plot, the defendant and Harris successfully lured Victim-1 to bars in Queens on December 24 and December 26, 2023. Both times, gunmen arranged by McBean tried to kill Victim-1.  During the December 26 shooting, three gunmen surrounded Victim-1's car and unloaded about a dozen rounds of ammunition into the vehicle.  Victim-1 was struck multiple times but miraculously survived.  His girlfriend, Clarisa Burgos, who was seated in the passenger's seat, was struck in the head and died instantly. Burgos was twenty-eight years old. She was the mother of a four-year-old boy.

On numerous occasions after the murder, McBean, Harris, co-defendant Julissa Bartholomew, and the defendant conspired and attempted to delete and destroy evidence relating to the murder plot.  These obstruction efforts also included a plot by McBean and the defendant to pay for Chelsey Harris's retained attorney to prevent her from cooperating with law enforcement, as well as death threats that the defendant posted on social media using a contraband cellphone while in custody.

### The Initial Efforts to Track and Lure Victim-1

In early December 2023, Victim-1 and McBean were engaged in a dispute over social media. Victim-1 was at liberty, and McBean was detained at MDC pending sentencing after pleading guilty to a violent crime in aid of racketeering in the U.S. District Court for the Eastern District of New York. The dispute consisted principally of dueling public social media posts in which Victim-1 and McBean mocked each other and threatened each other with violence. For

---

on Harris would not adequately reflect their relative culpability.  The defendant and Chelsey Harris are *not* similarly situated under an analysis of the relevant sentencing factors.

example, on December 8 and December 9, 2023, Victim-1 publicly posted the following images and texts mocking McBean (whose alias is "Jeezy Mula") and his mother:

 

As another example, on December 10, 2023, Victim-1 publicly posted the following image of McBean (left, with his hands clasped) and an associate with the caption, "He does anything for social media ima kill you every chance i get I told social media I got more money th[a]n both of them":



Shortly thereafter, McBean began using a contraband cellphone from his cell at MDC to conspire with the defendant, Chelsey Harris, and others to kill Victim-1. The co-conspirators planned to use offers of sex from Harris to lure Victim-1 to various bars and restaurants in New York City where Victim-1 could be ambushed and killed. The defendant and Harris, who were at liberty, provided McBean with regular updates about Victim-1's location throughout the plot, thereby enabling McBean to provide directions to the shooters regarding where to find and kill Victim-1.

The defendant and Harris's first known efforts to track Victim-1 occurred during the evening of December 20 and into the early morning hours of December 21, 2023. That evening, the defendant and Harris traveled to a club in Queens looking for Victim-1. The defendant and Harris provided regular updates to McBean via Telegram about their location and their attempts to find and engage with Victim-1. This effort to locate Victim-1 was ultimately unsuccessful, and the next day, the co-conspirators sent each other messages expressing their disappointment about being unable to find him. PSR ¶ 16.

Despite the failure of December 20 and 21, Harris was able to obtain Victim-1's phone number. With McBean and the defendant's assistance, Harris began corresponding with Victim-1 on December 22, 2023. That evening, Harris and Victim-1 exchanged flirtatious messages, and Harris encouraged Victim-1 to meet her in person. Throughout the next few days, whenever Harris was communicating with Victim-1, she was simultaneously plotting with McBean and the defendant via Telegram about what to say to Victim-1, how to flirt with Victim-1, and where to lure Victim-1 so that they could have him killed. PSR ¶ 17.

On December 21, 2023, the defendant sent messages to another individual via Instagram: "I'm only wit chin [referring to Harris]" | "Yeah we on a lil mission for my cousin". On December 22, 2023, the defendant posted a photograph of himself sitting in his car with a black semi-automatic pistol sitting on the center console expressing disappointment after failing to carry out the mission that night, as depicted below:



The Hush Lounge Shooting

At 12:41 a.m. on December 23, 2023, McBean messaged the defendant and Harris, "Hush is a go," referring to a nightclub named Hush Café Lounge and Garden in Maspeth, Queens. Less than an hour later, Harris sent Victim-1 text messages arranging to meet in person during the evening of December 23.

At 2:05 p.m. on December 23, Harris texted Victim-1, "Evening! Lmk [*i.e.*, let me know] when you free, have a good day." Victim-1 responded, "Okay." A few hours later, at 4:55 p.m., Harris tried again to arrange a meeting with Victim-1, texting him, "Im boutta go to some shit in queens, called hush. Did you eat yet?" Harris asked Victim-1, "[W]anna meet there or u feel for something else to eat?" Victim-1 asked to call Harris later.

At 1:16 a.m. on December 24, 2023, Victim-1 asked Harris where she was. Harris responded, "Home… where u want me to be?" Harris and Victim-1 exchanged flirtatious texts, and Harris repeatedly offered to meet with Victim-1 in person. She made clear to Victim-1, "I['m] tryna see you fr [*i.e.*, for real]." Shortly thereafter, Harris invited Victim-1 to pick her up from her home in the Bronx. Victim-1 then drove to Harris's location and brought her to Hush around 3:00 a.m.

When they arrived at Hush, Harris messaged the defendant, who was communicating with McBean directly, "We at the bar," "We soon leave," "Wya [*i.e.*, where you at]." Harris then told the defendant that Victim-1 "went to the bathroom" and asked, "But i remember jeezy [*i.e.*, McBean] said not to go back to his car," "So how we gonna do this." The defendant offered to call Harris a taxi, but Harris stated that she could find her own way home.

Still at Hush, Harris asked the defendant whether McBean had arranged the ambush yet so that she could leave the bar before the shooting began: "Is jeezy ppl situated?", "Ask him if they here yet," "Cause I ca[n] dead tell him im goin out n bang it on him [*i.e.*, leave without saying goodbye]." The defendant wrote back to Harris, "Lmk [*i.e.*, let me know] when u ready I'll send ya Uber now." Harris asked the defendant to send the taxi at about 3:15 a.m. At 3:13 a.m., Harris wrote to the defendant, "Get it," referring to the taxi. Harris told the defendant that Victim-1 was "outside" and that she was "in the bathroom." The defendant then messaged Harris and McBean on Telegram, "He outside," and encouraged Harris to go to the taxi that the defendant had ordered for her. PSR ¶ 18.

Shortly thereafter, gunmen fired on Victim-1 outside Hush. The bullets missed Victim-1, but they struck his vehicle. Victim-1 later posted on social media, "Shots fire im not dead I'm up," and "Threw 10 shots and missed all 10 is crazy go get a refund twin [laughing and crying emoji] [middle finger emoji]." Victim-1 also posted a video of his car riddled with bullet holes, accompanied by the caption, "Get your refund they [got] me out like Rick Ross when they shot … [h]is rolls Royce up smh [six laughing and crying emojis]," referring to a famous rapper who was shot at while riding in a Rolls Royce vehicle in Florida in 2013. Hours later, McBean, through two intermediaries, wired Harris $1,500. PSR ¶ 19.

## The Xscape Lounge Shooting

Having failed to kill Victim-1 outside Hush, the defendant, McBean, and Harris tried again to lure Victim-1 to another club on December 25, 2023.  This plan did not work because Victim-1 fell asleep too early to meet up with Harris that night.  PSR ¶ 20.  So the co-conspirators began plotting to attack Victim-1 again the following night.

During the afternoon of December 26, 2023, the defendant, McBean, and Harris began selecting the location for their next attempt to murder Victim-1. McBean told his co-conspirators that the "the pick up," meaning the location where Harris would tell Victim-1 to meet her, had to "be [in] queens."  The defendant began trying to identify the ideal bar in Queens for the hit. At 5:43 p.m. on December 26, the defendant wrote to the defendant and McBean, "Xscape," referring to a nightclub named Xscape NYC in South Richmond Hill, Queens.

As they were plotting the location of their next attack, the defendant, McBean, and Harris corresponded about the messages that Harris should send to Victim-1 to entice him to meet her that evening.  At 4:43 p.m. on December 26, McBean wrote to Harris, "Ask him what shit y'all wanna get into." At 4:52 p.m., Harris texted Victim-1, "Wat we boutta get into."  Later that evening, McBean asked Harris, "Yo," "I'm saying you told him," "Your plans corr[e]ct," "Food then Xscape."  The defendant then directed Harris, "You need to send him a freaky pic or sum." Immediately thereafter, Harris sent Victim-1 a picture of herself nude and, as directed, wrote, "Heard me? Im grabbin food really quick now then hookah and then coming to you."

At approximately 7:25 p.m., the defendant sent a series of text messages to another individual saved in the contacts of his cellphone as "Silver" asking for this individual to assist with the "mission" that was happening at "Xscape" that evening: "Can you stay on standby and come with me to a loung real quick" | "On a mission" | "It's in queens" | "N I need you" | "Like 10 ish just go to xscape" | "I'll send money for the Uber."

At 8:06 p.m., Victim-1 wrote to Harris, "Let's have a three some."  Harris appears to have informed McBean about this request, and McBean directed her to "say with who."  Harris then asked Victim-1, "With who bae."  Victim-1 replied, "A girl," referring to Burgos.  Victim-1 assured Harris, "She pretty."  Harris agreed, writing "Okay i believe you."  Victim-1 later provided Burgos's social media account to Harris and wrote, "She nice."  Harris replied, "Okay okay!", "Cute."

At 9:52 p.m., McBean began growing impatient and messaged the defendant and Harris, "Talk to me," "Wassup," "It's 10."  Harris, who had met up with Smith at a restaurant in Manhattan that afternoon, told McBean that she and the defendant were "[l]eaving now."  McBean replied, "Stay in contact with him tel[l] him you getting ready [to] head [to] xscape," "You need more shots [of alcohol]."  Minutes later, Harris wrote to Victim-1, "Got your food now bae headed to xscape now, imma lyk [*i.e.*, let you know] when i get there n shit. Im just gettin drinks real quick so i can be in the mood."  A few minutes later, after receiving an update about the defendant and Harris's location, McBean wrote, "Ok bet ima tell you around the time they gonna be there."  Harris then texted Victim-1, "imma lyk [*i.e.*, let you know] when im ready for you."

The defendant and Harris arrived at Xscape at about 10:30 p.m.  They informed McBean about their location, and he instructed them, "Kopy don't tell him come get you yet," "Like 40 mins away."  McBean told the defendant and Harris that he would let them know when to tell Victim-1 to arrive at the club.

McBean then provided the defendant and Harris with clear instructions about how to arrange the ambush: "Only thing I need you [to] tell me is what V [*i.e.*, vehicle] boy in[.] act like you coming out for food then double back go [to the] bath room and type what V [*i.e.*, vehicle] boy in some shit like that," "I need to know the V [*i.e.*, vehicle]."  The defendant offered to "walk out" of Xscape "with [his] mask on."  McBean rejected that idea because he believed that "[o]nce [Victim-1] see[s] a mask," "He gonna panick."

At 11:16 p.m., Harris sent Victim-1 a location pin for Xscape and wrote, "Im ready forrr youu."  Victim-1 started driving toward the location of the club, with Burgos in the front passenger's seat of his car.  Meanwhile, the defendant plotted with McBean and Harris about how best to tell McBean which car Victim-1 was driving, so that McBean could relay that information to the shooters.  McBean recommended that Harris "walk up to [Victim-1's car] then act like you forgot the food," "And text me the car color."  McBean warned Harris, "Once you tell me the car," "Don't walk near it again."

At about 10:26 p.m., a black SUV containing three gunmen drove past Xscape and parked about a block away.  McBean then messaged the defendant and Harris, "On board," "Where dude." The defendant told McBean that Victim-1 "told her 15 mins."

At 10:37 p.m., Victim-1 texted Harris, who was inside Xscape, "Come outside." McBean then privately reminded Harris, "The car I need."  One minute later, Harris exited Xscape and waited for Victim-1's car, which arrived and double parked just outside the club at about 10:39 p.m.  As depicted in surveillance video, Harris immediately walked up to the front passenger's

seat of Victim-1's car and saw Burgos seated there. Harris then walked to the backseat door of the car, paused, and then ran back inside Xscape, consistent with McBean's instructions.



*Harris Looking at Burgos Inside Victim-1's Car Before the Shooting*

Harris ran inside Xscape and then back to the club's vestibule, where she knelt down to hide herself from Victim-1 and Burgos, who were waiting in the car outside. At 10:40 p.m., from that kneeling position, Harris messaged McBean, just as he had instructed her to do.



*The Defendant Kneeling in the Vesitbule of Xscape*

McBean responded to Harris, "Color." After spending a few more moments using her cellphone from the ground in the vestibule, Harris stood up and walked back inside the club. Victim-1 and Burgos were still outside waiting.

One minute later, three hooded gunmen dressed in all black exited the black SUV, which was still a block away. They walked calmly down the street, in the direction of Xscape. At the corner nearest to the club, with a clear view of Victim-1's car, the gunmen paused and split up— one gunman crossed the street to approach Victim-1's car from the passenger's side, while the two other gunmen approached Victim-1's car from the driver's side. PSR ¶ 25.

The gunmen then executed a coordinated attack. They surrounded Victim-1's vehicle and fired multiple shots into both sides of the car. Victim-1 tried to drive away, but the gunmen kept shooting. Eventually, the gunmen stopped, ran back to the black SUV, and drove off. PSR ¶ 25.



*The Shooters Firing on Burgos and Victim-1 Outside Xscape*

Victim-1 drove to a nearby police precinct to seek medical attention. As Victim-1 was driving away, Harris texted him, "Where did you go," "The girl [*i.e.*, Burgos] don't like [me]?" When Victim-1 arrived at the precinct, the officers saw that several of the gunmen's bullets had struck Victim-1 in the torso, and that he was in dire need of medical attention. Officers also found Burgos slouched over in the front passenger's seat of Victim-1's car. She had been shot in the head and was already dead. PSR ¶ 25.

<u>Efforts to Obstruct Justice</u>

On December 27, 2023, while Victim-1 was at the hospital, McBean, the defendant, and Harris used Telegram to discuss the Xscape shooting. Later that evening, members of the NYPD identified the defendant from surveillance video recovered from Xscape and asked her to accompany them to the precinct for questioning. Harris then messaged McBean and the defendant on Telegram, "Delete everything," "Boyz [*i.e.*, the NYPD] at my house," "Askin to talk," "Im stickin to my scripy." PSR ¶ 26.

The police interviewed Harris that evening, and she lied to the officers about nearly every material fact about her involvement in the scheme.  Harris claimed to have no advanced knowledge of the shooting outside Xscape and no involvement whatsoever in arranging the shooting.  Harris even claimed that when she knelt down in the vestibule of Xscape just minutes before the gunmen opened fire on Victim-1's car, she was tying her shoes rather than telling McBean the color of the target vehicle so that he could pass that information along to the shooters.

At the end of the interview, the police seized Harris's phones and searched them pursuant to a warrant.  A forensic extraction of Harris's phone later revealed that she had deleted substantial portions of her Telegram communications with the defendant and McBean about the plot to kill Victim-1 and had attempted to delete the "Delete everything," "Boyz at my house" series of messages she had just sent.  PSR ¶ 26.

Members of the NYPD informed MDC officials about their suspicions that McBean had used a contraband cellphone to orchestrate the December 26 shooting.  On December 29, 2023, MDC officials approached McBean's cell in preparation to search for this contraband cellphone.  McBean's cellmate jammed the cell door shut and prevented MDC officials from entering to conduct the search.  Behind the door, McBean smashed a contraband cellphone.  Eventually, MDC officials pried open the cell door and recovered the destroyed phone.  Law enforcement has not been able to retrieve electronic data from that broken cellphone because McBean destroyed it thoroughly.  PSR ¶ 27.

On January 3, 2024, NYPD officers also interviewed Karl Smith, who similarly claimed falsely that he had no knowledge or participation in the plot to murder Victim-1, despite being with Harris during the evening of the December 29 shooting.

In January 2024, the defendant and Harris continued exchanging messages via Instagram expressing concern about being caught for their participation in the murder.  For example, on January 26, 2024, Harris sent an attachment to the defendant, who asked: "What was going on."  Harris responded: "Them being retarded" | "Him n stali."  The defendant replied: "I don't like him" . . . "Don't worry ima have sum bad happen to him."  Harris then replied: "yeooo im deleting this chat rn [right now]."  In March 2024, Harris asked the defendant whether she should post something in response to posts on social media that she had been involved in setting up the murder: "Should I say: idk [I don't know] why my name keeps getting attached, but i literally have no reason to set anyone up.  Please stop spreading rumors." | "Yes or no?"  The defendant responded: "Yes" | "Matter fact no." | "Nobody even on that page pls."

In September 2024, Harris was arrested at Miami International Airport for her role in this conspiracy.  The officers interviewed Harris again following this arrest, and again she lied extensively.  For example, Harris claimed that the $1,500 payment that McBean wired to her through two intermediaries in the days between the shootings at Hush and Xscape was a Christmas present.

Meanwhile, McBean and the defendant learned of Harris's arrest and conspired to pay for Harris's lawyer.  In a cellphone seized from the defendant in November 2024, law enforcement recovered messages that McBean had sent to the defendant (the defendant's responses back to McBean were not recovered):

- On September 14, 2024, after trying to determine what happened during Harris's arrest at the airport, McBean wrote to the defendant: "Long story short , I'm getting her the lawyer .…"; "Moral of the story is Monday"; "She gonna have a full retained lawyer."

- On September 15, 2024, McBean wrote to the defendant again to discuss Harris and other evidence in the case.  During this conversation, the defendant was flying from Miami to New York and preparing to land, just as Harris had done right before she was arrested: "But I ain't even gonna trip"; "She solid"; "Be easy hit me when you land they try the same shit you know how to move Make sure nothing illegal in your phone Go through camera role delete out recently deleted"; "And clear internet search history"; "If you land good lmk [let me know]."

- On September 16, 2024, McBean wrote again to the defendant regarding Harris: "The lawyer was from Atlanta recommended her to a closer lawyer in New York so they gonna talk tomorrow zoom call and go from there but shawty is good they just forcing her to a grand jury try shake her up as long as she remain her which I have no doubts sh …."  Right beforehand, McBean also sent a series of messages indicating that the defendant had agreed to drive to a particular location and pick up money on behalf of McBean: "Where you parked at show me" | "Link Kyra" | "Kopy takje the $300" | "Give her 7,2" | "Lmao good looking ima start hitting you for moves like this."

- On September 17, 2024, McBean followed up with further messages to the defendant regarding Harris, her lawyer, and efforts to prevent Harris from cooperating: "Who can legally retain her a lawyer"; "I'm getting it done"; "Lawyer want 50k I'm giving it"; "The lawyer contacting the DA now telling her she on the case"; "They gonna use HER [i.e., Harris]"; "To come for other people"; "If she shut her mouth"; "It's healthy."  McBean also asked the defendant for another means for them to communicate: "I soon kall you" | "Send me another line" | "To kall you on" | "Yes hurry up."

- On September 21, 2024, McBean again instructed the defendant to create a new Apple iCloud account on his cellphone and to delete all of his Telegram messages: "You need to" | "To make a new iCloud" | "On your regular phone just in case they got your iCloud" | "I feel you should make a new one" | "Aight bet" | "Just making sure" | "Go to settings on your tele Click storage and data Storage usage And click clear cache" | "And clear that on your other tele too."

Similarly, the defendant's cellphone contained messages from McBean regarding an additional subpoena that had been served on co-defendant Julissa Bartholomew.  McBean stated: "They sent another subpoena today[,] [a]sking for any docs with my name your name bow wow and girl[.]  To sis still fishing if sis don't provide that which she won't and don't have they ain't got shit they fishing."

By April 2025, the defendant also had obtained a contraband cellphone while detained at the MDC in Brooklyn and began posting messages on social media:



The defendant also posted messages threatening individuals who were potentially providing information about him to law enforcement:



On April 19, 2025, the defendant posted a message that specifically threatened an individual believed to have provided information to law enforcement about the murder, saying: "[Name of individual] when I come home you a dead bitch I put that on my other.  You another one you really a wicked evil girl you playing with all our life's who's on this case shit is not a fucking game bitch this shit real life!!"[2]



A search of the defendant's social media account also revealed additional dates when the defendant posted photographs of himself with firearms, including a message sent on January 9, 2024

---

[2] In May 2024, a series of posts on the Code 33 Instagram had issued a series of posts designed to intimidate the same individual by speculating that the individual was cooperating with the investigation, including an alleged recording of the individual reporting Chelsey Harris to the police.

(depicting a photograph that appears to have been taken on September 11, 2021) and a video sent on May 15, 2024:





## B.     The Defendant's Guilty Plea and Plea Agreement

Trial in this case was originally scheduled to commence on July 28, 2025.  Approximately 10 days before trial, the defendant pleaded guilty to a S5 superseding information charging the defendant with cyberstalking resulting in life threatening bodily injury and death, in violation of 18 U.S.C. §§ 2261A(2), 2261(b)(1), (2), and 2 (Count One); and using and carrying a firearm, which was discharged, in furtherance of a crime of violence, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2 (Count Two).

The plea agreement between the Government and the defendant sets forth the parties' agreements as to the sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines").  The U.S. Probation Office agrees with the parties' Guidelines calculations. *See* PSR ¶ 108.  The adjusted offense level for Count One, after applying a two-level enhancement for obstruction of justice, is 45.  Pursuant to U.S.S.G. § 5A n.2, in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.  The defendant is also in Criminal History Category I.  PSR ¶¶ 47-59.  That results in a Guidelines sentence of life imprisonment for Count One.  PSR ¶ 108.  For Count Two, the stipulated Guidelines sentence is a consecutive term of 120 months' imprisonment. PSR ¶¶ 106-107.  Accordingly, the combined Guidelines sentence for Counts One and Two is life plus 120 months' imprisonment.

## C.     Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of

thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### D.     A Sentence of at Least 45 Years' Imprisonment is Necessary to Satisfy the Purposes of Sentencing

The Government respectfully submits that a sentence of at least 45 years' imprisonment is necessary and sufficient to reflect the seriousness of the defendant's crimes, provide for just punishment, promote respect for the law, ensure adequate deterrence, and avoid unwarranted sentencing disparities.

*First*, a sentence of at least 45 years' imprisonment is needed to reflect the seriousness of the crimes and the irreparable harm caused here by the defendant and his co-conspirators. Over the course of multiple days, the defendant participated in a coordinated and premeditated scheme to lure Victim-1 to public locations where he could easily be shot and killed by Dajahn McBean's gunmen. The defendant and Chelsey Harris worked together to gain access to Victim-1 and lure him to various nightclubs in New York City, resulting in two different shootings—an attempted murder on December 24, 2023 during which Victim-1's vehicle was shot multiple times, followed by the murder of Clarisa Burgos on December 26, 2023, during which Victim-1 was also shot over

12 times and was nearly killed. It is worth pausing to consider the sophisticated and premeditated nature of this plot: Hundreds of text messages were sent and received by the defendant, McBean, Harris, Bartholomew, and others in furtherance of the conspiracy over the course of nearly a week—all with the goal of luring Victim-1 to his death. On two different nights, the defendant and Harris successfully lured Victim-1 to a particular public location, where multiple gunmen lying in wait were able to open fire on Victim-1 at close range. The defendant also knew that he was assisting Dajahn McBean—a convicted felon and notorious gang member who was orchestrating the murder from the Brooklyn MDC using a contraband cellphone. All of these factors distinguish this case from a "garden variety" shooting or murder, and they heavily weigh in favor of a lengthy term of imprisonment for the defendant.

Beyond the violent and sophisticated nature of this scheme, the defendant and his co-conspirators also took numerous steps both before, during, and after the shootings to cover their tracks, destroy evidence, mislead investigators, and otherwise obstruct the investigation. For example:

- The defendant, McBean, and Harris used Telegram to communicate with each other—an encrypted communications platform known to be used by criminals because of its various features that prevent law enforcement from using pen registers, wiretaps, or search warrants to obtain evidence.

- When Harris was interviewed by law enforcement on December 27, 2023, she instructed the defendant and McBean to "delete everything" and reassured her co-conspirators that "Im stickin to my scripy." During her interview with law enforcement, Harris denied any knowledge or involvement in the scheme to murder Victim-1.

- On December 28, 2023, Hartford Police Department officers discovered that the rental car used by the shooters as their getaway vehicle had been driven across state lines to a parking lot in Hartford, CT and set on fire.

- On December 29, 2023, McBean's cellmate blocked MDC officers from entering their cell while McBean smashed and destroyed his contraband cellphone, preventing its data from being extracted.

- On January 3, 2024, the defendant was interviewed by NYPD officers and tried to steer the NYPD away from viewing the defendant or Harris as suspects. The defendant denied any knowledge or involvement in the scheme to murder Victim-1, denied any knowledge of a relationship between Victim-1 and Harris, and claimed that if he had known about any relationship between Harris and Victim-1, he would have warned Harris not to hang out with Victim-1. When confronted with surveillance video depicting Harris's actions at the nightclub shortly before the shooting, the defendant acknowledged that Harris's actions looked suspicious, but he claimed that Harris was known as an innocent partygoer who did not get involved in violence.

- In March 2024, the defendant and Harris discussed how Harris should respond in public to allegations on social media that she was involved in setting up the murder—an effort to deflect attention away from public perceptions that they were involved in the murder.

- In July 2024, Julissa Bartholomew attempted to remotely wipe a cellphone that law enforcement had seized from her pursuant to a court-authorized search warrant after the device had already been brought to NYPD's Computer Crimes Unit.

- In September 2024, McBean and the defendant conspired to retain a lawyer for Harris after she was arrested to ensure that Harris would not cooperate with law enforcement. McBean also instructed the defendant to "clear internet search history"; "delete out recently deleted" in the "camera role" and "make sure nothing illegal in your phone." McBean also instructed the defendant to create a new Apple iCloud account and clear all Telegram messaging history on his cellphone.

- In April 2025, the defendant explicitly threatened an individual that had been suspected of cooperating with law enforcement in the investigation, saying: "[W]hen I come home you a dead bitch I put that on my mother."

While these efforts by the defendant, McBean, Harris, and Bartholomew may not have ultimately prevented them from being arrested and charged, there is no question that the defendants have successfully delayed and obstructed law enforcement's investigation through their destruction of evidence. To date, law enforcement has still not identified or arrested the shooters responsible for the attempted murders of Victim-1 and the murder of Clarisa Burgos, leaving these dangerous gunmen out on the streets and depriving the Burgos Family and Victim-1 from seeing the shooters brought to justice for their participation in the murder. Additionally, the Government takes extremely seriously the death threat that the defendant publicly lodged against the suspected witness on his public social media account for the world to see. In his own words, the defendant promised: "when I come home you a dead bitch". He then emphasized the seriousness of the threat: "I put that on my mother." These threatening words are even more concerning in this case, where the defendant was posting on social media using a contraband cellphone—the very same tool that Dajahn McBean used to orchestrate a murder for hire from the Brooklyn MDC less than 18 months earlier. The planning, premeditation, obstruction of justice, and attempted witness intimidation in this case are all highly aggravating factors warranting a sentence of at least 45 years' imprisonment.

A sentence of at least 45 years' imprisonment is also needed here to reflect the extraordinary pain and suffering caused by these crimes to Clarisa Burgos, her son, and her family. Clarisa Burgos was only 28 years old at the time that she was murdered. She was an innocent bystander who had nothing to do with the ongoing beef on social media between Dajahn McBean and Victim-1. Her life was snuffed out in a single instant because the defendant and his co-conspirators decided to participate in this heinous murder plot on behalf of a gang member who was behind bars. Like every human being, Clarisa Burgos had every right to a long life filled with all the joys, sorrows, adventures, and challenges of growing older. She had every right to spend time with people she loved, to have a successful career as a real estate agent, to watch her son grow up, to get married, to have more children if she wanted, and to meet her grandchildren one day.

As Clarisa Burgos's family has pointed out in their statements to the Court, there is a fundamental injustice in the reality that while the defendant will get to live out the rest of his days, including a potential date when he will be eventually released from prison and return to his family and friends, Clarisa Burgos will never come home.  It is fundamentally unfair that the defendant will talk at sentencing about his future and his plans for the rest of his life, while Clarisa Burgos will have no opportunity to speak because she is dead.  As a result, the Government urges the Court to impose a sentence that reflects the horrible and tragic loss of life caused by the defendant's actions.  In the Government's view, a sentence at or near the 23-year sentence being requested by the defendant would fail to reflect the seriousness of the crimes and the value of Clarisa Burgos's basic human dignity.

The extraordinary and irreparable harm caused by this murder also extends to Clarisa Burgos's family and friends, including her son—who was only four years old at the time of the murder.  Burgos's son has been left with only fleeting memories of his mother, and to this day still does not fully understand why his mother is not coming back.  For the rest of his life, Burgos's son will grow up without the love and care of his mother, and every birthday, graduation, and life milestone will be a painful reminder of his mother who was brutally murdered.  It is well known that losing a parent at a young age can cause deep and complex psychosocial and emotional harms that may not be diagnosed until much later in life, including PTSD, loss of stability, long-term behavioral issues, and feelings of stigma and isolation.  Burgos's tight-knit family has also been forever broken and torn apart.[3]  As one of Burgos's family members wrote in their statement, "The pain [of Burgos's death] runs deep—deeper than any sentence can measure."  They miss Burgos's hugs, her laugh, and her infectious smile at holidays and birthdays.  Understandably, Burgos's family believes that those responsible for taking Clarisa Burgos's life should now forfeit their own.  It is easy to overlook that this murder plot also involved very serious injuries to Victim-1, who was shot over 10 times and would have certainly died if not for emergency lifesaving medical treatment.  In other words, this case was a heartbeat away from being a double-homicide, and Victim-1 will live out the rest of his life with the scars and trauma of nearly being shot to death.

The Sentencing Commission has categorically stated in its Application Notes to the sentencing guidelines for first-degree murder: "In the case of premeditated killing, life imprisonment *is* the appropriate sentence if a sentence of death is not imposed."  *See* U.S.S.G. § 2A1.1, Application Note 2, (emphasis added).  It is one of the few places in the Sentencing Guidelines where the Sentencing Commission speaks so categorically about the appropriate sentence to be imposed for a particular type of crime, regardless of other specific characteristics of the offense or a defendant's criminal history category.  It is not difficult to understand why: the Sentencing Commission decided that the most serious punishment (short of capital punishment) should be the presumptive punishment for the most serious crime: intentionally murdering another human being.  While the Government is not requesting a life sentence here given that the defendant did not serve as one of the shooters who killed Clarisa Burgos, and he pleaded guilty and accepted

---

[3] The Government understands that several of Burgos's relatives may request to address the Court at the defendant's sentencing. The Government has also attached several written victim impact statements, including an additional victim impact statement that has been received since Harris's sentencing. The Government further respectfully requests that the Court enter the attached restitution order to compensate the Burgos family for their out-of-pocket funeral and burial costs.

responsibility instead of proceeding to trial, the Government respectfully submits that a sentence of 45 years' imprisonment is necessary to reflect the seriousness of this offense and to capture all of the aggravating factors described above. This was not an ordinary crime or even an ordinary murder by any measurement. It was one of the most serious crimes imaginable, and the harms caused by the defendant are deep, profound, and permanently life-altering for Clarisa Burgos, her family, and her friends. The Government respectfully submits that anything less than a sentence of 45 years' imprisonment would fail to adequately account for the seriousness of the defendant's crimes and deprive Clarisa Burgos, her family, and Victim-1 of the justice they deserve for the harm that has been inflicted upon them.

*Second*, the nature and circumstances of the defendant's participation in this murder plot also weighs heavily in favor of a sentence of at least 45 years' imprisonment. The Government concedes that the defendant is less culpable than Dajahn McBean, who orchestrated the entire plot to murder Victim-1 from the Brooklyn MDC while using a contraband cellphone. As the Court is aware, the Government has filed its notice of intent to seek the death penalty against McBean. Similarly, the Government recognizes that the defendant was not one of the shooters and did not personally shoot and kill Clarisa Burgos. As a result, the Government is not requesting a life sentence here, despite that being the Guidelines sentence. Nonetheless, the defendant played a critical role in this scheme by agreeing to work with Chelsey Harris to gain access to Victim-1, lure Victim-1 to various locations to be killed, and then provide information about Victim-1's location to the shooters. It is also clear that the defendant understood early on that the scheme would involve violence, and he wholeheartedly agreed to nonetheless assist McBean in the murder plot. On December 21, 2023, the defendant sent messages to another individual via Instagram: "I'm only wit chin [referring to Harris]" | "Yeah we on a lil mission for my cousin". On December 22, 2023, the defendant then posted a photograph of himself sitting in his car with a black semi-automatic pistol sitting on the center console. Given the context of the prior messages, it is clear that the defendant places his hand on his head while looking disappointed because of his failure to complete the "mission" to locate Victim-1 on that particular date. At no point is the Government aware of Chelsey Harris possessing a firearm during the course of the conspiracy. Additionally, the Government does not have a complete record of all the communications that would have been exchanged in private between the defendant and McBean, or between the defendant and other members of the conspiracy, as a result of their successful efforts to delete evidence from their phones. Nonetheless, even the messages that the Government obtained from Harris's cellphone show an active role being played by the defendant. It was the defendant who came up with the idea for the second shooting to take place at Xscape after McBean said to the defendant and Harris: "Find one in queens." Similarly, on December 26, 2023, it was the defendant who instructed Harris: "You need to send him a freaky pic or sum"—and then Harris sent Victim-1 a sexually explicit photograph of herself. When McBean asked for more information about the vehicle that Victim-1 is driving, the defendant also offered to assist, saying "I can walk out with my mask on" (which McBean responds would be a bad idea). Following the murder, the defendant also lied to law enforcement about his role and Harris's role in the murder and was part of communications with McBean about destroying evidence on their cellphones and paying the retainer for a lawyer for Harris to ensure she did not cooperate with law enforcement. These messages all show that McBean treated the defendant as one of his closest confidantes and co-conspirators in the murder plot and post-murder coverup of the crime. Additionally, it was the defendant who then posted a message on his Instagram account in April 2025 threatening to kill an individual who he believed

had cooperated with law enforcement against him, saying: "[W]hen I come home you a dead bitch I put that on my mother." All of this conduct shows that the defendant did not play a minor, minimal, or unwitting role in this murder plot. Rather, he was a full participant in the crimes and should be sentenced accordingly.

In his sentencing submission, the defendant argues that he either played a less than or equally culpable role to Chelsey Harris and thus deserves essentially the same sentence. As a result, the defendant suggests that he should receive a sentence that is roughly equivalent, or even less, than the 23-year term of imprisonment that the Court imposed for co-defendant Chelsey Harris. (Def. Submission at 3-6). But the Government views the defendant's actions in this case are far more culpable overall, and the Government respectfully submits that any sentence that is not at least 10 years longer than Harris's sentence would fail to reflect the relative culpability between Harris and the defendant. Below are just some of the ways that the defendant's criminal conduct was more serious and aggravating than Harris's conduct:

- Unlike Harris, the defendant was armed with a gun and took a photograph of himself with the firearm after telling others that he was "on a mission" for McBean. The evidence from the defendant's social media account also shows that his possession of a firearm in December 2023 was not an aberration, as he posted other photographs of himself in possession of firearms.

- Unlike Harris, the defendant also tried to recruit another individual to participate in the murder plot. On December 26, 2023, the defendant sent a series of text messages to another individual saved in the contacts of his cellphone as "Silver" asking for this individual to assist with the "mission" that was happening at "Xscape" that evening and offered to pay for the individual's Uber to the lounge.

- Harris and Smith both lied to law enforcement about their involvement in the murder plot, and both of them attempted to delete evidence from their cellphones. However, Smith was also part of conversations with McBean where they discussed paying the retainer for Harris's defense lawyer to prevent Harris from cooperating with law enforcement, and they discussed Bartholomew's receipt of a grand jury subpoena. Months after the murder, Harris and Smith were still scheming together about how to avoid getting caught.

- While Harris pleaded guilty long before trial and accepted the Government's first plea offer, the defendant did not plead guilty until just 10 days in advance of trial, after the final pretrial conference and after it became clear the defendant had no chance of prevailing at trial. In the months leading up to his trial, the defendant also sent messages to others from his contraband cellphone suggesting that he was innocent. For example, on April 28, 2025, in response to a message from an individual stating, "U did NOTHIGN [sp] wrong bro," the defendant responded: "Yea I know they just got me in that dumbass chat."

- Smith possessed a contraband cellphone at the MDC, which he used to issue a death threat to a specific individual that he believed had cooperated with law enforcement. The death threat is extremely concerning, especially given that this case involved a murder that was orchestrated using a contraband cellphone at the MDC, and there is evidence that the

defendant has previously had access to firearms.  The Government is aware of no crimes that Chelsey Harris committed while in pretrial detention, and the Government is not aware of any disciplinary violations that Harris received.  As a result, the Government has far greater concerns about the defendant's future dangerousness and likelihood of committing additional crimes in the future.

For all these reasons, to the extent that the Court feels compelled to use Harris's sentence as an anchoring point,[4] the Government believes that Smith's sentence should be at least 10 years longer to reflect the relative culpability between Smith and Harris.  The Court should reject the defendant's argument that he deserves a sentence that is identical or less than the sentence of 23 years' imprisonment received by Harris.

In his sentencing submission, the defendant also attempts to connect physical abuse he experienced as a child with his participation in the murder, suggesting that his childhood "warped his sense of what is 'normal' danger, trained him to read and appease powerful, volatile men, and left him hungry for belonging and approval outside the family." (Def. Submission at 10-11).  But upon closer scrutiny, it is difficult to see the mitigating force of these arguments, and the Government respectfully submits that the defendant's background should be given little weight here.  To begin with, as the defendant acknowledges, he is not like other defendants who grew up surrounded by street violence and who began committing crimes with other delinquents from an early age, dramatically increasing the chances that they would eventually join a neighborhood crew or street gang.  Quite the opposite, the defendant has no juvenile or adult criminal history and worked as a counselor at various group homes where he served court-involved youth between 2017 and 2022.  As a result, the defendant had an up-close view of the criminal justice system through his employment as a young adult, and there is no reason to think that he would have thought that it was lawful or wise for him to assist Dajahn McBean in carrying out a murder-for-hire while he was in custody at a federal detention facility.  Additionally, while the defendant's submission speculates that he participated in this scheme because of a desire to gain approval from McBean (stemming from his childhood desire to appease his abusive father), the defendant himself denied that he was motivated by a desire to impress McBean during his forensic psychiatric evaluation. *See* Def. Submission at 83 ("While Mr. Smith denied the desire to impress Mr. McBean, Mr. Smith's yearning for appreciation and love by others, coupled with his substance use throughout the days of late December 2023, affected his ability to exercise appropriate decision-making and judgment during the instant offense.").  To the extent that the defendant's childhood background provides some explanatory force for why he decided to participate in this murder plot, the defendant also provides no assurances to the Court regarding why those same factors will not cloud his judgment and cause him to engage in more criminal activity in the future.  Indeed, even while the defendant has been in pretrial custody facing murder charges and the possibility of spending the rest of his life in prison, the defendant was regularly committing new crimes by possessing and using a contraband cellphone, including to post death threats to suspected witnesses.  If anything,

---

[4] As the Court is undoubtedly aware, a sentencing court is not required under 18 U.S.C. § 3553(a) to consider possible disparities between co-defendants, only nationwide disparities.  *See United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (explaining that Second Circuit has "repeatedly made clear that section 3553(a)(6) requires a district court to consider nationwide sentence disparities but does not require a district court to consider disparities between co-defendants").

the defendant has demonstrated by his own actions and words between December 2023 and the present that he has little to no respect for the law, and the only "warped" sense of danger that the defendant possesses is his own brazenness in believing that he can outsmart law enforcement and avoid being held accountable for his crimes. The Government respectfully submits that these characteristics are aggravating, not mitigating, and that a sentence of 45 years' imprisonment here is necessary to deter the defendant from committing additional crimes while he is in BOP custody and after he is released from prison.

Finally, the Government underscores that the interests of general deterrence and promoting respect for the law demand a very significant sentence here. The crimes here were public, violent, and widely known throughout McBean and Victim-1's communities, and they caught fire on social media because they involved McBean, a relatively infamous rapper with a lengthy criminal record who was awaiting sentencing for ordering a shooting in connection with his membership in the RealRyte Crew. To this day, multiple social media users regularly post content commenting on the proceedings in this case. Just as one example, the following is just one post on social media relating to co-defendant Chelsey Harris's sentencing, which alone garnered over 300 comments and over 1,700 social media "likes":



Because of the public nature of the crimes here—a publicity that they invited by associating with McBean and participating in assassination attempts in the open street—the community knows what the defendant and his co-conspirators did, and it knows how much the Burgos family has suffered as a result. That widespread publicity triggers a need for the Court to impose a sentence that is a sufficient public condemnation of this conduct and that sends a clear message to those watching about the punishment that will befall anyone who helps a federal detainee commit crimes of violence, including shootings and murders. A significant sentence here is also necessary to send a message to federal prisoners that any crimes of violence committed while in BOP custody will not be met with leniency. The Government respectfully submits that any sentence less than 45 years' imprisonment would be insufficient to satisfy the need for this sentence to deter others like

Smith who may be tempted to participate in murder-for-hire schemes and crimes of violence on behalf of dangerous federal prisoners like Dajahn McBean.

### E.   Conclusion

The Government respectfully requests that the Court impose a sentence of at least 45 years' imprisonment.

Respectfully Submitted,

JAY CLAYTON
United States Attorney

by:   ___/s/_____
Ryan W. Allison
Andrew K. Chan
Dominic Gentile
Assistant United States Attorneys
(212) 637-2474